14.7.1  This Agreement is binding upon and is for the benefit of the Parties hereto and their respective successors and permitted assigns.  LBRM and, so long as the Tolling Agreement is in effect, BP, are each an intended beneficiary of this Agreement during the term of the Tolling Agreement. This Agreement is not made for the benefit of any party not a Party hereto other than LBRM and, so long as the Tolling Agreement is in effect, BP, and no party other than the Parties hereto, LBRM and, so long as the Tolling Agreement is in effect, BP and their respective successors and permitted assigns will acquire or have any benefit, right, remedy, or claim under or by virtue of this Agreement.

14.7.2  The Secondary Party may not assign or transfer this Agreement or any of the Secondary Party's rights or obligations hereunder without the prior written consent of the Primary Party, such consent not to be unreasonably withheld, conditioned, or delayed; provided, however, that notwithstanding the foregoing, the Secondary Party may, without the consent of the other Party, assign or transfer this Agreement and its rights and obligations hereunder to: (a) any Person succeeding to all or substantially all of the Secondary Party's interest in its Facility; or (b) either Party providing financing for the Secondary Party or its Affiliates.

14.7.3  The Primary Party may not assign or transfer this Agreement or any of Primary Party's rights or obligations hereunder without the prior written consent of each of the other Parties, such consent not to be unreasonably withheld, conditioned, or delayed; provided, however, that notwithstanding the foregoing, the Primary Party may, without the consent of the other Party, assign or transfer this Agreement and its rights and obligations hereunder to: (a) any Person succeeding to all or substantially all of such Primary Party's interest in the Primary Party's Facility and the Shared Services Systems; or (b) any Financing Party providing financing for such Primary Party or its Affiliates.

14.7.4  If either Party assigns this Agreement to a Financing Party in accordance with Section 14.8.2 or Section 14.8.3, then: (a) the other Party shall negotiate and execute a customary consent to collateral assignment for the benefit of such Financing Party that provides such Financing Party with customary lender protections, including extended cure periods, rights relating to foreclosure, and the ability to secure a replacement agreement if this Agreement is rejected in bankruptcy; and (b) if the Primary Party is the Party assigning its rights under this Agreement to a Financing Party, then such Primary Party shall use commercially reasonable efforts to cause such assignment to be subject to a non-disturbance or similar agreement pursuant to which such Primary Party's Financing Party agrees that, in the event of the exercise or enforcement of the Financing Party's liens on the Shared Services Systems or Shared Services Systems Site, this Agreement and the Secondary Party's rights hereunder will not be terminated or otherwise impaired, all on such terms and conditions as could not reasonably be expected to materially impair the Secondary Party's operation, maintenance, and repair of its Facility or the generation or distribution of electricity therefrom or materially increase the expenses to be paid by the Secondary Party in the operation, maintenance, and repair of its Facility.

39

Confidential

**14.8**     <u>Governing Law; Dispute Resolution</u>.

14.8.1   <u>Agreement to Arbitrate</u>.  If a dispute arises between the Parties regarding the terms, covenants, conditions, application, interpretation, enforceability, validity, performance, or breach of this Agreement or any matter arising out of, connected with, or relating to this Agreement, whether sounding in contract, tort, unfair competition, law, equity, or any other legal form (a "***Dispute***"), then such Dispute shall be resolved solely by final and binding arbitration administered by the American Arbitration Association (or its successor) ("***AAA***") and governed by the AAA's Commercial Arbitration Rules then in effect.

14.8.2   <u>Demand for Arbitration; Arbitrators</u>.  Either Party or LBRM may submit a Dispute to final and binding arbitration by filing a notice of demand for arbitration.  Any notice of demand for arbitration shall be in writing and shall be delivered to the other Party and the AAA. The Dispute shall be heard by three (3) neutral arbitrators, who shall each be selected as follows: (a) The Primary Party shall nominate an arbitrator within fifteen (15) Business Days of its receipt of the demand for arbitration (unless Such Primary Party is the Party demanding arbitration, in which case Such Primary Party shall nominate an arbitrator in its demand for arbitration); (b) the Secondary Party shall nominate an arbitrator within fifteen (15) Business Days of the demand for arbitration; <u>provided</u> that if the Secondary Party is unable to designate an arbitrator within such fifteen (15) Business Days period, then the AAA shall appoint an arbitrator for the Secondary Party in accordance with the AAA rules then in effect; and (c) within fifteen (15) Business Days of the appointment of the two (2) arbitrators by the AAA (which period may be extended upon agreement of the Parties), the two (2) arbitrators shall jointly nominate the third arbitrator, who shall serve as the chair of the arbitration.  If the two arbitrators cannot agree on the appointment of the chair within the designated period, then the AAA shall appoint the chair in accordance with the AAA rules then in effect.

14.8.3   <u>Seat and Location of Arbitration; Language</u>.  The Parties agree that the seat of any arbitration shall be New York.  All proceedings before the arbitrators shall be in New York, New York, or such other place as the Parties and arbitrators may agree, and shall be conducted in the English language.

14.8.4   <u>Arbitrators' Powers</u>.  The tribunal shall not have the right to award lost profits, consequential, incidental, indirect, special, treble, multiple, or punitive damages; <u>provided</u> that no amounts payable pursuant to this Agreement (including liquidated damages) shall be deemed to constitute irrecoverable lost profits, consequential, incidental, indirect, special, treble, multiple, or punitive damages. The tribunal shall have full power and discretion as to matters of arbitration procedure, including but not limited to the power to order interim relief or any other procedural remedy that would have been available to the Parties had the matter been heard in court.

14.8.5   <u>Arbitration Award</u>.  The arbitration award shall be issued in writing in the English language and shall state the reasons upon which it is based.  The award issued by the tribunal shall be final and binding on the Parties and not subject to any judicial

review or challenge whatsoever, to the maximum extent permitted by law.  The award shall be paid within thirty (30) days after the date it is issued and shall be paid in United States dollars in immediately available funds, free and clear of any liens, taxes, or other deductions.  A judgment recognizing or enforcing such award may be rendered by any court of competent jurisdiction.

14.8.6   <u>Fees and Costs</u>.  The arbitrators shall be empowered to award the prevailing Party its reasonable arbitration costs, including reasonable attorneys' fees and expert fees, and the costs associated with the arbitration.  Each Party shall bear its own fees and costs until the arbitrators determine which, if any, Party is the prevailing Party and the amount that is due to such prevailing Party.

14.8.7   <u>Confidentiality</u>.  The arbitration shall be confidential; <u>provided</u> that such matters may be disclosed without the prior consent of the other Parties to lenders, investors, affiliates, auditors, or tax or other Governmental Authorities, or as may be required by law.

14.8.8   <u>Injunctive Relief</u>.

(a)   Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement is intended to, nor shall it, prevent the Parties from seeking injunctive relief in aid of arbitration.  Such injunctive relief may be sought from any court of competent jurisdiction or the arbitrators, irrespective of whether arbitration has been initiated pursuant to this Section.

(b)   If either Party initiates or attempts to initiate judicial proceedings to resolve a Dispute that is within the scope of this Section or to prevent or frustrate arbitration that has been or will be initiated pursuant to this Section, then the other Party will be entitled to appropriate relief in court or from AAA to enjoin, stay, suspend, or otherwise prevent such judicial proceedings, whether or not arbitration has been or will be initiated in connection with the matter that is subject to arbitration pursuant to this Section.  The Parties agree that the Party which initiates or attempts to initiate such judicial proceedings hereby waives and is barred from raising in court or any other forum any argument, objection, or claim against such relief.  The Parties further agree that the Party seeking the injunction, stay, suspension, or similar relief will not be required to provide any undertaking or security in order to obtain such relief.

(c)   No Party may initiate an action seeking to annul an arbitration award in a court that is not within the seat of the arbitration.  If either Party initiates or attempts to initiate an action seeking to annual an arbitration award in a court that is not within the seat of the arbitration, the other Party shall be entitled to appropriate relief in that court, a court within the seat of the arbitration, and any other forum, to enjoin, stay, suspend, or otherwise prevent the annulment action that is prohibited by this Section.  The Parties agree that the Party which initiates or attempts to initiate an annulment

41

Confidential

action in a court that is not within the seat of the arbitration hereby waives and is barred from raising any argument, objection, or claim against such relief. Furthermore, the Parties agree that the Party seeking the injunction, stay, suspension, or similar relief will not be required to provide any undertaking or security in order to obtain such relief.

14.8.9 <u>Arbitrability</u>. The terms of this Agreement requiring arbitration are self-executing. It is unnecessary for either Party to petition a court to compel arbitration in order to initiate arbitration. Each Party hereby irrevocably submits itself to the jurisdiction of the arbitration tribunal specified in this Section. The Parties agree that any issues regarding the jurisdiction of the arbitrators, the agreement to arbitrate, and the arbitrability of any claims or disputes arising under, relating to, or in connection with this Agreement are issues solely for the arbitrators, not a court, to decide. Each of the Parties expressly waives any right it may have to seek in court, including in enforcement proceedings, a determination on the jurisdiction of the arbitrators, the agreement to arbitrate, or the arbitrability of any claims or disputes.

