## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION

Section 1.1.   **Definitions**. As used in this Agreement, the following terms have the respective meanings set forth below or set forth in the Articles referenced below.

"*1998 Letter Agreement*" shall mean that certain Letter Agreement entered into by and between HOVIC and the Government, dated October 14, 1998.

"*Affiliate*" or "*Affiliates*" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person; provided that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract (including, a shareholders' agreement or a members' agreement between Persons who have an interest in an Affiliate) or otherwise.

"*Agreement*" shall have the meaning set forth in the Preamble.

"*Amended Terminal Operating Agreement*" shall mean that certain Amended and Restated Terminal Operating Agreement, dated as of the date hereof, by and between Terminal Operator, as Terminal Operator, and the Government of the U.S. Virgin Islands, as the Government, as further amended, amended and restated, supplemented or modified from time to time.

"*Annual Audit*" shall have the meaning set forth in Section 15.2(A).

"*Annual Audit Report*" shall have the meaning set forth in Section 15.2(B).

"*Applicable Law*" shall mean any present or future constitution, law, statute, ordinance, order, injunction, administrative and/or judicial order or decree, code, rule, regulation, or Authorization, or any amendments thereto, and any voluntary cleanup program and/or brownfields program of any Governmental Authority (excluding any such legislative, judicial or administrative body or instrumentality acting in any capacity as a lender, guarantor or mortgagee) applicable to a Party or its Affiliate or the subject matter of this Agreement.

"*Applicable Product Price*" shall have the meaning set forth in Section 8.2(F).

"*Argus*" shall have the meaning set forth in Section 8.2(F).

"*Argus Indices*" shall have the meaning set forth in Section 8.2(F).

"*ASCI Price*" shall have the meaning set forth in Section 8.2(C).

"*Authorization*" shall mean any licenses, certificates, permits, orders, approvals, consents, determinations, variances, franchises, and authorizations from any Governmental Authority.

"*Base Margin*" shall have the meaning set forth in Section 8.2(C).

"*Business Day*" shall mean Monday through Friday of each week, except that a legal holiday recognized as such by the Government (including, for the avoidance of doubt, any administrative leave day granted by the Government for the entire U.S. Virgin Islands) shall not be regarded as a Business Day, and a "*Day*" shall be any calendar day.

"*Castilla Blend Price*" shall have the meaning set forth in Section 8.2(C).

"*Carried Interest*" shall have the meaning set forth in Section 8.6(A).

"*Change in Law*" shall mean any of the following events occurring after the date of execution of this Agreement:

(a)     a change to, or repeal of, any existing Applicable Law;

(b)     the promulgation of any new Applicable Law; or

(c)     any withdrawal or amendment of any Authorization other than:

(i)     in accordance with the terms upon which it was originally granted;

(ii)     as a result of a material failure by Refinery Operator to comply with a material condition of the applicable Authorization; or

(iii)     as a result of any unlawful act or omission of Refinery Operator.

"*Clean Air Act Consent Decree*" shall mean the Consent Decree entered on June 7, 2011 in *United States of America and The United States Virgin Islands v. HOVENSA, L.L.C.* (Civ. No. 1:11 -cv-00006) (D.V.I., St. Croix Div.), as may be amended by the court from time to time.

"*Closing*" shall have the meaning set forth in Section 3.1(A).

"*Closing Date*" shall have the meaning set forth in Section 3.1(B).

"*Closing Payment*" shall have the meaning set forth in Section 8.1

"*Closing Payment Balance*" shall be determined at the end of each calendar quarter and shall be equal to (a) as of the end of the first calendar quarter during which Closing occurs, (i) the product of (x) the Closing Payment and (y) the Closing Payment Interest Rate (prorated for the actual days in that time period relative to a full calendar quarter), *plus* (ii) the Closing Payment and (b) as of the end of each calendar quarter thereafter, (i) the product of (x) the

Closing Payment Balance at the end of the previous calendar quarter and (y) the Closing Payment Interest Rate, *plus* (ii) the Closing Payment Balance at the end of the previous calendar quarter, *less* (iii) any Quarterly Refinery Payments or portions thereof retained by Refinery Operator during such calendar quarter as described in Article 8 of this Agreement.

"*Closing Payment Interest Rate*" shall mean an interest rate of 2.41% per calendar quarter, except that in the event the Refinery Restart does not occur prior to the end of the initial Refinery Evaluation Period, the Closing Payment Interest for such period shall be 1% per calendar quarter.

"*Coastal Zone Management permit*" shall mean a permit obtained under the Virgin Islands Coastal Zone Management Act, as amended

"*Commissioner of Labor*" shall mean the Commissioner of Labor of the U.S. Virgin Islands.

"*Confidential Information*" shall mean information or data proprietary to the Government and/or Refinery Operator including:

    (a)    books, records and documentation;

    (b)    information regarding any aspect of the Oil Refinery and Related Facilities and the operation thereof;

    (c)    information from and relating to Customers, Supply and Offtake Counterparties. stakeholders and any contractor of the applicable Party;

    (d)    written information that is clearly marked as confidential or proprietary by a Party;

    (e)    oral information identified in writing as confidential after disclosure, or as so stated when made, regardless of whether such written or oral information originated with the disclosing Party or any third party, which is provided to the receiving Party after the date hereof, and

    (f)    all written information generated by a Party or its representatives that contains, reflects or is derived from furnished Confidential Information,

provided, however, that such information or data shall exclude information already in the public domain, or which may subsequently become part of the public domain through no fault of the Government or Refinery Operator. For the avoidance of any doubt, Confidential Information includes any information recorded or stored in any digital format on electronic, optical or magnetic media or any other material that contains or otherwise reflects Confidential Information.

"*Contaminant*" shall include but not be limited to any contaminant, air contaminant, solid or hazardous waste, hazardous material, infectious waste, waste, pollutant, air pollutant, hazardous air pollutant, regulated air pollutant, pollution, air pollution, radioactive material, hazardous or toxic substance, crude oil, any fraction thereof, petroleum product, petroleum byproduct, and/or fuel additive, defined or regulated as such now or in the future in or under any Environmental Laws or voluntary cleanup or brownfields program.

"*Contract*" shall mean any note, bond, mortgage, indenture, guaranty, license, franchise, permit, agreement (including, a shareholders' agreement, a members' agreement, or both), contract, commitment, lease, purchase order, or other instrument or obligation, and any amendments thereto.

"*Contract Year*" shall have the meaning set forth in Section 8.2(C).

"*Customers*" shall have the meaning set forth in Section 11.1.

"*Decommissioned Equipment*" shall have the meaning set forth in Section 16.3(B)(1).

"*Deemed Margin*" shall have the meaning set forth in Section 8.2(C).

"*Discharge Date*" shall have the meaning set forth in Section 9.1(A).

"*Dispute*" shall have the meaning set forth in Section 19.4.

"*Distributions*" shall mean any distribution to a member, shareholder or its Affiliates in respect of any ownership interest (including any membership interest) in Refinery Operator (excluding, for the avoidance of doubt, any distribution to LB Refining from its subsidiaries), whether in cash or property, or the redemption, purchase or acquisition of any interest of such member, shareholder or Affiliate.

"*District Court*" shall have the meaning set forth in Section 4.1(B).

"*DPNR*" shall have the meaning set forth in Section 4.1(B).

"*Easements*" shall have the meaning set forth in Section 9.1(A).

"*Effective Date*" shall have the meaning set forth in Section 2.1.