14.8.10 **WAIVER OF RIGHT TO A TRIAL BY JURY OR OTHERWISE. THE PARTIES HEREBY EXPRESSLY WAIVE ALL RIGHTS TO TRIAL BY JURY OR OTHERWISE ON ANY CLAIM, CAUSE OF ACTION, SUIT OR PROCEEDING DIRECTLY OR INDIRECTLY INVOLVING OR RELATED TO THE TERMS, COVENANTS, CONDITIONS, APPLICATION, INTERPRETATION, ENFORCEABILITY, VALIDITY, PERFORMANCE, OR BREACH OF THIS AGREEMENT OR ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH OR RELATED TO THIS AGREEMENT. THE PROVISIONS OF THIS AGREEMENT RELATING TO WAIVER OF TRIAL BY JURY SHALL SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT.**

14.8.11 <u>Governing Law</u>. This Agreement, and any disputes relating to, arising out of, or connected with this Agreement, shall in all respects be governed by and construed in accordance with the laws of the State of New York, without giving effect to: (a) any laws thereof that might vest jurisdiction in a court to determine the timeliness of making a demand for arbitration or of noticing an intention to arbitrate, including but not limited to New York C.P.L.R. § 7502(b); or (b) any choice of law rules thereof which might direct the application of the laws of another jurisdiction.

14.8.12 <u>Service of Process</u>. In any arbitration or any other proceeding concerning a Dispute, including a judicial proceeding in aid of arbitration or to recognize and enforce an arbitration award, each of the Parties irrevocably consents to receive process solely in accordance with <u>Article 13</u>. For the avoidance of doubt, each Party irrevocably waives any right it may have to receive process in accordance with The Hague Convention or any other treaty, law, or rule of any jurisdiction relating to process.

42

14.9     **Amendment**.  This Agreement may be modified, amended, or supplemented only by a written agreement executed by each Party and LBRM. Without limiting the foregoing, the Parties  may amend Exhibits B, D and E of this Agreement within ninety (90) days following the date hereof in order to meet and reflect the reasonable operational requirements of each of the Parties, in each case, subject to the applicable Party's respective obligations under the Operating Agreement and the Financing Documents to which it is a party.

14.10    **Survival**.  All rights and obligations that by their nature are to be performed after any termination of this Agreement shall survive any such termination.

14.11    **Waiver; Remedies**.  No delay on the part of either Party in exercising any right, power, or privilege hereunder will operate as a waiver thereof, nor will any waiver on the part of either Party of any right, power, or privilege hereunder operate as a waiver of any other right, power, or privilege hereunder, nor will any single or partial exercise of any right, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power, or privilege hereunder.

14.12    **Confidentiality**. Each Party recognizes that, in connection with this Agreement, it may become privy to nonpublic information regarding the financial condition, operations, and prospects of the other Party.  Each Party agrees to keep all nonpublic information regarding, or received by, the other Party strictly confidential (including, without limitation, any such nonpublic information received by such Party from its Affiliates or BP), and to use all such information solely in order to effectuate or monitor the purpose of this Agreement; <u>provided</u> that each Party may provide confidential information:

    (a)     to its employees, agents, attorneys, accountants, consultants and Affiliates who have a need to know such information in order to negotiate, effectuate, evaluate or monitor this Agreement;

    (b)     to its external auditors and to any Governmental Authority having jurisdiction over such Party;

    (c)     to any Financing Party (or potential Financing Party) or representative of such Financing Party (or potential Financing Party), so long as such Financing Party (or potential Financing Party or representative) has agreed to keep such information confidential; and

    (d)     to any transferee of, or prospective transferee of, any of its rights or obligations under this Agreement, so long as such Person is subject to an agreement containing provisions substantially the same as those of this Section 14.12;

             <u>provided</u>, <u>further</u>, that confidential information does not include information:

        (i)     once it becomes publicly available without breach of this Agreement;

        (ii)     that is rightfully obtained by a Party from another source without a duty of confidentiality; or

(iii)    that is independently developed or ascertained by a Party.

In the event that any of the Parties to this Agreement or any of the employees, agents or Affiliates of such Parties are requested pursuant to, or required by, Applicable Law, regulation or legal process to disclose any of the nonpublic information, such Party will, to the extent permitted by law, promptly notify any affected Party prior to any such disclosure so that such Party may seek a protective order or other appropriate remedy or, in such Party's sole discretion, waive compliance with the terms of this Section 14.12.  In the event that no such protective order or other remedy is obtained, or that such Party waives compliance with the terms of this Section 14.12, the Party required to disclose such nonpublic information or its employees, agents or Affiliates will furnish only that portion of the nonpublic information that it is advised by counsel is legally required and will exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the nonpublic information.

**14.13**   **Facsimile; Counterparts**.   Either Party may deliver executed signature pages to this Agreement by facsimile or electronic transmission to the other Parties, which facsimile or electronic copy shall be deemed to be an original executed signature page. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute a single instrument.

*[Signature pages follow]*

US-DOCS\101520926.60

IN WITNESS WHEREOF, each Party hereto has executed this Agreement as of the date first written above.

**LIMETREE BAY TERMINALS, LLC**,
a U.S. Virgin Islands limited liability company,

By: _____

Name: Darius Sweet

Title:  Chief Executive Officer

**LIMETREE BAY REFINING, LLC**,
a U.S. Virgin Islands limited liability company,

By: _____

Name: Brian Lever

Title:  President

ACKNOWLEDGED BY:

**LIMETREE BAY REFINERY
MARKETING, LLC,**
a U.S. Virgin Islands limited liability
company,

By: _____
Name: Brian Lever
Title:  President

*[Signature Page to Shared Services Systems Agreement (Limetree)]*

Confidential

IN WITNESS WHEREOF, each Party hereto has executed this Agreement as of the date first written above.

**LIMETREE BAY TERMINALS, LLC**,
a U.S. Virgin Islands limited liability company,

By: _____

Name:  Darius Sweet

Title:   Chief Executive Officer

**LIMETREE BAY REFINING, LLC**,
a U.S. Virgin Islands limited liability company,

By: _____

Name:  Brian Lever

Title:   President

ACKNOWLEDGED BY:

**LIMETREE BAY REFINERY MARKETING, LLC,**
a U.S. Virgin Islands limited liability company,

By: _____

Name:  Brian Lever

Title:   President

*[Signature Page to Shared Services Systems Agreement (Limetree)]*

# EXHIBIT A

## SHARED PREMISES

**Shared Premises (owned, leased or submerged land permit rights held by LBT)**

1. Terminal Plot No. 4 over portions of Estates Blessing, Hope, Jerusalem, and Figtree Hill, consisting of 386.444 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

2. Terminal Plot No. 5 over portions of Estates Figtree Hill and Castle Coakley Land, consisting of 33.773 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

3. Terminal Plot No. 9, Estate Limetree Bay, Reclaimed Land, consisting of 197.4471 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

4. Plot No. 29, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 1.840 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

5. Plot No. 45, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 1.790 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

6. Plot No. 52, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 4.070 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

7. Plot No. 53, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 22.137 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

8. Plot No. 53-C, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 0.734 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

9. Plot No. 5, Estate Caldwall, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 46.111 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

10. Plot No. 3-A, Estate Cottage, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 12.837 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 7, 1991

11. Plot No. 4 Estate Cottage, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 70.000 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 7, 1991

12. Remainder Plot No. 4-B, Estate Blessing, King Quarter, St. Croix, U.S. Virgin Islands, consisting of 35.82 U.S. acres, more or less, as more fully shown on OLG Drawing No. A9-131-C018, dated June 26, 2018.

13. Plot No. 2-A, Estate Hope, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting 4.475 U.S. acres, more or less, as more fully shown on OLG Drawing No. A9-113-C016, dated May 12, 2016

14. Plot No. 6-D Estate Hope, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 26.332 U.S. acres, more or less, as more fully shown on OLG Drawing No. A9-113-C016, dated May 12, 2016

A-1

Confidential

15. Plot No. 13-A, Estate Limetree Bay, Reclaimed Land, consisting of 2.617 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. D9-6551-C017, dated April 26, 2017.