"*Environmental Laws*" shall mean any Applicable Law, Order or other requirement of Applicable Law (including environmental Authorizations) that relates to (a) the protection of human health or the environment, including but not limited to threatened or endangered species, federally-jurisdictional wetlands, ambient air, surface water, groundwater, land surface or subsurface strata, natural resources, natural resource damages, and the restoration and replacement of natural resources, or (b) the presence, Release, threatened Release, generation, recycling, disposal or treatment of Contaminants, or the arrangement for any such activities.

12

"*EPA*" shall have the meaning set forth in Section 4.1(B).

"*Equity Holders*" shall include the direct and indirect owners of (i) the stock of a corporation, (ii) the equity of the membership interests of a limited liability company, and (iii) the ownership interest of any other entity.

"*Excluded Lands*" shall mean the real property described as excluded lands in Appendix A.

"*Exempted Assets*" shall have the meaning set forth in Section 19.5.

"*Exemptions*" shall have the meaning set forth in Section 11.2.

"*Existing Terminal Financial Assurance*" shall have the meaning set forth in Section 8.5(A).

"*Expert*" shall have the meaning set forth in Section 8.2(F).

"*Extension*" shall have the meaning set forth in Section 2.3.

"*Financial Assurance*" shall have the meaning set forth in Section 8.5(B).

"*Force Majeure Event*" shall have the meaning set forth in Section 18.1.

"*Full-Time Employee*" shall mean an individual employed by Refinery Operator for work in the U.S. Virgin Islands on the Refinery who works no less than 32 hours per week and is covered by employer-provided health insurance. The number of Full-Time Employees on any given date shall be calculated as the three-month trailing average of the number of Full-Time Employees at the Refinery on such date.

"*Government*" shall have the meaning set forth in the Preamble.

"*Government Indemnified Party*" shall have the meaning set forth in Section 13.3.

"*Governmental Authority*" shall mean any foreign, federal, territorial, state or local governmental entity, authority or agency, court, tribunal, regulatory commission or other body, whether legislative, judicial or executive (or a combination or permutation thereof) having jurisdiction as to the matter in question.

"*Governmental Function*" shall mean any regulatory, legislative, permitting, zoning, enforcement (including police power), licensing or other functions which the Government is authorized or required to perform in its capacity as a Governmental Authority in accordance with Applicable Law.

"*Governor*" shall have the meaning set forth in Section 3.2(C)(1).

13

*"Guaranteed Amount"* shall have the meaning set forth in Section 8.5(B).

*"HERT"* shall mean the HOVENSA environmental response trust created pursuant to that certain Environmental Response Trust Agreement, having an effective date of February 17, 2016, made by and between HOVENSA, as Settlor and Project Navigator, Ltd., as Trustee.

*"HOVENSA"* shall mean HOVENSA L.L.C.

*"HOVIC"* shall mean Hess Oil Virgin Islands Corp.

*"HSFO Price"* shall have the meaning set forth in Section 8.2(C).

*"I-1"* shall have the meaning set forth in Section 12.1(E).

*"Initial Term"* shall have the meaning set forth in Section 2.2.

*"Intercompany Agreement"* shall have the meaning set forth in Section 13.4.

*"Internal Revenue Code"* shall mean, as applicable, the Internal Revenue Code of 1986, as amended, and/or the Internal Revenue Code of 1986, as amended and as mirrored in the U.S. Virgin Islands and applicable thereto pursuant to the Naval Service Appropriation Act of 1922, 48 U.S.C. 1397.

*"International Standards"* shall mean with respect to any engineering, construction or operations work conducted by or on behalf of a Party, that such work is performed in accordance with professional practices and standards generally accepted by the international refining and community and that such work is provided by an experienced and competent professional organization generally recognized by that community as competent in its respective service area.

*"LB Refining"* shall have the meaning set forth in the Preamble.

*"Legislature"* shall mean the Legislature of the U.S. Virgin Islands.

*"Lender"* shall mean any Person providing debt, bond or capital market financing or refinancing or credit support or interest rate hedging for such financing or refinancing, including any agent or trustee for such Person or Persons.

*"Lessor"* shall have the meaning set forth in Section 11.1.

*"Liabilities"* shall mean any and all indebtedness, Taxes, liabilities and obligations, whether accrued or fixed, known or unknown, absolute or contingent, matured or unmatured, or determined or determinable.

*"Losses"* shall mean all suits, actions, Liabilities, legal proceedings, claims, demands, losses, costs, and expenses of whatsoever kind or character, including reasonable attorneys' fees and expenses and case costs and expenses.

14

"*Margin Adjustment*" shall have the meaning set forth in Section 8.2(C).

"*Maximum Payment*" shall have the meaning set forth in Section 8.2(A).

"*Minimum Payment*" shall have the meaning set forth in Section 8.2(A).

"*Notice*" shall have the meaning set forth in Section 19.1.

"*NRD Settlement and Release Agreement*" shall mean the Settlement and Release Agreement fully executed on and with an effective date of May 29, 2014, by and among the Commissioner of the U.S. Virgin Islands Department of Planning and Natural Resources, the Government of the U.S. Virgin Islands, Hess Oil Virgin Islands Corp., and HOVENSA, LLC, which resolved the litigation among the parties in *Commissioner of the Dep't of Planning and Natural Resources v. Century Alumina Co., et al.*, Civ No 2005-0062 (attached hereto as Appendix C).

"*NYH RBOB Price*" shall have the meaning set forth in Section 8.2(C).

"*NYH ULSD Price*" shall have the meaning set forth in Section 8.2(C).

"*Oil Refinery and Related Facilities*" shall mean the Refinery, the Terminal, and all other related facilities, equipment, and real and personal property associated with petroleum import, export, processing, storage and related activities at the Refinery, the Terminal, the container port, the dock, and certain rights to occupy and use all Submerged Lands (including lands on or under the surface of any kind of water), whether or not covered by the Submerged Land Lease or Submerged Lands Permits, and all facilities and property now or in the future related thereto on St Croix, U.S. Virgin Islands, but excluding the Excluded Lands.

"*Option Parcels*" shall mean the real property described as option parcels on Appendix A

"*Order*" shall mean any judgment, order, injunction, decree, writ, permit, or license issued or entered by or with any Governmental Authority or any arbitrator, whether preliminary, interlocutory, or final

"*Original Terminal Operating Agreement*" shall have the meaning set forth in the Recitals

"*Owners*" shall mean ArcLight Energy Partners, Fund VI, L.P, Freepoint Commodities LLC, and their respective Affiliates (exclusive of Refinery Operator).

"*Parties*" and "*Party*" shall have the meaning set forth in the Preamble.

"*Payment Default*" shall have the meaning set forth in Section 16.1.

"*Payment Obligations*" shall have the meaning set forth in Section 9.1.

"*Payment Recalibration Election*" shall have the meaning set forth in Section 8.3.

"*Person*" shall mean and include an individual, a partnership, a limited partnership, a limited liability partnership, a limited liability limited partnership, a joint venture, a joint stock company, a corporation, a limited liability company, an association, a trust, an unincorporated organization, a group, any governmental entity or any other form of entity or organization.

"*Pre-Existing Contamination*" shall have the meaning set forth in the NRD Settlement and Release Agreement.

"*Proceeding*" shall mean a proceeding, arbitration, action, claim, suit, pending settlement, or other legal proceeding of any kind or nature before or by any Governmental Authority, arbitrator or panel.

"*Processed Volume*" shall have the meaning set forth in Section 8.2(C).