16. Plot No. 8, Estate Limetree Bay, Reclaimed Land (LPG Flare), consisting of 0.030 U.S. acre, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

**Shared Premises (owned, leased or submerged land permit rights held by LBR)**

1. **A portion of Refinery Plot No. 1** (see explanation below) over portions of **Estates Blessing and Hope**, consisting of 175.1634 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

2. **A portion of Refinery Plot No. 2** (see explanation below) over portions of **Estates Blessing, Hope, and Jerusalem**, consisting of 36.686 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

3. **A portion of Refinery Plot No. 3** (see explanation below)  over portions of **Estates Jerusalem, Figtree Hill, and Castle Coakley Land**, consisting of 187.8263 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

   LBR will acquire those portions of Refinery Plots 1, 2 and 3 shown in "blue" on the attached color coded map, less and except those portions of each plot shown in "white" on the attached color coded map as excluded areas ("Excluded Areas") pursuant to the title remediation process contemplated by LBT and LBR. These Excluded Areas include the areas labeled SCPC and Excluded Refinery Process Areas (excluded from Refinery Plot 1), West Sulfur Recovery, Surface Impoundment No. 1, and Surface Impoundment No. 2 (excluded from Refinery Plot 2), and Surface Impoundment No. 3 (excluded from Refinery Plot 3).

4. Plot No. 214, Estate Ruby, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 0.1914 U.S. acre, more or less, as more fully shown on OLG Drawing No. 4413 dated June 5, 1987.

5. Refinery Plot No. 6, Estate Limetree Bay, Reclaimed Land, consisting of 26.7027 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016; excluding Surface Impoundment 3 as defined in the Refinery Operating Agreement.

6. Refinery Plot No. 7, Estate Limetree Bay, Reclaimed Land, consisting of 19.857 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

A-2

7. Plot No. 12, Estate Limetree Bay, Reclaimed Land (Flare), consisting of 5.8240 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

**Shared Premises Agreements**

1. Submerged Lands (as defined in the Terminal Operating Agreement)

    a. Submerged Land Lease (as defined in the Terminal Operating Agreement).

    b. Submerged Land Permits (as defined in the Terminal Operating Agreement)

    c. 1998 Letter Agreement (as defined in the Terminal Operating Agreement)

2. Existing Easement Agreements dated effective January 4, 2016

    a. Cross Easement Agreement made effective this 4th day of January, 2016, by and between Limetree Bay Terminals, LLC, a limited liability company organized under the laws of the U.S. Virgin Islands, whose address is c/o Nichols Newman Logan Grey & Lockwood, 1131 King Street, Christiansted, VI 00820, and HOVENSA L.L.C., a limited liability company organized under the laws of the U.S. Virgin Islands whose address is 1 Estate Hope, Christiansted, St. Croix 00820 and recorded on February 6, 2018 in PC 1490, Page 420, Documents No. 2018000482 in the Office of the Recorder of Deeds, Christiansted, St. Croix, U.S. Virgin Islands.

    b. Easement Agreement made effective this 4th day of January, 2016, by and between Limetree Bay Terminals, LLC, a limited liability company organized under the laws of the U.S. Virgin Islands, whose address is c/o Nichols Newman Logan Grey & Lockwood, 1131 King Street, Christiansted, VI 00820, and HOVENSA L.L.C., a limited liability company organized under the laws of the U.S. Virgin Islands whose address is 1 Estate Hope, Christiansted, St. Croix 00820 and recorded on February 6, 2018 in PC 1490, Page 433, Document No. 2018000484 in the Office of the Recorder of Deeds, Christiansted, St. Croix, U.S. Virgin Islands. [1]

    c. Easement Agreement made effective this 4th day of January, 2016, by and between HOVENSA L.L.C., a limited liability company organized under the laws of the U.S. Virgin Islands whose address is 1 Estate Hope, Christiansted, St. Croix 00820 as the grantor and Limetree Bay Terminals, LLC, a limited liability company organized under the laws of the U.S. Virgin Islands, whose address is c/o Nichols Newman Logan Grey & Lockwood, 1131 King Street, Christiansted,

---

[1] Reciprocal easement for remediation.

A-3

Confidential

VI 00820, as the grantee, and recorded on February 6, 2018 in PC 1490, Page 452, Document No. 2018000483 in the Office of the Recorder of Deeds, Christiansted, St. Croix, U.S. Virgin Islands.[2]

d. Easement Agreement between HOVENSA, L.L.C. and Limetree Bay Terminals, LLC dated January 04, 2016, recorded January 04, 2016 in Photocopy 1422, Page 184, Document No. 2016000009[3]

3. Grant of Easement from Hess Oil Virgin Islands Corporation in favor of Ansetta E. De Chabert, a perpetual 50' right-of-way and turnabout basin from lands of de Chabert at Jerusalem and Figtree Hill and across Pcl. 6 Jerusalem for access to the channel and turnabout basin to be constructed at Limetree Bay, with an additional guarantee of 1000 linear feet of berthing area along the easterly side of the proposed turnabout basin and conditions of use, dated November 19, 1965 and recorded November 23, 1965 at Photocopy 44-M, Page 295, Document No. 3779.

---

[2] From Hovensa to LBT for access.

[3] Over Government Parcels for access to monitoring stations

A-4

Confidential



**EXHIBIT B**

**DESCRIPTION OF SHARED SERVICES SYSTEMS, SHARED SERVICES, SHARED AUTHORIZATIONS, AND SHARED EXPENSES**

1. **SHARED SERVICES SYSTEMS**

| | SHARED SERVICES SYSTEMS | LOCATION OF SHARED SERVICES SYSTEMS | PRIMARY PARTY | SECONDARY PARTY |
|---|---|---|---|---|
| 1. | Power Plant Turbines # 4, 7, 8, 9, 10, 13 | Refinery Plot 3 | LBR | LBT |
| 2. | Wastewater treatment facility | Refinery Plot 3 & 6 | LBR | LBT |
| 3. | Coke domes, handling and loading | Refinery Plot 7 & 8 | LBR | LBT |
| 4. | Sulfur loading | Refinery Plot 3 & Terminal Plot 9 | LBR | LBT |
| 5. | Cottages | Remainder Plot 4-B (Estate Blessing), Refinery Plot 3 (Estate Figtree), Plot 4, 3-A, 5, (Estate Cottage, Estate Coldwall) | LBT | LBR |
| 6. | Warehouses | Refinery Plot 1, Terminal Plot 9 | LBR | LBT |
| 7. | Main Administration Building | Terminal Plot 4 | LBT | LBR |
| 8. | Limetree Village | Estate Castle Coakley, Plot 53 | LBR | LBT |
| 9. | Laboratory | Terminal Plot 4 | LBR | LBT |
| 10. | Enterprise Resource Planning | N/A | LBR | LBT |
| 11. | Vehicle Garage | Refinery Plot 1 | LBR | LBT |
| 12. | Emergency Response Equipment | Refinery Plot 1 | LBR | LBT |
| 13. | Abandoned SCPC Tanks by Gate #2 | Refinery Plot 1 | LBR | LBT |
| 14. | Boiler #5 | Refinery Plot 1 | LBR | LBT |

B-1

Confidential

| 15. | Steam Turbine Generator | Refinery Plot 1 | LBR | LBT |
|---|---|---|---|---|
| 16. | Maintenance Shop | Refinery Plot 1 | LBR | LBT |
| 17. | Parking Lots | Refinery Plot 1 | LBR | LBT |
| 18. | All American Canal | Refinery Plot 3 & Terminal Plot 4 & 9 | LBR | LBT |
| 19. | Other Drainage Canals | Refinery Plot 3 | LBR | LBT |

## II.   SHARED AUTHORIZATIONS

| Permit | Permit Holder | Agency |
|---|---|---|
| SPM Army Corps of Engineers Permit | LBT | ACE |
| Amendment to SPM CZM Permit CZX-29-17 | LBT | DPNR |
| ATC/PTO Pump Upgrade, Gasolines Loading MVCS, and SPM STX-895-AC-PO-18 | LBT | DPNR |
| Submerged Land Permits SLP-3, SLP-23, SLP-52, SLP-167 and Container Port Lease and Contract | LBT | DPNR |
| Coker Loading Dock CZM Permit CZX-6-99W | LBT | DPNR |
| Krause Lagoon Channel CZM Permit CZX-24-93W | LBT | DPNR |
| Terminal Facility License TFL-STX-001 | LBT/LBR | DPNR |
| Hazardous Waste Generation and Storage STX C-093 | LBT/LBR | DPNR |
| Special Solid Waste Generation, Storage, Treatment and Disposal STX-270 | LBT/LBR | DPNR |
| Title V operating permit | LBT/LBR | EPA/DPNR |
| NSR permits | LBR/LBT | EPA |
| Consent Decree | LBR/LBT | DPNR/EPA |
| TPDES VI000019 | LBT/LBR | DPNR |
| Process Makeup Water Groundwater Wells Appropriation Permits 2012-530-0944 | LBR | DPNR |
| CZM Development Permit for MARPOL project | LBT/LBR | DPNR |

B-2

Confidential

| Building permits, road closing permits for Limetree Bay Village | | LBT/LBR | | USVI | |
|---|---|---|---|---|---|

B-3

Confidential

US-DOCS\101520926.60

**EXHIBIT C**
**MEMORANDUM OF SHARED SERVICES SYSTEMS AGREEMENT**

This Memorandum of Shared Services Systems Agreement (the "***Memorandum***") is made and entered into as of November 30, 2018, by and among (a) LIMETREE BAY TERMINALS, LLC, a U.S. Virgin Islands limited liability company ("***LBT***") and (b) LIMETREE BAY REFINING, LLC, a U.S. Virgin Islands limited liability company ("***LBR***").