"*Qualifying Change in Law*" shall mean (1) any Change in Law of the U.S. Virgin Islands that (a) becomes effective as a result of an express and affirmative legislative or rulemaking act of the Government, (b) is not required by a Change in Law of the United States, and (c) is not required to conform to any requirements of any federally-delegated program, or (2) any Change in Law the terms of which apply expressly to (a) the Refinery and/or the Refinery Site or operations thereon, and not to facilities, sites, or operations that are similar in whole or in part and/or (b) Refinery Operator or its Affiliates disproportionately in relation to other similarly situated persons.

"*Quarterly Refinery Payment*" shall have the meaning set forth in Section 8.2

"*RCRA*" shall have the meaning set forth in Section 13.1(B)(7).

"*RCRA Corrective Action*" shall have the meaning set forth in Section 13.1(B)(7)

"*Recalibration Amount*" shall mean, with respect to any period, an amount equal to any U.S. Virgin Islands corporate net income tax that Refinery Operator would be required to pay on its earnings for such period if (a) Refinery Operator were classified as a corporation for U.S. Virgin Islands income tax purposes, (b) solely for purposes of the calculation under this definition, the exemptions from U.S. Virgin Islands corporate net income taxes in Article 11 did not apply to Refinery Operator, except to the extent such exemptions would otherwise apply to a U.S. Virgin Islands corporate income taxpayer, (c) such U.S. Virgin Islands corporate net income tax were determined under the Internal Revenue Code and other Applicable Law, in each case, in effect for such period, and (d) Refinery Operator were not permitted to carry back net operating losses to any of its prior taxable periods. For the avoidance of doubt, references in this definition to taxes and the Internal Revenue Code are solely for purposes of calculating the amount of the Recalibration Amount, and the Recalibration Amount is not intended to be a tax.

16

"*Refinery*" shall mean all petroleum processing equipment and related facilities, equipment, and real and personal property associated with petroleum processing and related activities, including certain Shared Services Systems and housing for employees and contractors of Refinery Operator, exclusive in each case of the Terminal, as contemplated by the Original Terminal Operating Agreement, this Agreement and the Amended Terminal Operating Agreement and in each case now or hereafter located on the Refinery Site.

"*Refinery Change of Control*" shall mean, with respect to Refinery Operator, consummation of a transaction or series of transactions whereupon (i) the Owners cease to hold, either directly or indirectly, a majority of the equity interests in Refinery Operator following the consummation of such transaction or series of transactions, (ii) the Owners cease to directly or indirectly control Refinery Operator following consummation of such transaction or series of transactions or (iii) the Owners cause Refinery Operator to sell, transfer or dispose of all or substantially all of its assets, or all or substantially all of the assets constituting the Refinery by asset sale, stock sale, merger or otherwise; *provided, however*, that no Refinery Change of Control shall be deemed to have occurred in the event of any direct or indirect transfer of a majority of the equity interests in Refinery Operator to an Affiliate thereof or a transfer under clause (iii) above to an Affiliate of Refinery Operator.

"*Refinery Deconstruction*" shall have the meaning set forth in Section 6.4(B)

"*Refinery Evaluation Period*" shall have the meaning set forth in Section 6.4(A)

"*Refinery Operations*" shall mean the processing at the Refinery of crude oil and other feedstock into refined petroleum products or biofuels (including renewable diesel) and the commercialization thereof, including Shared Services Systems operations

"*Refinery Operator*" shall mean LB Refining and any wholly-owned subsidiaries thereof that are engaged in acquiring, owning (directly or indirectly) or operating, in whole or material part, the Refinery as set forth in this Agreement.

"*Refinery Property Option Agreement*" means the Option Agreement, dated January 4, 2016, by and between Limetree Bay Terminals, LLC and HERT, as successor in interest to HOVENSA L.L.C.

"*Refinery Restart*" shall mean the resumption or initiation on the Site of existing or after constructed petroleum processing units and achievement of (a) an average throughput of at least eighty-five thousand (85,000) barrels per day for a period of at least fourteen (14) consecutive days (without any of the processing units in a minimum configuration consisting of a crude unit, a vacuum unit, the coker, DD6, DD7, DD9, and a platformer going off-line or failing to operate unless otherwise provided for in the start-up testing procedure) or (b) a cumulative Processed Volume of two million (2,000,000) barrels. "Petroleum processing units," for purposes of this definition, shall include (i) physical processes for separating hydrocarbon compounds based on physical characteristics such as distillation, and (ii) chemical processes for transforming the

17

structure of petroleum molecules, including without limitation cracking, coking, and hydrotreating. For the avoidance of doubt, the Refinery Restart may occur only once.

"*Refinery Secured Assets*" shall have the meaning set forth in Section 9.1.

"*Refinery Security Documents*" shall have the meaning set forth in Section 9.1.

"**Refinery Site**" shall mean the real property at the Site on which the Refinery and various Shared Services Systems are now or hereafter located as further described in Appendix A, together with all other real property now or hereafter owned, occupied, or leased by Refinery Operator at the Site and used in each case in connection with the Refinery, including Refinery Submerged Lands and excluding the Excluded Lands.

"*Refinery Site Restoration*" shall have the meaning set forth in Section 16.3(B).

"*Refinery Submerged Lands*" shall have the meaning set forth in Section 6.3(A).

"*Refinery Subordinate Security Interest*" shall have the meaning set forth in Section 9.1.

"*Refinery Transfer Agreement*" shall have the meaning set forth in the Recitals.

"*Release*" shall mean any release, spill, emission, leaking, dumping, injection, pouring, pumping, placing, emptying, injecting, escaping, discarding, abandoning, deposit, disposal, discharge, migrating, or disposal into, on, under, or through the environment (including, but not limited to, ambient air, surface water, groundwater, soil, land surface, or subsurface strata)

"*Respond*" or "*Response*" shall mean all actions, including but not limited to removal actions, remedial actions, corrective actions, enforcement actions, and natural resource restorations, mitigations, and replacements, taken or ordered by or on behalf of the U.S or the Government, ordered by a court of competent jurisdiction, or otherwise required by Applicable Law, pursuant to any Environmental Laws in response to any Release or threatened Release of a Contaminant.

"*Return*" shall mean all returns, statements, forms and reports for Taxes.

"*RINS Price*" shall have the meaning set forth in Section 8.2(C).

"*Senior Management Employees*" shall mean the ten (10) most highly compensated Full-Time Employees employed by Refinery Operator.

"*Senior Obligations*" shall have the meaning set forth in Section 9.1(A).

"*Severe Turn-down Year*" shall have the meaning set forth in Section 8.2(C).

"**Shared Services Systems**" shall mean the various support systems (including, without limitation, the fire control system management, power supply, and process, waste, and storm

water conveyance or treatment systems and potable water supply) currently available or to be expanded or built in the future on the Site for the provision of shared services by and between Refinery Operator, Terminal Operator, and the HERT, including as contemplated from time to time in the Shared Services Systems Agreement.

"*Shared Services Systems Agreement*" shall have the meaning set forth in the Recitals

"*Site*" shall mean the real property on which the Oil Refinery and Related Facilities are located, including but not limited to land, "*submerged and filled lands*" and "*trust lands*", within the meaning of 12 V.I.C. § 902(cc) and (dd), respectively, waterways, groundwater, and coastal zones, as further described and delineated in Appendix A with respect to those assets and certain lands and rights to land acquired by Terminal Operator or Refinery Operator under or as contemplated by the Amended Terminal Operating Agreement, this Agreement and the Purchase Agreement (as defined in the Amended Terminal Operating Agreement) and including the Terminal Site, Refinery Site, and Option Parcels, together with all other real property now or hereafter owned or leased by Terminal Operator or Refinery Operator adjacent or in close proximity to the Terminal Site, Refinery Site, or Option Parcels and used in connection with the Terminal or Refinery, but excluding the Excluded Lands.