1.      LBT owns an interest in certain real property as described in those instruments listed on Annex A hereto, as they may be amended from time to time (the "**LBT Shared Property**").

2.      LBR owns an interest in certain real property as described in those instruments listed on Annex B hereto, as they may be amended from time to time (the "**LBR Shared Property**").

3.      LBT and LBR have executed and entered into that certain Shared Services Systems Agreement, (the "**Agreement**") dated as of the date hereof, pursuant to which the parties thereto have agreed (a) to share in certain costs and expenses of development of the LBT Shared Property and LBR Shared Property and otherwise to cooperate with one another in the development of the Shared Services Systems (as defined therein), all upon the terms and conditions set forth therein and (b) to provide certain limited services to the other parties with respect to the LBT Shared Property and LBR Shared Property as specified therein.

4.      The commencement date of the Agreement is November 30, 2018.  The Agreement shall terminate on the mutual agreement of LBT and LBR or as otherwise provided in the Agreement.

5.      This Memorandum shall inure to the benefit of and be binding upon LBT and LBR, and their respective heirs, executors, administrators, successors and assigns; provided, however, that this Memorandum is not intended to, and shall not, modify, amend, limit or expand any of the terms or provisions of the Agreement or any of the rights granted to LBT and LBR under the Agreement.  The covenants, terms, conditions and restrictions of the Agreement shall be binding upon, and inure to the benefit of the Parties thereto and shall continue as a servitude running with each of the Terminal Site (as defined therein) and Refinery Site (as defined therein).   In the event of any conflict between the terms and provisions of this Memorandum and the terms and provisions of the Agreement, the terms and provisions of the Agreement shall prevail. The terms and provisions of the Agreement are incorporated herein by this reference.

[Next pages are signature pages.]

C-1

Executed on the date of acknowledgement to be effective as of the date first set forth hereinabove.

**LBT**:

**LIMETREE BAY TERMINAL, LLC,**
a U.S. Virgin Islands limited liability company,

By: _____

Name: _____

Title: _____

_____
Witness 1

_____
Witness 2

_____ )
                                 )
_____ )

The foregoing instrument was acknowledged before me this ____ day of _____ 2018 by _____ as _____ of Limetree Bay Terminals, LLC, a U.S. Virgin Islands limited liability company, on behalf of said limited liability company.

_____

NOTARY PUBLIC

C-2

Confidential

**LIMETREE BAY REFINING, LLC**,
a U.S. Virgin Islands limited liability company,

By: _____

Name: _____

Title: _____


_____
Witness 1


_____
Witness 2


_____  )
_____  )
_____  )


    The foregoing instrument was acknowledged before me this ____ day of _____ 2018 by _____ as _____ of Limetree Bay Refining, LLC, a U.S. Virgin Islands limited liability company, on behalf of said limited liability company.


_____

NOTARY PUBLIC

ANNEX A
to
Memorandum of Shared Services Systems Agreement

1. Terminal Plot No. 4 over portions of Estates Blessing, Hope, Jerusalem, and Figtree Hill, consisting of 386.444 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

2. Terminal Plot No. 5 over portions of Estates Figtree Hill and Castle Coakley Land, consisting of 33.773 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

3. Terminal Plot No. 9, Estate Limetree Bay, Reclaimed Land, consisting of 197.4471 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

4. Plot No. 29, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 1.840 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

5. Plot No. 45, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 1.790 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

6. Plot No. 52, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 4.070 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

7. Plot No. 53, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 22.137 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

8. Plot No. 53-C, Estate Castle Coakley, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 0.734 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

9. Plot No. 5, Estate Caldwall, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 46.111 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

10. Plot No. 3-A, Estate Cottage, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 12.837 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 7, 1991

11. Plot No. 4 Estate Cottage, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 70.000 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 7, 1991

12. Remainder Plot No. 4-B, Estate Blessing, King Quarter, St. Croix, U.S. Virgin Islands, consisting of 35.82 U.S. acres, more or less, as more fully shown on OLG Drawing No. A9-131-C018, dated June 26, 2018.

13. Plot No. 2-A, Estate Hope, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 4.475 U.S. acres, more or less, as more fully shown on OLG Drawing No. A9-113-C016, dated May 12, 2016

14. Plot No. 6-D Estate Hope, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 26.332 U.S. acres, more or less, as more fully shown on OLG Drawing No. A9-113-C016, dated May 12, 2016

C-4

Confidential

15. Plot No. 13-A, Estate Limetree Bay, Reclaimed Land, consisting of 2.617 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. D9-6551-C017, dated April 26, 2017.

16. Plot No. 8, Estate Limetree Bay, Reclaimed Land (LPG Flare), consisting of 0.030 U.S. acre, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

C-5

Confidential

ANNEX B
to
Memorandum of Shared Services Systems Agreement

1. **A portion of Refinery Plot No. 1** (see explanation below) over portions of **Estates Blessing and Hope**, consisting of 175.1634 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

2. **A portion of Refinery Plot No. 2** (see explanation below) over portions of **Estates Blessing, Hope, and Jerusalem**, consisting of 36.686 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

3. **A portion of Refinery Plot No. 3** (see explanation below)  over portions of **Estates Jerusalem, Figtree Hill, and Castle Coakley Land**, consisting of 187.8263 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

   LBR will acquire those portions of Refinery Plots 1, 2 and 3 shown in "blue" on the attached color coded map, less and except those portions of each plot shown in "white" on the attached color coded map as excluded areas ("Excluded Areas") pursuant to the title remediation process contemplated by LBT and LBR. These Excluded Areas include the areas labeled SCPC and Excluded Refinery Process Areas (excluded from Refinery Plot 1), West Sulfur Recovery, Surface Impoundment No. 1, and Surface Impoundment No. 2 (excluded from Refinery Plot 2), and Surface Impoundment No. 3 (excluded from Refinery Plot 3).

4. Plot No. 214, Estate Ruby, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 0.1914 U.S. acre, more or less, as more fully shown on OLG Drawing No. 4413 dated June 5, 1987.

5. Refinery Plot No. 6, Estate Limetree Bay, Reclaimed Land, consisting of 26.7027 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016; excluding Surface Impoundment 3 as defined in the Refinery Operating Agreement.

6. Refinery Plot No. 7, Estate Limetree Bay, Reclaimed Land, consisting of 19.857 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

7. Plot No. 12, Estate Limetree Bay, Reclaimed Land (Flare), consisting of 5.8240 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

C-6

Confidential



Refinery Option Parcels
Areas Shown in Blue to Be Purchased

**EXHIBIT D**
Undivided Interest Sale

|  | SHARED SERVICES SYSTEMS | LBR SHARE | LBT SHARE |
|---|---|---|---|
| 1. | Turbines # 4, 7, 8 | 70% | 30% |
| 2. | Turbines # 9, 10, 13 | 90% | 10% |
| 3. | Wastewater treatment facility | 80% | 20% |
| 4. | Electrical transmission | 80% | 20% |
| 5. | Piping | 70% | 30% |
| 6. | Coke domes, handling and loading | 100% | 0% |
| 7. | Sulfur loading | 100% | 0% |
| 8. | Cottages | 0% | 100% |
| 9. | Warehouses | 80% | 20% |
| 10. | Main Administration Building | 80% | 20% |
| 11. | Laboratory | 90% | 10% |
| 12. | Laboratory Equipment | 100% | 0% |
| 13. | Compressed air | 95% | 5% |
| 14. | Potable water | 80% | 20% |
| 15. | Steam | 95% | 5% |
| 16. | Nitrogen | 95% | 5% |
| 17. | All Other Buildings | 50% | 50% |

D-1

# EXHIBIT E

## Shared Expense Allocation Criteria

### I. Overview

Section II of this Exhibit E sets forth the intentions of the Parties with respect to certain elements of the cost allocation methodology for certain Shared Services and Shared Services Systems. The Parties hereby agree that the following principles apply to the cost allocation methodology for the Shared Services and Shared Services Systems listed on Section II of this Exhibit E:

- Unless otherwise specified, Shared Expenses shall be allocated between the Parties monthly.

- As provided in Section 4.1 and 5.8 of the Shared Services Systems Agreement and subject to the terms thereof, the Parties and, subject to Section 14.7.1 of the Shared Services Systems Agreement, BP shall have access to the monthly invoices and supporting detail.