"*Submerged Lands*" shall mean such portions of the Site that are subject to the Submerged Land Lease, a Submerged Lands Permit, or occupancy or development rights to trust lands or other submerged lands in Coastal Zone Management permits as modified and assigned to Terminal Operator or Refinery Operator, as applicable.

"*Submerged Land Lease*" shall mean that certain Lease, dated as of October 16, 1976, by and between the Government and HOVIC.

"*Submerged Lands Permits*" means all permits issued by a Governmental Authority in connection with the Submerged Lands, as set forth in Section 6.3.

"*Subordinate Security Interest*" shall have the meaning set forth in Section 9.1.

"*Supply and Offtake Counterparties*" shall have the meaning set forth in Section 11.1.

"*Surface Impoundment No. 3*" shall have the meaning given to it in Module IV.A of the 1999 RCRA Part B Permit, EPA Facility I.D. Number: VID980536080 (the "*RCRA Part B Permit*") and as shown on Figure 1 to the RCRA Part B Permit and Attachment IV-1, Figure D-3.

"*Taxes*" shall mean all taxes, assessments, charges, duties, fees, levies or other governmental charges imposed by a taxing authority, including all U.S. federal, state, territory, local, foreign, and other income, franchise, annual report fees, profit, gross receipts, capital gains, capital stock, transfer, sales, use, value added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, social security, withholding, and other taxes, assessments, charges, duties, fees, levies, and other governmental charges imposed by a taxing

19

authority of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Return) all estimated taxes, deficiency assessments, additions to tax, penalties, and interest.

"*Term*" shall mean the Initial Term and any Extensions.

"*Terminal*" shall mean all storage and blending equipment, docks, tanks, and all other related facilities, equipment, and real and personal property associated with petroleum import, export, mixing, storage, and related activities, including certain Shared Services Systems and housing for employees and contractors of Terminal Operator, exclusive of the Refinery, and in each case, now or hereafter located on the Terminal Site.

"*Terminal Operator*" shall have the meaning set forth in the recitals.

"*Terminal Site*" shall mean the real property at the Site on which the Terminal and certain Shared Services Systems are now located as further described in Appendix A, together with all other real property at the Site now or hereafter owned, occupied, or leased by Terminal Operator and used in connection with the Terminal, including Terminal Submerged Lands (as defined in the Amended Terminal Operating Agreement) and Option Parcels and excluding the Excluded Lands.

"*Termination*" shall have the meaning set forth in Section 16.3(A).

"*Termination Event*" shall have the meaning set forth in Section 16.3(A).

"*Total Realized Refinery Profit*" shall mean, as of any date of calculation and without double counting, (i) Refinery Operator's total Distributions through such date, *plus* (ii) consideration received by the Owners for the Refinery in a Refinery Change of Control transaction on or prior to such date, *less* (iii) all capital contributions to Refinery Operator through such date. Total Realized Refinery Profit shall exclude any amounts associated with the transfer of the Refinery to Refinery Operator.

"*Transaction Value*" shall have the meaning set forth in Section 8.6(B).

"*Turn-down Year*" shall have the meaning set forth in Section 8.2(C).

"*U.S. Virgin Islands Resident*" shall mean (i) any United States citizen currently domiciled in the U.S. Virgin Islands for one year or more; (ii) an individual who has attended a school in the U.S. Virgin Islands for at least six years or is a high school or UVI graduate and who is registered to vote in the U.S. Virgin Islands; or (iii) the holder of a permanent resident card (United States Department of Justice Form No. I-551, or appropriate successor form(s)) domiciled in the U.S. Virgin Islands for one year or more. An individual shall demonstrate that he or she has been a resident for one year or more for the purpose of this definition using documents that demonstrate the commencement of the individual's residency in the USVI. Such documents may include, without limitation, a residential lease, a deed, a W-2VI Form issued by

an employer, a W-4 form timely completed by an employee, a voter registration card, a permanent resident card, and a U.S. Virgin Islands driver's license.

"*USDOJ*" shall have the meaning set forth in Section 4.1(B).

"*USGC VGO Price*" shall have the meaning set forth in Section 8.2(C).

"*UVI*" shall have the meaning set forth in Section 7.4.

"*VIWAPA*" shall have the meaning set forth in Section 8.7.

Section 1.2.   **Agreement Components**. This Agreement consists of the body of this Agreement and the following attachments:

Appendices:

Appendix A   Terminal Site and Refinery Site

Appendix B   List of Claims and Litigations

Appendix C   NRD Settlement and Release Agreement

Appendix D   Base Margin

Appendix E   Memorandum of Understanding with UVI

Appendix F   Form of Special Warranty Deed

Each Appendix referred to in this Agreement is part of this Agreement and is hereby incorporated into the body of the Agreement as if set forth in full therein.

Section 1.3.   **Agreement Interpretation**. In construing this Agreement: (a) no consideration shall be given to the captions of the articles, sections, subsections or clauses, which are inserted for convenience in locating the provisions of this Agreement and not as an aid to construction and shall not be interpreted to limit or otherwise affect the provisions of this Agreement or the rights and other legal relations of the Parties; (b) no consideration shall be given to the fact or presumption that either Party had a greater or lesser hand in drafting this Agreement; (c) examples shall not be construed to limit, expressly or by implication, the matter they illustrate; (d) the word "includes" and its syntactic variants mean, unless otherwise specified, "includes, but is not limited to" and corresponding syntactic variant expressions; (e) words such as "herein", "hereby", "hereafter", "hereof", "hereto" and "hereunder" refer to this Agreement as a whole and not to any particular article, section or provision of this Agreement; (f) whenever the context requires, the plural shall be deemed to include the singular, and vice versa; (g) each gender shall be deemed to include the other gender, when such construction is appropriate; (h) references to a Person are also to its permitted successors and permitted assigns; (i) all references in this Agreement to Appendices, Exhibits, Schedules,

Sections and Articles refer to the corresponding Appendices, Exhibits, Schedules, Sections and Articles of this Agreement unless expressly provided otherwise; (j) references to the "U.S." mean to the United States of America; (k) references to "$" or "Dollars" mean U.S. Dollars; and (l) unless otherwise expressly provided herein, any agreement, instrument or Applicable Law defined or referred to herein means such agreement, instrument or Applicable Law as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of Applicable Laws) by succession of comparable successor Applicable Laws and reference to all attachments thereto and instruments incorporated therein. .

## ARTICLE 2
## TERM OF AGREEMENT

Section 2.1.    **Effective Date**. This Agreement shall become effective (the "*Effective Date*") upon the first day on which (i) this Agreement has been executed by all Parties and (ii) this Agreement has been duly ratified by the Legislature of the U.S. Virgin Islands.

Section 2.2.    **Initial Term**. The initial term of this Agreement (the "*Initial Term*") shall commence on the Effective Date and continue in effect until January 4, 2041, unless extended pursuant to Section 2.3 below.

Section 2.3.    **Extension of Term**. The Term may be extended for up to one (1) period of fifteen (15) additional years (the "*Extension*") upon (a) the delivery of written notice to the Government by Refinery Operator no later than eighteen (18) months prior to the expiration of the Initial Term, (b) certification by Refinery Operator that as of the date of such notice and as of the expiration of the Initial Term, Refinery Operator is in material compliance with its obligations under this Agreement, and (c) within forty-five (45) Days of receipt of such certification, the Government shall confirm that Refinery Operator's certification is correct, such confirmation not to be unreasonably withheld, conditioned or delayed.