- All fixed dollar-denominated quantities in Section II, excluding the costs for Coke and Sulphur handling, shall be escalated annually based on the Consumer Price Index (CPI) (or, in the case of Shared Expenses relating to the Cottages and/or Limetree Village, at 75% of the Consumer Price Index). The escalation shall be made as part of the annual budgeting process.

- Approach to fixed costs: Prior to the Commissioning Period (as defined in the Tolling Agreement), the Provider will allocate a reasonable share of the fixed costs to each of the Parties based on pro forma average usage of the applicable Shared Service or Shared Services System. Starting at the beginning of the Commissioning Period (as defined in the Tolling Agreement) and, absent a Major Event, continuing for the Term of this Agreement, each Party's share of fixed costs for the Shared Services and Shared Services Systems will be the Fixed Cost Allocation amounts specified in Section II of this Exhibit E, without modification. The fixed costs shall include baseload costs as well as any costs for required spare capacity or back-up systems.

- Approach to variable costs: Each Party's share of variable costs for the Shared Services and Shared Services Systems will be based on actual usage where commercially reasonable and estimated usage otherwise.

- The Provider for any Shared Service and/or Shared Services System will review the allocated fixed and variable costs six months after commissioning is complete and no less than annually thereafter and will provide details of its review to the other Party. In addition, the Provider shall allow the Recipient and, subject to Section 14.7.1 of the Shared Services Systems Agreement, BP, reasonable access to the results of the review and the books and records maintained by Provider with respect to the Shared Services and/or Shared Services Systems for which it is the Provider in accordance with Section 4.1 and 5.8 of the Shared Services Systems Agreement. If the allocated fixed and variable costs determined following such review differ from the original

E-2

allocated fixed and variable costs, the amount of the difference shall be the subject of a True-Up Invoice in accordance with Section 10.1 of the Shared Services Systems Agreement.

- Upon the occurrence of a Major Event, solely with respect to any Shared Service, Shared Services System, Shared Authorization or Shared Premises affected by any such Major Event, the Fixed Cost Allocation for the fixed Shared Expenses below shall be updated to reflect the pro forma average usage of the service leading to such expense. For the avoidance of doubt, the Fixed Cost Allocation is intended to be set such that the Shared Expense allocated to each Party for a given Shared Service and/or Shared Services System does not exceed the cost such Party would have incurred if it had provided such Shared Service and/or Shared Service System for itself alone.

- For the avoidance of doubt, LBR shall bear all costs associated with the restart cost scope of work as defined in Appendix 2 of the Tolling Agreement including the restart of portions of the power plant, electrical transmission system, etc.

## II. Defined Allocation

| SHARED SERVICES | PROVIDER | FIXED COST ALLOCATION | COST ALLOCATION METHODOLOGY |
|---|---|---|---|
| **Personnel Cost** | Both | 70% LBR: 30% LBT | • The fully loaded cost of any employee who works on the business of both Parties shall be allocated monthly between the Parties in proportion to the amount of time spent working for each. The allocation of time between the Parties may be accomplished via either time tracking or reasonable methods of estimation.<br><br>• To the extent the Parties share any senior personnel and consider it impractical to utilize a system to track the allocation, the fully loaded costs of such officers shall be shared according to the Fixed Cost Allocation. |

E-3

| | | | |
|---|---|---|---|
| **Power Cost** | LBR | 80% LBR; 20% LBT | • The Parties shall use commercially reasonable efforts to measure power usage by metering. To the extent metering (i) is not cost-effective or (ii) may be cost-effective but meters in connection therewith have not been installed at the time such service is provided, the Provider shall allocate power usage to the Recipient based on a commercially reasonable method of estimation, taking into account available data and consistently applied.<br><br>• The Provider shall charge the Recipient for power in accordance with the following calculation:<br><br>$P_C = [C_F \times H_R + VC] \times T_P + A_{FC} \times FC$<br><br>Where:<br><br>$P_C$ = Cost of power billed to the Recipient, $ per month<br><br>$C_F$ = Fuel cost, $ per MMBtu; determined pursuant to the Fuel Cost section below<br><br>$H_R$ = Heat rate, MMBtu/MWhr; initial value of 8.1; reflects fuel consumption and is net of steam production; to be trued up to reflect realized heat rate<br><br>$VC$ = Non-fuel variable cost of generating power, $/MWhr<br><br>$T_P$ = Terminal power usage of the Recipient, MWhr<br><br>$A_{FC}$ = Allocation of fixed cost to the Recipient, %; equal to the Fixed Cost Allocation<br><br>$FC$ = Total fixed cost of generating power, $ per month |

E-4

| | | | |
|---|---|---|---|
| **Fuel Cost** | <ul><li>The Provider shall supply fuel to both itself and the Recipient. The Provider shall charge the Recipient for any fuel used directly by the Recipient in an amount equal to the fuel price as defined below multiplied by the fuel quantity. The price of fuel used for power generation ($C_I$) shall be the fuel price as defined below. All sales shall be adjusted to equivalent MMBtus.</li><li>For any quantity of fuel imported to supply the Recipient, the fuel price shall be the equal to the actual delivered cost of imported fuel purchased at market price on an arms-length basis</li><li>For any quantity of fuel supplied by LBR production, the fuel price shall be the cost of imported fuel at market price. To the extent that no fuel is imported or the cost of imported fuel is not representative of the market price, the cost of imported fuel shall be determined by the Provider based on broker quotes using a commercially reasonable methodology consistently applied.</li><li>Fuel use for dedicated terminal services such as fuel required for the truck rack flare or marine vapor combustion unit shall be metered where commercially reasonable. The meters shall be provided and maintained by Recipient. Both the Provider and the Recipient shall be allowed to witness and approve the installation, maintenance and proving of the meters. To the extent metering (i) is not cost-effective or (ii) may be cost-effective but meters in connection therewith have not been installed at the time such service is provided, the Provider shall allocate fuel usage to the Recipient based on a commercially reasonable method of estimation, taking into account available data and consistently applied.</li></ul> | LBR | N/A |
| **Wastewater Facility (Including Both Power and Non-power Expenses)** | <ul><li>The fixed costs of the wastewater facility shall be allocated according to the Fixed Cost Allocation. The variable costs of the wastewater facility shall be allocated between the Parties based on factors including volume of water processed and hydrocarbon loading.</li><li>LBT shall bear the wastewater facility variable cost related to metered usage by the HERT associated with the HERT's remediation efforts, which cost LBT charges back to the HERT.</li></ul> | LBR | 80% LBR; 20% LBT |

E-5

| Road Cost | LBT | 50% LBR; 50% LBT | • LBR shall be responsible for all maintenance costs associated with roads on the Refinery Site, and LBT shall be responsible for all maintenance costs associated with roads on the Terminal Site.<br>• Maintenance costs incurred for the shared roads shall, absent a Major Event, be allocated between the Parties according to the Fixed Cost Allocation.<br>• Any road that is a boundary between LBT and LBR property will be a shared road.<br>• Schedule 1 to this Exhibit E designates roads as Refinery, Terminal or shared roads. |
|---|---|---|---|
| Electrical Transmission Cost | Both | 80% LBR; 20% LBT | • LBR shall be responsible for all maintenance costs associated with electrical transmissions assets on the Refinery Site, and LBT shall be responsible for all maintenance costs associated with electrical transmissions assets on the Terminal Site.<br>• Schedule 2 to this Exhibit E lists certain feeders with shared ownership. Electrical transmission equipment that is downstream of shared feeders and required for delivery of power to load centers, including transformers, substations, and motor control centers, shall also be deemed shared systems. Schedule 2 to this Exhibit E shall be updated on or after the date of the Shared Services Systems Agreement in accordance with the second sentence of Section 14.9 of the Shared Services Systems Agreement to determine which of the feeders listed on Schedule 2 to this Exhibit E are shared feeders and which are utilized only by one of the Parties.<br>• For the shared transmission equipment, costs shall, absent a Major Event, be allocated between the Parties according to the Fixed Cost Allocation. |
| Stormwater Evacuation Cost | LBR | N/A | • Stormwater handling costs shall, absent a Major Event, be allocated based on the collection areas for sheet flow in each of the operating areas as shown in the attached plat plan. |