Section 2.4.    **End of Term**. Not fewer than two (2) years prior to the end of the Term (as it may be extended by the Extension), Refinery Operator and the Government shall negotiate in good faith to reach a commercially reasonable agreement on a further extension of this Agreement. If Refinery Operator and the Government are unable to reach such an agreement, then the expiration of the Term shall constitute a Termination Event for purposes of Section 16.3(A)(3).

## ARTICLE 3
## CLOSING; CLOSING CONDITIONS; TERMINATION BEFORE CLOSING

Section 3.1.    **Time and Place of Closing.**

(A)    **Closing.** Unless this Agreement shall have been terminated and the transactions herein contemplated shall have been abandoned pursuant to this Article 3, and subject to the satisfaction or waiver of the conditions set forth in Section 3.2 (other than

22

conditions, the fulfillment of which, by their nature, are to occur at the completion of the transactions contemplated by this Agreement (the "*Closing*")), the Closing shall take place at the same time and place as the closing under the Refinery Transfer Agreement, provided that all conditions precedent to Closing have been satisfied or waived by the appropriate party, but in any event no later than three (3) months following the Effective Date, unless otherwise extended for an additional three (3) months' period by mutual agreement of the Governor and Refinery Operator.

      (B)    **Closing Date.** The date on which the Closing occurs is herein referred to as the "*Closing Date*".

Section 3.2.   **Conditions to Closing**

      (A)    **Condition Precedent.** This Agreement and all of its terms shall be subject to the ratification and approval of the Legislature and the placement of the signature of the Governor thereon.

      (B)    **Conditions of the Government to Closing.** The obligations of the Government to consummate the transactions contemplated by this Agreement are subject, at the option of the Government, to the satisfaction or waiver by the Government, on or prior to Closing, of each of the following conditions

      (1)    All conditions precedent and other closing requirements pursuant to the Refinery Transfer Agreement have been satisfied or waived.

      (2)    No order, writ, injunction or decree shall have been entered (and be in effect) by any Governmental Authority of competent jurisdiction prohibiting the transaction from proceeding; and no statute, rule, regulation or other legal requirement shall have been promulgated or enacted (and be in effect) by any Governmental Authority, that, on a temporary or permanent basis, restrains, enjoins or invalidates the transactions contemplated hereby.

      (3)    Each of the representations and warranties of Refinery Operator contained in this Agreement shall be true and correct in all material respects.

      (4)    Refinery Operator shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed under this Agreement prior to or on the Closing Date.

      (5)    Refinery Operator shall have delivered to the Government the items identified in Section 3.3(A).

      (C)    **Conditions to Refinery Operator Closing.** The obligations of Refinery Operator to consummate the transactions contemplated by this Agreement are subject, at the

23

option of Refinery Operator, to the satisfaction or waiver by Refinery Operator, on or prior to Closing, of each of the following conditions:

(1)    The Legislature shall have ratified and approved the transactions contemplated by this Agreement, and the terms and conditions of this Agreement and the signature of the Governor of the U.S. Virgin Islands (the "*Governor*") shall have been placed thereon.

(2)    The transactions contemplated by the Refinery Transfer Agreement and Amended Terminal Operating Agreement shall have closed.

(3)    No order, writ, injunction or decree shall have been entered (and be in effect) by any Governmental Authority of competent jurisdiction prohibiting the transaction from proceeding; and no statute, rule, regulation or other legal requirement shall have been promulgated or enacted (and be in effect) by any Governmental Authority, that, in each case, on a temporary or permanent basis, restrains, enjoins or invalidates the transactions contemplated hereby. For the avoidance of doubt, nothing herein is intended to negate or obviate any condition or use restriction set forth in any permit, consent decree, or Environmental Law.

(4)    Each of the representations and warranties of the Government contained in this Agreement shall be true and correct in all material respects.

(5)    The Government shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed by the Government under this Agreement prior to or on the Closing Date.

(6)    Terminal Operator shall have assigned or transferred its rights and obligations with respect to the Refinery Submerged Lands to Refinery Operator, as approved herein by the Government as set forth in Section 6.3 hereof, including the transfer of certain rights and obligations with respect to certain Refinery Submerged Lands currently occupied by Terminal Operator that appear on Appendix A as Refinery Submerged Lands for which the right to occupy and use is set forth in the Original Terminal Operating Agreement and included in the Refinery Transfer Agreement but for which it is understood by the Government no separate lease or permit exists for Terminal Operator to assign or transfer.

(7)    Refinery Operator shall have entered into definitive and comprehensive commercial documentation with one or more qualified and experienced companies for feedstock supply, product offtake and financial participation in the Refinery Restart and the conditions to effectiveness of such documentation shall have been satisfied or waived in accordance with the terms thereof.

Section 3.3.   **Closing Deliveries**.

24

(A)     **Closing Deliveries of Refinery Operator.** At the Closing, upon the terms and subject to the conditions of this Agreement, Refinery Operator shall deliver, or cause to be delivered, to the Government, or perform or cause to be performed, the following:

(1)     A certificate duly executed by an authorized officer of Refinery Operator dated as of the Closing Date, certifying on behalf of Refinery Operator that the conditions set forth in Section 3.2(B)(5) have been fulfilled;

(2)     A certificate duly executed by an authorized officer of Refinery Operator dated as of the Closing Date, (i) attaching and certifying on behalf of Refinery Operator complete and correct copies of (x) the organizational documents of Refinery Operator, as in effect as of the Closing Date, and (y) the resolution of Refinery Operator authorizing the execution, delivery and performance by Refinery Operator of this Agreement and the transactions contemplated hereby and (ii) certifying the incumbency of each authorized representative of Refinery Operator executing this Agreement or any document delivered in connection with the Closing;

(3)     Evidence of payment of the Closing Payment by wire transfer in immediately available funds to a Government account at Bank of New York identified in advance by the Government in writing;

(4)  ·  Certificates of insurance evidencing the insurance Refinery Operator has obtained, or caused to be obtained, as required pursuant to Article 10;

(5)     The executed Refinery Security Documents; and

(6)     The Financial Assurance identified in Section 8.5.

(B)     **Closing Deliveries of the Government.** At the Closing, upon the terms and subject to the conditions of this Agreement, the Government shall deliver, or cause to be delivered to Refinery Operator the documentation required pursuant to this Agreement, as well as to perform or cause to be performed its obligations under this Agreement, including evidence of the ratification and approval of the Legislature of the transactions contemplated by this Agreement and the terms of this Agreement, including the necessary signature of the Governor.

Section 3.4.    **Termination Before Closing**

(A)     **Termination.** This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing, upon fifteen (15) days' written notice to the non-terminating party:

(1)     By mutual written consent of the Government and Refinery Operator;

(2)     By Refinery Operator, if (i) there shall be any statutes, laws, rules, regulations, ordinances, orders, and codes of or by any Governmental Authority that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited; or (ii) a Governmental Authority shall have issued an order, decree, or ruling or taken any other action permanently restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby, and such order, decree, ruling, or other action shall have become final and non-appealable; or (iii) any of the representations and warranties of the Government contained in this Agreement shall not be true and correct in all material respects at time of Closing; or (iv) the other party shall have failed to fulfill, in any material respect, any of its obligations under this Agreement required to be performed prior to or at Closing; or

(3)     By the Government, if (i) there shall be any statutes, laws, rules, regulations, ordinances, orders, and codes of or by any Governmental Authority (other than a U.S. Virgin Islands Governmental Authority) that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited; or (ii) a Governmental Authority (other than a U.S. Virgin Islands Governmental Authority) shall have issued an order, decree, or ruling or taken any other action permanently restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby, and such order, decree, ruling, or other action shall have become final and non-appealable; or (iii) any of the representations and warranties of Refinery Operator contained in this Agreement shall not be true and correct in all material respects at time of Closing; or (iv) Refinery Operator shall have failed to fulfill, in any material respect, any of its obligations under this Agreement required to be performed prior to or at Closing.