E-6

| | | | |
|---|---|---|---|
| **Piping** | Both | N/A | • LBR shall be responsible for all maintenance costs associated with pipe on the Refinery Site or pipe leading directly to/from Refinery process units and not otherwise used by LBT, and LBT shall be responsible for all maintenance costs associated with pipe on the Terminal Site except to such extent that LBR is responsible for the costs of such pipe.<br><br>• Any pipe projects executed by one Party on behalf of the other shall be allocated back at cost. |
| **Coke Domes, Coke Handling and Loading, Sulfur Loading** | LBR | 100% LBR; 0% LBT | • LBT shall spend up to $35 million refurbishing the coke and sulfur handling systems. LBR shall reimburse LBT for 100% of this cost plus a 13.5% cost of capital through a series of equal semi-annual payments over the five-year period following the Toll Start Date as defined in the Tolling Agreement.<br><br>• LBR may repay any outstanding balance of the coke and sulfur handling costs at any time prior to the end of the five-year repayment with no penalty / fees incurred as a result of early payment.<br><br>• LBR shall operate, maintain, and bear all ongoing costs associated with the coke domes, coke handling and loading, sulfur loading. |
| **Cottages** | LBT | N/A | • LBR shall lease up to 80 cottages in Estate Cottage and Estate Blessing from LBT and shall pay LBT rent of $3,900 per cottage per month.<br><br>• LBR shall also reimburse LBT for the actual operations and maintenance costs for the cottages it leases from LBT (including utilities and housekeeping). |

E-7

| | | |
|---|---|---|
| **Limetree Village** | LBR | N/A | <ul><li>Except to the extent LBT rents rooms in the man camp, LBR will bear 100% of all costs associated with the facility.</li><li>LBT may utilize space in the Limetree Village if LBR has unutilized space available.</li><li>LBT shall pay LBR rent for any Limetree Village rooms that it uses at a rate of $30 per room per night.</li><li>LBT shall also reimburse LBR for the cost per room charged to LBR by the Limetree Village operator and all other costs of providing such room (including an allocation of operations and maintenance costs) as determined by LBR.</li><li>If the facility is idle, LBT may restart and operate the facility and shall pay commercially reasonable rent per bed per night. In this case, LBT shall be responsible for the costs to operate and maintain the facility and shall be required to return the facility in similar condition.</li></ul> |
| **Warehouse** | LBR | N/A | <ul><li>Warehouse operating expenses (including employees) shall be allocated and billed to the Recipient according to the square footage in the warehouse used specifically by such Party.</li><li>To the extent the Provider maintains an inventory of common parts also used by the Recipient and such parts are not immediately required by the Provider for its operations and, if agreed by the Provider, the Recipient shall have the option to purchase such parts from the Provider for use in its operations at cost plus 15%.</li><li>To the extent reasonable, freight costs shall be allocated on a direct basis. Any freight costs for shared shipments shall be allocated based on the PO values of material shipped.</li></ul> |

E-8

US-DOCS\101520926.60

| | | | |
|---|---|---|---|
| **Laboratory** | LBR | 100% LBR; 0% LBT | • To the extent there is additional space available beyond what is needed by the Provider and the Recipient requests use of such space, the Provider shall make such space available to the Recipient for use by such Party or such Party's designated third-party laboratory service.<br>• The Recipient and/or the third-party shall reimburse the Provider for the pro-rata share of building operating and maintenance costs based on the percentage of square footage occupied.<br>• The Provider shall charge the Recipient for any test it runs on the Recipient's behalf at cost based on a commercially reasonable allocation of the cost associated with such test. |
| **Compressed Air** | LBR | 100% LBR; 0% LBT | • The Provider shall operate and maintain the plant air compressors.  LBR shall bear 100% of the cost of owning, maintaining, and operating the compressed air units.<br>• The Provider shall sell compressed air to the Recipient at a fixed price of $0.60 per 1000 scf.<br>• The Provider shall allocate usage to the Recipient based on commercially reasonable estimated usage. |
| **Potable and Non-potable Water** | LBT | N/A | • Each Party shall be allocated a share of the potable and non-potable water expenses monthly based on actual usage of each type of water.<br>• The Parties shall use commercially reasonable efforts to meter usage of potable and non-potable water. To the extent metering (i) is not cost-effective or (ii) may be cost-effective but meters in connection therewith have not been installed at the time such service is provided, the Provider shall allocate potable and non-potable water usage to the Recipient based on a commercially reasonable method of estimation, taking into account available data and consistently applied. |

E-9

| | | |
|---|---|---|
| **Steam** | LBR | 100% LBR; 0% LBT |

- LBR shall bear 100% of the costs to own, operate, and maintain the boilers and steam production.

- To the extent the Provider is unable to use all the steam it produces, such steam shall be offered to the Recipient at no charge.

- The Parties shall use commercially reasonable efforts to meter usage of steam. To the extent metering (i) is not cost-effective or (ii) may be cost-effective but meters in connection therewith have not been installed at the time such service is provided, the Provider shall allocate steam usage to the Recipient based on a commercially reasonable method of estimation, taking into account available data and consistently applied.

- The Provider shall sell steam (except for unused excess steam) to the Recipient at a cost calculated as follows:

$$S_C = C_F \times [(S_{HP} \times 1.3) + (S_{MP} \times 1.2) + (S_{LP} \times 1.15)] + [(C_W \times Q_W) + C_M] \times [S_{HP} + S_{MP} + S_{LP}]$$

Where:

$S_C$ = Monthly cost of steam billed to the Recipient

$C_F$ = Fuel cost, $ per MMBtu

$S_{HP}$ = High-pressure steam consumed by the Recipient, k lbs

$S_{MP}$ = Medium-pressure steam consumed by the Recipient, k lbs

$S_{LP}$ = Low-pressure steam consumed by the Recipient, k lbs

$C_W$ = Water cost, $ per gallon (initially from Seven Seas)

$Q_W$ = Water usage to produce steam, gallon per k lbs steam = 130 (permanent, deemed amount)

$C_M$ = Miscellaneous maintenance and operating cost allocations, $ per k lbs of steam; value of $1 per k lbs of steam

E-10

| Category | Party | Allocation | Provisions |
|---|---|---|---|
| **Nitrogen** | LBR | 100% LBR; 0% LBT | • LBR shall bear 100% of the cost of owning, operating, and maintaining the on-site nitrogen generation system.<br>• For any quantity of nitrogen imported to supply the Recipient, the price shall be the equal to the actual delivered cost of imported nitrogen purchased at market price on an arms-length basis<br>• For nitrogen supplied to the Recipient from the Provider's on-site generation system using available capacity not required by the Provider, the cost shall be $4.00 per 1000 scf. The Recipient shall provide any tube trailers required for its own transportation of $N_2$.<br>• The Recipient shall make reasonable commercial efforts to allow the Provider to utilize the Recipient's nitrogen tube trailer at no charge from time-to-time. The Parties shall use commercially reasonable efforts to meter usage of nitrogen. To the extent metering (i) is not cost-effective or (ii) (ii) may be cost-effective but meters in connection therewith have not been installed at the time such service is provided, the Provider shall allocate nitrogen usage to the Recipient based on a commercially reasonable method of estimation, taking into account available data and consistently applied. |
| **Contaminant Cleanup** | Both | N/A | • Disposal costs for hazardous waste spills or contamination shall be charged according to causation.<br>• Equipment costs in association with the spill or contamination shall be charged in accordance with the equipment provision below. |
| **OSRO (Spill Response)** | LBT | N/A | • The costs of any annual subscription fees for spill response shall be allocated to each of the Parties based on its pro rata share of the reasonably determined avoided cost of pursuing standalone coverage.<br>• Usage fees shall be charged for any OSRO requirements in accordance with causation. |

E-11

| | | | |
|---|---|---|---|
| **Insurance** | LBR | 80% LBR; 20% LBT | • For any insurance policies procured jointly, each Party shall be allocated a share of the insurance expense pursuant to the opinion of a third-party insurance broker in their sole discretion.<br>• Any common risk management personnel shall be allocated between the Parties according to the Fixed Cost Allocation. |
| **EHS** | LBR | 80% LBR; 20% LBT | • To the extent practical, each Party shall be responsible for the actual costs associated with ES&H compliance for its business.  Shared EHS costs that are impractical to assign to a specific party shall be allocated according to the Fixed Cost Allocation. |
| **Training** | LBR | 80% LBR; 20% LBT | • To the extent practical, actual training costs shall be allocated the responsibility of the respective party.  For costs that are impractical to sign to a specific party, costs shall be borne according to the Fixed Cost Allocation. |
| **Fire Safety/ Emergency Response** | LBR | 60% LBR; 40% LBT | • Shared fire safety/emergency response costs shall be allocated according to the Fixed Cost Allocation. |
| **Security** | LBT | N/A | • Costs shall be allocated 50% based on site square footage occupied and 50% on the number of employee and contractors on site.<br>• Notwithstanding the allocation, 100% of the Limetree Village security costs shall be to the account of LBR (a share of which may be passed through to LBT for any Limetree Village beds it uses). |
| **Shared Software** | LBR | 80% LBR; 20% LBT | • Shared software costs that are billed on a "per seat" basis, each Party shall be allocated a portion the costs related to shared software licenses monthly based on the number of its employees who are users of such software.  Shared employees shall be counted based on the percentage of their cost allocated to each Party (i.e., if a shared employee is allocated 80% to LBR and 20% to LBT, such employee shall count as 0.8 seat for LBR and 0.2 seat for LBT).<br>• For software that is shared but not billed on a "per seat" basis, costs shall be allocated between the Parties according to the Fixed Cost Allocation. |