(B)     **Effect of Termination.** If (i) this Agreement is terminated pursuant to Section 3.4(A) or (ii) the Closing does not occur by the date provided in the proviso of Section 3.1(A), this Agreement shall become void and of no further force or effect, and the Original Terminal Operating Agreement shall remain in full force and effect unless otherwise terminated in accordance with its terms.

## ARTICLE 4
## REFINERY PERMITS

Section 4.1.   **Permits.**

(A)     Refinery Operator shall use commercially reasonable efforts to (i) obtain all current federal, territorial, and local Authorizations that are currently held by or issued to Terminal Operator, and any necessary modification(s) thereof, including but not limited to those under Environmental Laws, required to restart and maintain Refinery Operations as contemplated by the Agreement as soon as commercially reasonable and (ii) thereafter maintain such Authorizations. Refinery Operator shall use commercially reasonable efforts to obtain and maintain any other federal, territorial, and local Authorizations, and any necessary modification(s) thereof, including but not limited to those under Environmental Laws, in each case which, as of any date of determination, are necessary to be obtained by or on behalf of Refinery Operator at such time in light of the then current stage of development, construction

and/or operation of the Refinery to enable restart and maintain Refinery Operations in accordance with this Agreement as soon as commercially reasonable. The Government shall use commercially reasonable efforts to assist Refinery Operator in obtaining all such Authorizations. Notwithstanding the foregoing, the Parties shall cooperate with each other and use commercially reasonable efforts to support, and shall not interfere with or delay, any effort by the other Party or any other party to obtain and maintain all necessary federal, territorial, and local Authorizations, and necessary modification(s) thereof, including but not limited to those under Environmental Laws, to enable the Refinery Restart as soon as commercially reasonable.

(B)     Refinery Operator shall use commercially reasonable efforts to obtain and maintain all necessary approvals in order to restart Refinery Operations as soon as commercially reasonable, including approvals from the U.S. Department of Justice (*"USDOJ"*), the U.S. Environmental Protection Agency (*"EPA"*), the U.S. Virgin Islands Department of Planning and Natural Resources (*"DPNR"*), and the District Court for the District of the U.S. Virgin Islands (*"District Court"*) to, among other things, add Refinery Operator as a named party defendant to the Clean Air Act Consent Decree and modify the Clean Air Act Consent Decree to restart Refinery Operations. Such efforts with regard to the Consent Decree shall include, but not be limited to, (i) working with the Government (and, if applicable, third parties) and negotiating with USDOJ, EPA, and DPNR the terms and conditions of one or more filings to add Refinery Operator as a named party defendant to the Clean Air Act Consent Decree and to so modify the Clean Air Act Consent Decree (and any proposed order(s) modifying the Clean Air Act Consent Decree), (ii) cooperating with USDOJ, EPA, and DPNR and taking such actions necessary to finalize and lodge with the District Court such filings and proposed orders, (iii) cooperating with and assisting as reasonably necessary USDOJ, EPA, and DPNR in responding to any public comments, and (iv) filing of any papers, provision of testimony, participating in any public meetings or hearings or court proceedings, or taking other actions reasonably necessary to support and seek District Court approval and entry of such modification. To the extent the Government is not directly involved in any aspect of Refinery Operator's efforts pursuant to this Section 4.1(B), Refinery Operator shall timely inform the Government of the status and outcome of such efforts.

(C)     Notwithstanding any other provision in this Agreement, the Government hereby acknowledges and agrees that Refinery Operator may surrender all or part of existing permits under the Clean Air Act for the Refinery in order to achieve (i) compliance with the Clean Air Act Consent Decree, provided that Refinery Operator shall use commercially reasonable efforts to achieve compliance that do not require surrender of the permit or part thereof or (ii) to the extent done in conjunction with the permanent shut down of the portions of the Refinery for which such permits or parts thereof are surrendered.

(D)     The Government shall cooperate with and assist Refinery Operator and Terminal Operator (if added as a party to the Clean Air Act Consent Decree) with respect to a modification to the Clean Air Act Consent Decree to toll or exempt Refinery Operator and Terminal Operator from fines, penalties and liabilities thereunder prior to the Closing or that

27

accrue from and after the Original Closing Date (as defined in the Amended Terminal
Operating Agreement) or during periods when Refinery process units or equipment are idled.

## ARTICLE 5

## OPERATION OF THE REFINERY

### Section 5.1.    Independent Operation and Non-Interference

(A)    Refinery Operator and/or its permitted successors and assigns shall own
and maintain the Refinery as a standalone facility pursuant to the terms and conditions of this
Agreement from the Closing Date until completion of the Term.

(B)    The Government agrees and shall ensure that Refinery Operator shall
have the right to (i) occupy and use the Refinery Site, including the Refinery Submerged Lands
in accordance with the Submerged Lands Lease and Submerged Lands permits as assigned and
approved pursuant to Section 6.3, and Applicable Law, (ii) operate the Refinery as set forth
herein as an independent refinery facility, and (iii) perform its obligations hereunder without
regard to any judicial proceedings with respect to previous owners of the Oil Refinery and
Related Facilities or their Affiliates prior to or after the Closing, or the rights or claims of any
successor in interest to or trustee of any such previous owner's or the Government's interests in
the Refinery.

(C)    Refinery Operator shall perform all of its obligations under this
Agreement and the other agreements or transactions related thereto, and shall use commercially
reasonable efforts to cause its contractors, subcontractors and agents or employees and their
authorized representatives to perform their obligations under the relevant Contracts, in a
manner that does not unduly interfere with Terminal Operations (as defined in the Amended
Terminal Operating Agreement).

(D)    The Government shall perform all of its obligations under this
Agreement and the other agreements or transactions related thereto, and use commercially
reasonable efforts to cause its contractors, subcontractors and agents or employees and their
authorized representatives to perform their obligations, in a manner that does not unduly
interfere with the Refinery Restart and the Refinery Operations.

(E)    The Government agrees that Refinery Operator shall not be nor be
deemed a "public utility" under Applicable Law in connection with the operation of the
Refinery or any agreement to provide services to any person or entity with operations at the
Site or to the Government after Closing.

(F)    The Government acknowledges that Refinery Operator and Terminal
Operator shall have the right to modify, expand, replace and operate the power generation and
transmission facilities at the Site as they determine is necessary to provide appropriate power
generation resources to the Terminal and, as appropriate, the Refinery. Refinery Operator

28

agrees that (1) to the extent there is excess power generation capacity at the Site, it will, upon the Government's request, work in good faith with the Government and the Terminal Operator to identify means of utilizing that excess capacity for the benefit of the U.S. Virgin Islands on terms to be embodied in a customary power purchase agreement, and (2) to the extent new or additional power generation capacity is required, Refinery Operator shall, consistent with its reasonable business judgment, take into consideration alternative sources of power such as wind, solar, or other non-fossil fuel based power generation facilities.

Section 5.2.   **Refinery Operations**  Refinery Operator shall perform all operations of or related to the Refinery and carry out its responsibilities under this Agreement, and shall use commercially reasonable efforts to ensure that its subcontractors perform all operations of or related to the Refinery, (i) in accordance with International Standards, (ii) as a reasonable and prudent refinery operator, in a sound and workmanlike manner, with due diligence and dispatch; (iii) in accordance with sound, workmanlike and prudent practices of the oil refining industry; and (iv) in compliance with Applicable Law. Refinery Operator shall develop safety and access procedures and policies of general application for access to the Refinery Site, including appropriate requirements for insurance to be carried by parties, vessels, and vehicles accessing the Refinery Site.