E-12

| Category | Party | | Description |
|---|---|---|---|
| **Heavy Equipment and Vehicles** | Both | 80% LBR: 20% LBT | • Each Party is responsible for the costs of its own vehicles.<br>• Costs of rental equipment shall be allocated based on usage. The expectation is that equipment shall be leased on a daily, weekly, monthly or other basis and charges shall be allocated based on usage tracked via work order or equipment hours.<br>• For shared usage where it is impractical to track actual usage, costs shall be allocated between the Parties according to the Fixed Cost Allocation.<br>• Each Party shall be responsible for the cost of any fuel it uses for heavy equipment, vehicles, and tugs pursuant to the Fuel Cost section above.<br>• LBT shall be responsible for the purchase of all fuel for the tugs. |
| **Administration Building & Services** | LBT | N/A | • Each Party shall be allocated costs associated with the administrative building and services provided therein based on the share of the administrative building square footage it occupies. |
| **Other buildings** | Both | N/A | • LBR shall be responsible for operating other buildings on the Refinery Site, and LBT shall be responsible for operating other buildings on the Terminal Site.<br>• The cost of any other buildings operated by one Party but used by the other Party shall be allocated based on the share of the building square footage it occupies. |
| **Oily Solids** | LBR | N/A | • LBR shall use commercially reasonable efforts to process oily solids from LBT operation at no charge to LBT. To the extent that processing of such oily solids requires LBR to incur incremental cost, the Parties will mutually agree on the amount that LBR charges to LBT for such processing, with such charge reasonably based on LBR's incremental cost associated with processing such oily solids. |

E-13

| Firewater | LBR | Various | <ul><li>The costs to operate and maintain firewater assets shall be borne as follows:<ul><li>Firewater pumps and intake system: 50% LBR:50% LBT</li><li>New express lines: 70% LBR:30% LBT</li><li>Any connection from the new express line to and within the Refinery Sites: 100% LBR</li><li>Any connection from the new express line to and within the Terminal Sites: 100% LBT</li><li>The shared portions of the Williams firewater system components (e.g. hoses, reels, pumpers, and other miscellaneous equipment): 50% LBR:50% LBT</li></ul></li></ul> |
|---|---|---|---|
| **Emergency Response Equipment** | LBR | 60% LBR: 40% LBT | <ul><li>The cost to operate and maintain emergency response equipment associated exclusively with the Terminal Site shall be borne by LBT.</li><li>The cost to operate and maintain emergency response equipment associated exclusively with the Refinery Site shall be borne by LBR.</li><li>Any costs not exclusively for the Terminal Site or Refinery Site shall be shared between the Parties according to the Fixed Cost Allocation.</li></ul> |
| **Other Miscellaneous Shared Items** | Both | N/A | <ul><li>The costs of operating other shared properties or shared services that are not yet Shared Services Systems or Shared Services in accordance with this Agreement and/or that are not otherwise referenced in this Exhibit E shall be shared as below:</li><li>Fixed costs will be allocated based on whether either LBT or LBR require the service independently and, if the service is required by both Parties, based on pro forma average usage of the applicable service.</li><li>Variable costs will be allocated on actual usage where commercially reasonable and estimated usage otherwise.</li><li>If such shared properties or shared services systems are added as Shared Services Systems or Shared Services in accordance with this Agreement, the provisions of Section 2.4 and 6.1 shall apply</li></ul> |

US-DOCS\101520926.60

## **Schedule 1 to Exhibit E**

### **Roads**

See attached.

US-DOCS\101520926.60



Road Maintance
for Shared Services
Agreement
Legend
PINK = LBR
YELLOW = SHARED
No highlights = LBT
Rev 12Nov2018

For Reference Only, See Livelink for Official Copy
2/9/2017

**Schedule 2 to Exhibit E**

**Electrical Transmission Cost**

**Limetree Bay Feeders**
UTILITY #1
UTILITY #2
#2CDU, #1
#2 CDU, #2
#2 CDU, #3
#2 CDU, #4
LIMIT AMP
#1 VISBREAKER, #1
#1 VISBREAKER, #2
#3 DU
UOP, #1
UOP, #2
UOP, #3
ADMIN BUILDING
TANKFARM # 1
TANKFARM #2
FDR TO S/S #8
C-2301-C
LABORATORY
TANKFARM "A"
TANKFARM "B"
VAC/SULF, A&C
VAC/SULF, B&D
BTX - A, C, E
BTX - B, D, F
VACUUM #1
VACUUM #2
BTX #1
BTX #2
MANIFOLD #1
MANIFOLD #2
PHASE IV FDR #1
PHASE IV FDR #2
SCPC
SCPC
NO. 1 AUX XFM
NO. 2 AUX XFM
NO. 3 AUX XFM
AUX XFM 1105A
AUX XFM 1105B
FEEDER A TO SS #46
FEEDER B TO SS #46

E-16

5CDU
5CDU
5CDU
5CDU
6CDU
6CDU
6CDU
6CDU
VAC/SULF
VAC/SULF
VAC/SULF
VAC/SULF
SS 28,6,14,15,29
SS 28,6,14,15,29
SRU, SS 25-27
SRU, SS 25-27
DD #6&7
DD #6&7
DD #9, SS-24
DD #9, SS-24
DD #9, SS-24
DD #9, SS-24
DD #9, SS-24
DD #9, SS-24
FCC, SS-33
FCC, SS-33
FCC, SS-33
FCC, SS-33
SS-34
SS-34
SS-34
SS-34
SS-34
SS-34
SS-34
SS-34
SS-35
SS-35
SS-35
SS-35
SS-36
SS-36
SS-36
SS-36
BUS-Y (CD-7001)
BUS-Y (CD-7101B)

E-17

BUS-Y (CD-7101C)
NO. 4 AUX XFM
NO. 5 AUX XFM
NO. 6 AUX XFM
NO. 7 AUX XFM *
NO. 8 AUX XFM
NO. 9 AUX XFM
NO. 10 AUX XFM
P-7934A
P-7934B
P-7934C
P-7940A
P-7940B
COKER
COKER
COKER
COKER
VILLAGE

US-DOCS\101520926.60

# EXHIBIT 4

*Execution Copy*

REFINERY OPERATING AGREEMENT

BY AND AMONG

THE GOVERNMENT OF THE U.S. VIRGIN ISLANDS

AND

LIMETREE BAY REFINING, LLC

July 2, 2018

## TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS AND CONSTRUCTION ............................................................. 9

    Section 1.1    Definitions ............................................................................................. 9

    Section 1.2    Agreement Components ....................................................................... 21

    Section 1.3    Agreement Interpretation ..................................................................... 21

ARTICLE 2 TERM OF AGREEMENT ........................................................................... 22

    Section 2.1    Effective Date ...................................................................................... 22

    Section 2.2    Initial Term .......................................................................................... 22

    Section 2.3    Extension of Term ............................................................................... 22

    Section 2.4    End of Term ......................................................................................... 22

ARTICLE 3 CLOSING, CLOSING CONDITIONS, TERMINATION BEFORE
         CLOSING ............................................................................................ 22

    Section 3.1    Time and Place of Closing ................................................................... 22

    Section 3.2    Conditions to Closing .......................................................................... 23

    Section 3.3    Closing Deliveries ............................................................................... 24

    Section 3.4    Termination Before Closing ................................................................ 25

ARTICLE 4 REFINERY PERMITS ............................................................................... 26

    Section 4.1    Permits ................................................................................................. 26

ARTICLE 5 OPERATION OF THE REFINERY .............................................................. 28

    Section 5.1    Independent Operation and Non-Interference ..................................... 28

    Section 5.2    Refinery Operations ............................................................................ 29

ARTICLE 6 ADDITIONAL OPERATING PROVISIONS .................................................. 29

    Section 6.1    [RESERVED] ....................................................................................... 29

2

Section 6.2.   [RESERVED] ........................................................................... 29

Section 6.3   Submerged Lands ................................................................... 29

Section 6.4   Refinery Obligations .............................................................. 31

ARTICLE 7 EMPLOYMENT ...................................................................... 33

Section 7.1.   Minimum Commitment ......................................................... 33

Section 7.2.   Resident Employment ........................................................... 34

Section 7.3   Hiring Preferences ................................................................ 34

Section 7.4   Non-Discrimination ............................................................... 34

Section 7.5.   Training and Continuing Education ....................................... 35

ARTICLE 8 FINANCIAL OBLIGATIONS OF REFINERY OPERATOR ............. 35

Section 8.1   Closing Payment and Related Payments ................................. 35

Section 8.2   Quarterly Refinery Payment .................................................. 35

Section 8.3   Payment Recalibration .......................................................... 39