## ARTICLE 6
## ADDITIONAL OPERATING PROVISIONS

Section 6.1.   [RESERVED]

Section 6.2.   [RESERVED].

Section 6.3.   **Submerged Lands**.

(A)   Refinery Operator shall have exclusive rights and obligations (except as provided in the Shared Systems Services Agreement) with respect to certain Submerged Lands that are part of the Refinery Site as set forth in Appendix A as updated from time to time to the extent permitted under, or in furtherance of, this Agreement, and as transferred to Refinery Operator under the Refinery Transfer Agreement ("*Refinery Submerged Lands*"), in each case with respect to the occupancy and use of said land, rights and easements as contemplated herein, as follows:

(1)   the Government consents to and hereby approves the assignment by Terminal Operator to Refinery Operator of Terminal Operator's rights and obligations under the 1998 Letter Agreement, the Submerged Land Lease, and certain Submerged Lands Permits (as described below) to the extent such rights and obligations relate to Refinery Submerged Lands, so that upon such assignment Refinery Operator at Closing shall have all the rights and obligations as regards the occupancy and use of Refinery Submerged Lands (a) as the Lessee under the Submerged Land Lease and (b) as the Permittee under Submerged Lands Permit No. 3 and Amendments 1, 2, and 3 thereto, and under Submerged Lands Permit Nos. 23 and 52 issued by the United States Department of the Interior, and under Submerged

Lands Permit No. 167 issued by the Department of Conservation and Cultural Affairs of the Government of the U.S. Virgin Islands, as amended (which permit shall be considered current and valid), and the Government will execute whatever documents are necessary to make sure any Submerged Lands currently used by Terminal Operator which are not covered by any lease or permit can be occupied and used by Refinery Operator on the same conditions and terms as Submerged Lands Permit No. 3 and Amendments 1, 2, and 3 thereto, and under Submerged Lands Permit Nos. 23 and 52, which rights and obligations shall continue for the term of this Agreement, as such term is extended, and under Submerged Lands Permit No. 167 issued by the Department of Conservation and Cultural Affairs of the Government of the U.S. Virgin Islands, as amended, (which permit shall be considered current and valid and assigned to Refinery Operator) which rights and obligations shall continue for the term of this Agreement, as the term is extended, and under Coastal Zone Management permits CZX-24-93W, CZX-8-06W, and CZX-6-99W, and in each case the relevant permit and lease shall be hereby modified to the extent required to reflect the scope of Refinery Submerged Lands set forth in Appendix A (and for the avoidance of doubt, the Government acknowledges and agrees that Refinery Operator is granted and assigned and retains all of the rights and obligations under the Submerged Land Lease and Submerged Land permits as they relate to the occupancy and use of the Refinery Submerged Lands, except for that portion of the Refinery Submerged Lands on which Surface Impoundment No. 3 is located);

(2)     subject to Section 6.3(B), at Closing, the Government hereby recognizes and agrees that (i) as regards the Refinery Submerged Lands, Refinery Operator shall owe to the Government the indemnifications of Lessee as set forth in the Submerged Land Lease, and (ii) Terminal Operator shall be released by the Government, and the Government shall be released by Terminal Operator, with respect to such indemnities as regards the Refinery Submerged Lands;

(3)     subject to Section 6.3(B), at Closing, Refinery Operator shall be substituted for Terminal Operator, and Terminal Operator shall be released, and shall release the Government, under the 1998 Letter Agreement as regards the Refinery Submerged Lands,

(4)     subject to Section 6.3(B), as regards the Refinery Submerged Lands, the Government shall allow Refinery Operator to continue to use Submerged Lands Permit No. 3, Submerged Lands Permit No. 23, Submerged Lands Permit No. 52, and Submerged Lands Permit No. 167 on the terms set forth in the Amended Terminal Operating Agreement; and

(5)     subject to Section 6.3(B), as regards the Refinery Submerged Lands, Refinery Operator shall have the right to extend the term of the Submerged Land Lease for additional terms co-terminous with this Agreement.

(B)     For the avoidance of doubt, the Parties acknowledge that the releases effected by Section 6.3(A) are not intended to release Terminal Operator with respect to any environmental contamination of or damage to any properties or the Site that occurred during the period commencing on the "Closing Date" as defined in the Original Terminal Operating

Agreement and the Closing Date hereunder, whether now known or hereafter discovered, and that Refinery Operator is not required to assume liability for any such unreleased contamination or damage and related environmental liability of Terminal Operator. Nothing in this Section 6.3(B) shall change or modify (i) Refinery Operator's or Terminal Operator's liability for, or obligations with respect to, environmental contamination or damage to any properties prior to the Closing Date hereunder or (ii) any entity's liability for, or obligations with respect to, the RCRA Corrective Action.

(C) Notwithstanding the provisions of Section 6.3(A) above, the term of the Submerged Land Lease and the use rights granted to Refinery Operator, including those granted under Permit No. 3, Permit No. 23, Permit No. 52, and Permit No. 167, to use or occupy any Refinery Submerged Lands or other lands shall not extend beyond the Term of this Agreement.

Section 6.4. **Refinery Obligations**. Following the Effective Date, Refinery Operator shall undertake the following with respect to the Refinery:

(A) **Refinery Evaluation Period**. For a period of not less than thirty-six (36) months following the Effective Date, as such period may be extended for successive one (1) year periods by Refinery Operator by ninety (90) days' written notice to the Government prior to its expiration (collectively, the "*Refinery Evaluation Period*"), Refinery Operator shall evaluate the prospects of the Refinery Restart, and shall take all commercially reasonable measures to facilitate such Refinery Restart. Refinery Operator shall certify, in writing, to the Government any achievement of a Refinery Restart within five (5) Business Days thereof. Without prejudice to the rehabilitation, construction, start-up and future operation of any existing or new units that are initiated prior to the completion of the Refinery Evaluation Period, in no event shall the Refinery Evaluation Period exceed five (5) years following the Effective Date. If Refinery Operator would be subject to material liability under the Clean Air Act Consent Decree notwithstanding Refinery Operator and the Government's efforts pursuant to Section 4.1(A), the Refinery Evaluation Period shall, at the option of Refinery Operator, be terminated for all or a subset of the Refinery prior to the end of the then-current Refinery Evaluation Period within ten (10) days of a written notice by Refinery Operator of termination of such Refinery Evaluation Period, to minimize any such liability.

(B) **Refinery Deconstruction**. If (x) by the end of the Refinery Evaluation Period, no Refinery Restart has occurred or is planned to occur, Refinery Operator shall, within three (3) years following the end of such period, upon the Government's request in writing to so deconstruct (or at such earlier date as Refinery Operator may choose), undertake and complete the deconstruction of such parts of the above-grade Refinery as Refinery Operator determines, acting reasonably and in coordination with Terminal Operator, are unutilized and not necessary for the operation of the Terminal or (y) at any time during the implementation of, or following, the Refinery Restart, Refinery Operator, acting reasonably and in coordination with Terminal Operator, determines that parts of the above-grade Refinery, are unutilized and not necessary for the operation of the Refinery or the Terminal, then Refinery Operator may

31

undertake and complete the deconstruction of the parts of the above-grade Refinery so identified (in each case, the "***Refinery Deconstruction***"), subject to the following:

(1) The Refinery Deconstruction shall be developed and implemented by Refinery Operator and shall include decommissioning and dismantling the portions of the Refinery that are the subject of a Refinery Deconstruction, using commercially reasonable precautions for the protection of human health or the environment (including, but not limited to, all precautions required by Applicable Law) and in each case consistent with continued industrial use of the Refinery Site, including any remaining above-grade structures, fixtures, equipment, and machinery comprised by the Refinery, and removing such above-grade structures, fixtures, equipment, and machinery from the Refinery Site, except for (i) any portions of the Refinery necessary to the Terminal, including the Shared Services Systems, and (ii) subject to Applicable Law, in connection with a Refinery Deconstruction pursuant to Section 6.4(B)(x) above any portions of the Refinery identified in writing by the Government on a schedule to be provided to Refinery Operator by the Government not less than sixty (60) days after the end of the Refinery Evaluation Period.

(2) The Refinery Deconstruction shall be conducted at Refinery Operator's sole expense. To the extent the Refinery Deconstruction results in proceeds from the sale of structures, fixtures, equipment, or machinery, such proceeds will be distributed as follows:

(a) For any Refinery Deconstruction occurring prior to the Refinery Restart, Refinery Operator shall retain one hundred percent (100%) of the net proceeds received by it in connection with any such sales and reinvest such proceeds to fund capital expenditures incurred or to be incurred by Refinery Operator and its Affiliates in connection with such Refinery Restart and, to the extent that a positive balance of any such proceeds remains with Refinery Operator following Refinery Restart, Refinery Operator shall pay to the Government 50% of any such remaining net proceeds in excess of five million Dollars ($5,000,000), after giving effect to the payment of the costs of such Refinery Deconstruction; and

(b) For any Refinery Deconstruction occurring after the Refinery Restart, Refinery Operator shall retain the first five million dollars ($5,000,000) of net proceeds, and shall pay promptly to the Government fifty percent (50%) of any net proceeds in excess of five million dollars ($5,000,000), after giving effect to the payment of or irrevocable reserve for the costs of such Refinery Deconstruction.

(3) Refinery Operator will assume no liability for the remediation of any environmental contamination that occurred prior to the Closing Date.

(4) Nothing in this Section 6.4(B) or elsewhere in this Agreement shall prevent Refinery Operator from deconstructing or selling individual processing units or other assets of the Refinery prior to the end of the Refinery Evaluation Period, where Refinery

Operator has evaluated such unit or asset and determined that it is not necessary or appropriate for use in the Refinery Restart.

(5)     For the avoidance of doubt, Refinery Deconstruction shall not include any obligation to remove concrete pads or foundations

(C)     **Purchase Options.**  Following the Closing and for the avoidance of doubt irrespective of whether any Refinery Deconstruction has occurred, to the extent Refinery Operator does not own or have interests in certain real or personal property or Submerged Lands necessary to the operation of the Refinery, the Government acknowledges that (x) Refinery Operator or an Affiliate thereof shall be permitted to acquire from Terminal Operator, its Affiliates, or HERT (or the successors in interest thereto) (i) all or a portion of such property utilized primarily in connection with the Refinery for the purpose of expanding the Refinery, conducting refining or other processing operations, or other related commercial endeavors and (ii) rights, property and interests contemplated by the Shared Services Systems Agreement and (y) Terminal Operator shall have a similar purchase option under the Amended Terminal Operating Agreement.  The purchase price of such land shall be one Dollar ($1) per acre.  The Government acknowledges that upon assignment by Terminal Operator of all or any portion of its rights under the Refinery Property Option Agreement, Refinery Operator may exercise the option to purchase Option Refinery Property as set forth in the Refinery Property Option Agreement, and that Refinery Operator may accept assignment of and exercise on its own behalf the Terminal Operator's rights, pursuant to Section 6.5(B) of the Amended Terminal Operating Agreement, to acquire some or all of the Option Parcels and have them included within the Refinery and the Refinery Site.  Upon exercise of such option, the Parties shall execute and deliver such documents as are necessary or desirable to effectuate the sale and conveyance of the Option Refinery Property (as set forth in the Refinery Property Option Agreement) from the Government to Refinery Operator, including without limitation the Special Warranty Deed in the form set forth in Appendix F.

(D)     **Terminal Operator Obligations.**     Refinery Operator and the Government hereby acknowledge that in the event Refinery Operator fails to perform its obligations under paragraph (B) of this Section 6.4, Terminal Operator shall be required to undertake those obligations, as provided in the Amended Terminal Operating Agreement.  Refinery Operator and the Government hereby acknowledge that Terminal Operator shall retain certain above-grade Shared Services Systems for the benefit of the Site.

### ARTICLE 7
### EMPLOYMENT

Section 7.1.   **Minimum Commitment.**

(A)     Refinery Operator acknowledges that the commitment to increased long-term employment at the Refinery is a material goal of the Government's entry into this Agreement.

(B)     Promptly upon Closing and for at least thirty (30) days after the Closing Date, and, thereafter, for at least one hundred and eighty (180) days prior to any planned Refinery Restart, Refinery Operator shall use commercially reasonable efforts to solicit U.S. Virgin Islands Residents for employment at the Refinery, including by (i) advertising all employment vacancies in appropriate local newspapers, television stations, radio stations, and online news outlets, and (ii) posting all such vacancies with the U.S. Virgin Islands Department of Labor.

Section 7.2.   **Resident Employment**.   Not later than eleven (11) months following the Refinery Restart and during any period of Refinery Operations, Refinery Operator shall use commercially reasonable efforts to ensure that not less than eighty percent (80%) of the Full-Time Employees at the Refinery, and not less than fifty percent (50%) of the Senior Management Employees at the Refinery shall be U.S. Virgin Islands Residents, such residency to be confirmed annually by the Commissioner of Labor for the remainder of the Term; *provided*, in each case, that such applicants are, in the reasonable opinion of Refinery Operator, qualified for purposes of the Refinery Operations. For the purposes of this Article 7, individuals formerly employed by Terminal Operator, HOVENSA, HOVIC, or Pinnacle Services, LLC, for work at or regarding the Refinery or Terminal in the U.S. Virgin Islands in the ten (10) years preceding the Closing Date shall be considered U.S. Virgin Islands Residents.

Section 7.3.   **Hiring Preferences**.   To the extent that fewer than eighty percent (80%) of the Refinery's employees are U.S. Virgin Islands Residents for a particular calendar quarter, Refinery Operator shall (1) use commercially reasonable efforts to seek applicants for open positions from persons who are U.S. Virgin Islands Residents (and others who have demonstrable ties to such residents) and (2) in making hiring decisions, give preference for such positions to applicants who are U.S. Virgin Islands Residents; *provided*, that such applicants are, in the reasonable opinion of Refinery Operator, qualified for purposes of the Refinery Operations. If, at the end of the following calendar quarter, after making such efforts and providing such preferences, fewer than eighty percent (80%) of the Refinery's employees are U.S. Virgin Islands Residents, Refinery Operator shall certify in writing to the Commissioner of Labor that meeting the eighty percent (80%) target was impracticable for the preceding calendar year and that Refinery Operator shall continue to make best efforts to meet the target in the succeeding calendar year.

Section 7.4.   **Non-Discrimination**. Refinery Operator hereby agrees that no person, employee or applicant shall be excluded from participating in, or be subject to, discrimination in the performance of duties relating to or arising from this Agreement or the operations contemplated herein, on account of race, creed, color, sex, sexual orientation, religion, disability, national origin or veteran status. Refinery Operator shall not discriminate in employment decisions, including but not limited to upgrading, demotion, transfer, recruitment, layoff, termination, rates of pay or other forms of compensation and selection for training. Refinery Operator shall comply with Applicable Laws relating to employment matters, including those regarding posting of notices relating to workplace rights.