Section 8.4   Charitable Commitments ....................................................... 40

Section 8.5   Financial Assurance .............................................................. 40

Section 8.6   Government Carried Interest in Refinery Operator ................. 40

Section 8.7   Fuel Oil Pricing .................................................................... 41

ARTICLE 9 SECURITY INTEREST .......................................................... 41

Section 9.1.   Payments Secured By Lien .................................................... 41

Section 9.2   All Necessary Actions ........................................................... 43

Section 9.3   No Encumbrances ................................................................. 43

ARTICLE 10 INSURANCE ....................................................................... 43

Section 10.1   General Insurance ............................................................... 43

Section 10.2.   Insurance Requirements ...................................................... 44

3

ARTICLE 11 TAX AND FEE EXEMPTIONS................................................................................46

    Section 11.1   Scope of Exemption...........................................................................46

    Section 11.2.  Exemptions....................................................................................46

    Section 11.3   Limitations on Exemption..............................................................48

    Section 11.4   Tax Return Filings..........................................................................48

    Section 11.5.  No Adverse Actions........................................................................48

ARTICLE 12 REPRESENTATIONS AND WARRANTIES..................................................49

    Section 12.1.  Government Representations............................................................49

    Section 12.2   Refinery Operator Representations..................................................50

ARTICLE 13 COVENANTS OF REFINERY OPERATOR......................................................51

    Section 13.1   Environmental.................................................................................51

    Section 13.2.  Consents and Approvals...................................................................53

    Section 13.3.  Indemnification.............................................................................53

    Section 13.4.  Intercompany Agreements...............................................................54

ARTICLE 14 GOVERNMENT COVENANTS..........................................................................54

    Section 14.1.  Assistance with Permits..................................................................54

    Section 14.2.  Consents and Approvals...................................................................55

    Section 14.3   Beneficial Use.................................................................................55

    Section 14.4.  Other Legislation............................................................................56

    Section 14.5.  Change in Law.................................................................................56

    Section 14.6   Other Benefits................................................................................56

    Section 14.7   No Additional Cost to Refinery Operator.......................................57

    Section 14.8   Zoning, Legal Descriptions............................................................57

    Section 14.9.  Security...........................................................................................57

ARTICLE 15 REPORTING, AUDIT AND INSPECTION ................................................. 58

    Section 15.1   Reporting ................................................................ 58

    Section 15.2   Annual Audit ............................................................ 58

    Section 15.3   Inspection ................................................................ 58

ARTICLE 16 DEFAULT AND TERMINATION ............................................................. 59

    Section 16.1   Payment Default ....................................................... 59

    Section 16.2   RESERVED ............................................................... 59

    Section 16.3   Termination ............................................................. 59

    Section 16.4   Rights and Remedies Cumulative ............................. 61

ARTICLE 17 CONFIDENTIALITY ............................................................................... 61

    Section 17.1   Confidentiality ......................................................... 61

ARTICLE 18 FORCE MAJEURE .................................................................................. 62

    Section 18.1   Force Majeure Events .............................................. 62

    Section 18.2   Burden of Proof ...................................................... 63

    Section 18.3   Excused Performance .............................................. 63

    Section 18.4   Applicability ............................................................ 64

ARTICLE 19 MISCELLANEOUS .................................................................................. 64

    Section 19.1   Notices, Requests and Communications ................... 64

    Section 19.2   Assignment .............................................................. 65

    Section 19.3   Governing Law ........................................................ 67

    Section 19.4   Dispute Resolution .................................................. 67

    Section 19.5   Commercial Act ....................................................... 68

    Section 19.6   Limitation on Liability ............................................. 68

    Section 19.7   Entire Agreement; Subsequent Amendments ........... 69

Section 19.8   Severability of Provisions ........................................................... 69

Section 19.9   Payment Terms and Interest Calculation ..................................... 69

Section 19.10  Public Announcements ............................................................... 69

Section 19.11  Parties in Interest ...................................................................... 69

Section 19.12  Waiver ....................................................................................... 70

Section 19.13  Performance Extended to Next Business Day ............................. 70

Section 19.14  Negotiation and Preparation Costs ............................................ 70

Section 19.15  Further Assurances .................................................................... 70

Section 19.16  Counterparts ............................................................................. 70

## REFINERY OPERATING AGREEMENT

THIS OPERATING AGREEMENT (the "*Agreement*") is hereby made as of July 2, 2018, by and among the Government of the U.S. Virgin Islands (the "*Government*") and Limetree Bay Refining, LLC, a limited liability company existing under the laws of the U.S. Virgin Islands ("*LB Refining*", and as further defined herein, "*Refinery Operator*"). The Government and Refinery Operator are hereinafter sometimes individually referred to as a "*Party*" and sometimes hereinafter collectively referred to as "*Parties*".

### RECITALS

**WHEREAS**, the Government and Limetree Bay Terminals, LLC ("*Terminal Operator*") have entered into that certain Operating Agreement, dated December 1, 2015 and approved by the Legislature of the U.S. Virgin Islands on December 30, 2015 (as supplemented and clarified by letter agreements dated December 30, 2015 and January 26, 2016, the "*Original Terminal Operating Agreement*");

**WHEREAS**, under the Original Terminal Operating Agreement, Terminal Operator, as inducement to take ownership of, develop, operate, and maintain the Oil Refinery and Related Facilities, located at Limetree Bay, St. Croix, U.S. Virgin Islands, and in order to promote the public interest in the economic growth and development of the U.S. Virgin Islands, was granted rights to conduct the business of the Oil Refinery and Related Facilities and was exempted from certain taxes, duties, and other fees;

**WHEREAS**, Terminal Operator has restarted and is currently operating the Terminal at the Oil Refinery and Related Facilities;

**WHEREAS**, in the Original Terminal Operating Agreement, Terminal Operator committed to devote not fewer than eighteen (18) months to "evaluate the prospects" of a Refinery Restart, and to "take all commercially reasonable efforts to facilitate" such Refinery Restart;

**WHEREAS**, in January 2018, Terminal Operator informed the Government that Terminal Operator had identified and entered into negotiations with one or more large petroleum companies interested in participating in feedstock supply, product offtake and financial participation in a Refinery Restart ;

**WHEREAS**, in order to facilitate a Refinery Restart, Terminal Operator will enter into a transfer and assignment agreement (the "*Refinery Transfer Agreement*") with Refinery Operator, an indirect subsidiary of Limetree Bay Ventures, LLC, and an Affiliate under common ownership with Terminal Operator, pursuant to which Terminal Operator will transfer certain rights granted to it under the Original Terminal Operating Agreement in connection with the Refinery and the Refinery Site to Refinery Operator;

7

**WHEREAS**, to further facilitate a Refinery Restart, Terminal Operator has asked the Government to enter into a new Refinery Operating Agreement to reflect that the Refinery and the Refinery Site will be acquired, held and operated by Refinery Operator, rather than by Terminal Operator, and to govern the contractual relationship between the Government and Refinery Operator in its capacity as owner of the Refinery and the Refinery Site;

**WHEREAS**, the Government has determined that the Refinery Restart is critical to the economic well-being of the Territory, and will bring tax revenues, employment, and increased commercial activity that will benefit the Government and the people of the U.S. Virgin Islands;

**WHEREAS**, Refinery Operator has agreed to evaluate further the prospects of a Refinery Restart and to take all commercially reasonable measures to facilitate such Refinery Restart, and in furtherance of this objective has been engaged in discussions with one or more qualified and experienced international companies for feedstock supply, product offtake and financial participation in a Refinery Restart;

**WHEREAS**, Refinery Operator has agreed that if no such use for the Refinery can be identified within sixty (60) months following the closing of the transactions contemplated by this Agreement (as such period may be extended pursuant to the terms hereof), it will (at the Government's option) dismantle the Refinery in accordance with this Agreement, and Terminal Operator has agreed to perform such dismantling in the event that Refinery Operator fails to do so for any reason;

**WHEREAS**, Refinery Operator and Terminal Operator and certain Affiliates thereof shall enter into a shared services agreement with respect to certain facilities, access, use, permits and services to be shared by, or provided by Refinery Operator to, Terminal Operator, or by Terminal Operator to Refinery Operator, as the case may be (either directly or through a third party) in respect of, *inter alia*, the Shared Services Systems, including but not limited to fire control system management, power supply and process and potable water supply (the "*Shared Services Systems Agreement*");

**WHEREAS**, in order to protect the interests of the Territory, and to reflect the importance of the Government's role in facilitating the successful operation of the Refinery, the Government wishes to take a financial stake in the success of the new venture, which shall be in the form of a fee payable upon a Refinery Change of Control and shall not include any governance or management role; and

**NOW, THEREFORE**, in consideration of the premises and the mutual promises and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending hereby to be legally bound, the Government and Refinery Operator hereby agree and stipulate as follows: