Section 7.5.   **Training and Continuing Education**. Refinery Operator shall annually contribute not less than two hundred thousand dollars ($200,000) for training and scholarships for residents of the U.S. Virgin Islands. That contribution shall include, without limitation, (A) increasing financial support for the University of the Virgin Islands' ("*UVI*") degree program in Applied Science of Process Technology, on substantially the terms set forth in Appendix E, *provided, however*, that (1) Refinery Operator shall be deemed to have satisfied its obligations set forth in Appendix E so long as Terminal Operator is satisfying its obligations under Section 7.4 of the Amended Terminal Operating Agreement, and (2) Refinery Operator shall no longer be required to satisfy any obligations set forth in paragraph 9 of Appendix E that require Refinery Operator to provide the UVI with access to the training school referred to therein (now owned by the Government) and (B) providing college scholarships to U.S. Virgin Islands students. In addition, throughout the Term of this Agreement, Refinery Operator shall use commercially reasonable efforts to create and operate at Refinery Operator's own cost and expense additional training programs for the purpose of maximizing employment opportunities at the Refinery for U.S. Virgin Islands Residents, including establishing training programs that will teach refining-related skills to qualified U.S. Virgin Islands Residents including: refinery safety, refinery operations, general refinery maintenance, environmental management, welding, instrument fitting, pipe fitting and electrical maintenance. Refinery Operator shall cooperate with UVI with respect to such programs.

## ARTICLE 8
## FINANCIAL OBLIGATIONS OF REFINERY OPERATOR

Section 8.1.   **Closing Payment and Related Payments.** At Closing, Refinery Operator shall pay to the Government forty million dollars ($40,000,000), constituting a partial prepayment of future Quarterly Refinery Payments (as provided in Section 8.2 below) (the "*Closing Payment*"), in addition to the thirty million dollars ($30,000,000) to be paid to the Government by Terminal Operator pursuant to Section 8.1(B) of the Amended Terminal Operating Agreement.

Section 8.2.   **Quarterly Refinery Payment**.

Subject to Section 8.2(D) and the occurrence of the Refinery Restart, Refinery Operator agrees to pay to the Government a quarterly amount (the "*Quarterly Refinery Payment*"), in lieu of payment of certain taxes exempted in accordance with Article 11, as follows:

(A)   Each Quarterly Refinery Payment shall be the sum of (x) the product of (i) twenty-two million five hundred thousand dollars ($22,500,000), and (ii) the fraction of the Contract Year covered by the applicable calendar quarter (or portion thereof, with respect to the calendar quarter during which the Refinery Restart occurs and the calendar quarter during which this Agreement terminates), *plus* (y) the applicable Margin Adjustment (which may be positive or negative), *provided*, that

(1)   except as provided in paragraph (B) of this Section 8.2, the sum of the Quarterly Refinery Payments for each Contract Year shall not be less than fourteen

million dollars ($14,000,000) (the *"Minimum Payment"*) or more than seventy million dollars ($70,000,000) (the *"Maximum Payment"*) (pro-rated to any portion of such Contract Year), and

        (2)    all Quarterly Refinery Payments shall be retained by Refinery Operator and applied to reduce the Closing Payment Balance until the Closing Payment Balance is zero dollars ($0).

      (B)    Notwithstanding any contrary provision of this Section 8.2:

        (1)    if a Contract Year is a Turn-Down Year, then the Minimum Payment for such Contract Year shall be ten million dollars ($10,000,000). If in such Contract Year the Closing Payment Balance is greater than zero, all Quarterly Refinery Payments for such year shall be retained by Refinery Operator and applied to reduce the Closing Payment Balance until the Closing Payment Balance is zero dollars ($0);

        (2)    if a Contract Year is a Severe Turn-Down Year, then the Minimum Payment for such Contract Year shall be zero dollars ($0); and

        (3)    if during a Contract Year Refinery Operator provides three (3) months' advance written notice to the Government of its intent to discontinue Refinery Operations specifying a discontinuation date and, during such three (3) month period, proceeds to discontinue Refinery Operations, then each Quarterly Refinery Payment shall be reduced to zero dollars ($0) with effect from and after such discontinuation date, *provided*, that if Refinery Operator subsequently resumes Refinery Operations during the Term, the Quarterly Refinery Payment shall be calculated in accordance with this Section 8.2 from and after the date of such resumption of Refinery Operations.

      (C)    **Certain Defined Terms.** As used in this Section 8.2, the following terms shall have the meanings set forth below:

        (1)    *"ASCI Price"* shall be the simple average over the applicable quarter of the daily price per barrel quoted by Argus (on days when quoted) as "Argus Sour Crude Index (ASCI) month" (PA0006594).

        (2)    *"Base Margin"* shall be the margin per barrel shown in Appendix D, it being understood that Appendix D shall include (i) a Base Margin for the Castilla Deemed Margin formula and (ii) a Base Margin for the ASCI Deemed Margin formula.

        (3)    *"Castilla Blend Price"* shall be the simple average over the applicable quarter of the daily price per barrel quoted by Argus (on days when quoted) as "Castilla Blend diff to Ice Brent" (PA0010780) plus, if applicable, the ICE Brent index.

(4)     "*Contract Year*" shall mean a period of twelve (12) consecutive months starting on the date on which a Refinery Restart occurs and each twelve (12) consecutive month period thereafter, except that the Contract Year during which this Agreement terminates shall end on the date of such termination.

(5)     "*Deemed Margin*" shall be equal to (1) 0.1959 x NYH RBOB Price, *plus*, (2) 0.2434 x NYH ULSD Price, *plus*, (3) 0.3888 x USGC VGO Price, *less* (4) 1.00x Castilla Blend Price; *provided*, that, if for any period of at least two consecutive calendar quarters, (i) the volume of Castilla Blend exported from Covenas averages less than 200,000 barrels per day (as determined by reputable publications or sources to be agreed upon by the Refinery Operator and the USVI Government) and/or (ii) the average sulfur content of Castilla Blend increases to 2.25% or greater, Deemed Margin shall instead be thereafter equal to (1) 0.2094 x NYH RBOB Price, *plus*, (2) 0.3212 x NYH ULSD Price, *plus*, (3) 0.3410 x USGC VGO Price, *less* (4) 0.9187 x ASCI Price, *less* (5) 0.0813 x HSFO Price.

(6)     "*HSFO Price*" shall be the simple average over the applicable quarter of the daily price per barrel quoted by Argus (on days when quoted) as "Fuel oil 3% fob USGC" (PA0000829).

(7)     "*Margin Adjustment*" shall be equal to the product of (1) 18.4%, (2) (a) the Deemed Margin *less* (b) the Base Margin and (3) the Processed Volume. The Margin Adjustment may be positive or negative. In the event that the prices used in the Margin Adjustment formula are no longer available, the Margin Adjustment formula will first rely on any successor index for the same crude or product with the same specifications under the same terms at the same location. If such a successor index is not available, then Section 8.2(F) shall apply.

(8)     "*NYH RBOB Price*" shall be (i) the simple average over the applicable quarter of the daily price quoted by Argus (on days when quoted) for "Gasoline reg RBOB NYH barge fob prompt continuous" ( PA0002332) converted (as necessary) to dollars per barrel *less* (ii) the RINs Price.

(9)     "*NYH ULSD Price*" shall be (i) the simple average over the applicable quarter of the daily price quoted by Argus (on days when quoted) for "Diesel ULSD NYH barge fob prompt" (PA0004080) converted (as necessary) to dollars per barrel *less* (ii) the RINs Price.

(10)     "*Processed Volume*" shall be equal to the product of (a) the average actual daily volume of crude oil, fuel oil, and any residual oil processed (i) through any crude distillation unit, (ii) through any fractionator that feeds into the coker or (iii) directly through the coker at the Refinery Site, and (b) the number of days in the applicable calendar quarter. In the event that any volume is processed more than one time through a crude distillation unit, any fractionator that feeds into the coker or the coker or is processed through more than one of a crude distillation unit, any fractionator that feeds into the coker and/or coker, such volume shall be deemed to have been processed only once.

(11)    *"RINs Price"* shall be the simple average over the applicable quarter of the daily price quoted by Argus (on days when quoted) for "RIN Argus Renewable Volume Obligation year" (PA0012358) converted (as necessary) to dollars per barrel.

(12)    *"Severe Turn-down Year"* shall be any Contract Year in which the Processed Volume is less than ten thousand (10,000) barrels per day.

(13)    *"Turn-down Year"* shall be any Contract Year in which the Processed Volume is less than eighty-five thousand (85,000) barrels per day.

(14)    *"USGC VGO Price"* shall be the simple average over the applicable quarter of the daily per barrel price quoted by Argus (on days when quoted) for "VGO 0.5% USGC cargo del vs WTI" (PA0001097) plus, if applicable, the relevant WTI index.

(D)    **Payment Terms.** Quarterly Refinery Payments shall be payable on the final day of the first, second, third, and fourth fiscal quarters of each calendar year. Any amounts owed at the end of the calendar year shall be paid within thirty (30) days after the end of such calendar year. To the extent that the relevant calculations are not determined within such quarterly periods, Refinery Operator shall make a provisional payment on such payment dates and thereafter, when the relevant calculations are finally determined, make such adjustments to the immediately following quarterly payment as may be required to ensure that Refinery Operator pays the appropriate Quarterly Refinery Payment.

(E)    **Operating Expense.** The Quarterly Refinery Payment shall be deemed an operating expense by Refinery Operator and shall be paid in lieu of the taxes, fees, and other payments that are Exemptions identified in Article 11.

(F)    **Replacement Index.**

(1)    All references in this Agreement to "Castilla Blend diff to Ice Brent (PA0010780)", "Gasoline reg RBOB NYH barge fob prompt continuous ( PA0002332)", "VGO 0.5% USGC cargo del vs WTI (PA0001097)", "RIN Argus Renewable Volume Obligation year (PA0012358)", "Fuel oil 3% fob USGC (PA0000829)", "Argus Sour Crude Index (ASCI) month (PA0006594)", and "Diesel ULSD NYH barge fob prompt (PA0004080)" (together, the *"Argus Indices"*) shall refer to the prices for such products as published by Argus Media Ltd or a successor thereof (*"Argus"*) on the relevant day.

(2)    In the event that (i) any of the Argus Indices ceases to exist or contain any of the data necessary to determine the Castilla Blend Price, the NYH RBOB Price, USGC VGO Price, the RINs Price, the HSFO Price, the ASCI Price, and/or the NYH ULSD Price (each, the *"Applicable Product Price"*), as applicable, (ii) Argus changes the basis for the determination of any of such data in a manner that is materially adverse to either of the Parties or (iii) there is a variation in the applicable products and Argus does not publish a price for such product, then, in any such case, the Applicable Product Price in question shall be based on

such alternative publication, index or manner as most closely approximates the pricing methods then adopted by firms in the refining and marketing industry for deliveries of comparable products at relevant locations and as reasonably acceptable to both Parties. In the event that no agreement is reached regarding an alternative pricing method in such a situation, then the matter shall be referred to an expert ("*Expert*") for determination in accordance with Section 8.2(G) below.

(G)    **Expert Resolution Procedures.** If a matter which arises under Section 8.2(F) is submitted to an Expert for determination or the Parties mutually agree in writing that any other matter should be referred to an Expert for determination, the following provisions shall apply:

(1)    For any matter submitted to an Expert pursuant to the provisions of this Agreement, the Parties hereby agree that the proceedings shall be conducted and the decisions rendered by the Expert within forty-five (45) days of the Expert's selection. Each Party shall propose a firm having appropriate expertise in the refining and marketing industry, and the firms selected by the Parties shall jointly select a third-party firm having appropriate expertise in the refining and marketing industry to serve as the Expert. The Expert may not have a material ongoing relationship with either Party, provided, however, that each of Refinery Operator or, in the case of the Government, the Governor, may waive such requirement in its sole discretion. The Expert, once appointed, shall have no *ex parte* communications with either Party concerning the matter before him or her. Within ten (10) days of the selection of the Expert, each Party will present to the Expert and to the other Party any information the Party believes relevant to its position, along with a proposed resolution of the matter. The Expert shall have ten (10) days to review the submissions and to make a single request of each Party for any additional information the Expert believes relevant to the determination of the matter. The Parties will have ten (10) days to respond to the Expert's request. The Expert shall then have fifteen (15) days to make his or her decision.

(2)    The Expert shall not be authorized to award costs, fees or expenses to the prevailing party. The Expert's decision shall be final and binding on the Parties save in the case of fraud or manifest error. The Parties shall bear their respective costs and expenses related to, or arising in connection with, any proceedings before an Expert. Each Party shall bear 50% of the fees and expenses of the Expert.

Section 8.3.    **Payment Recalibration.** The payment obligations provided for in Section 8.2 shall apply for the first ten (10) years of this Agreement. At the end of the tenth (10th) year, and again at the beginning of any extension of the Term, either Party may elect to either (A) maintain the payment obligations set forth in Section 8.2 or (B) recalibrate the payment obligations provided in Section 8.2 (a "*Payment Recalibration Election*"). If either Party makes a Payment Recalibration Election, then for each period beginning on or after the date such Payment Recalibration Election is made, the Quarterly Refinery Payment definition in Section 8.2(A) shall no longer apply and the Quarterly Refinery Payment shall thenceforth be an

39

amount equal to the Recalibration Amount with respect to such period (treating the applicable quarter as the relevant "period" for this purpose).

Section 8.4.   **Charitable Commitments**.   In any year in which it conducts Refinery Operations, Refinery Operator shall contribute a minimum of three hundred thousand Dollars ($300,000) per year (in addition to the $200,000 to be contributed to training and scholarships under Section 7.5) to charitable causes in St. Croix (which shall be charitable entities that consider themselves non-profit charitable entities under Section 501(c)(3) of the Internal Revenue Code). The beneficiaries of such contributions shall be subject to approval by the Office of the Governor, such approval not to be unreasonably withheld.

Section 8.5.   **Financial Assurance**.

(A)   The Government acknowledges that Terminal Operator has provided financial assurance under the Original Terminal Operating Agreement in an amount of fifty million Dollars ($50,000,000) (the "*Existing Terminal Financial Assurance*") and agrees that, until separate Financial Assurance is provided as set forth in Section 8.5(B), Refinery Operator shall be entitled to benefit from such Existing Terminal Financial Assurance to support its obligations under this Agreement with respect to Refinery Site Restoration and Payment Default hereunder.

(B)   As soon as reasonably practicable after the Refinery Restart, Refinery Operator shall provide evidence of financial assurance (the "*Financial Assurance*") in an amount (the "*Guaranteed Amount*") equal to the lesser of (i) twenty five million Dollars ($25,000,000) and (ii) the net present value of the Minimum Payment for the balance of the Initial Term, discounted at ten percent (10%); provided, that notwithstanding the foregoing, the Financial Assurance will never be less than fifteen million Dollars ($15,000,000).   The Financial Assurance will be available to support Refinery Operator's obligations under the Agreement with respect to Refinery Site Restoration and Payment Default. The Financial Assurance shall be in the form of (x) an irrevocable stand-by letter of credit covering the Guaranteed Amount to be issued by an international bank reasonably acceptable to the Government or (y) a guaranty from a parent company of Refinery Operator to the extent such parent company has an investment grade credit rating, in each case, in form and substance consistent with the terms of this Section 8.5.

Section 8.6.   **Government Carried Interest in Refinery Operator**.

(A)   **Carried Interest**.   Upon Closing, Refinery Operator shall grant to the Government the right to receive a fee (the "*Carried Interest*") from Refinery Operator or an Affiliate upon a Refinery Change of Control under this Agreement. The Carried Interest shall carry no governance rights, and shall entitle the Government to no distributions or other payments, except that upon the occurrence of such a Refinery Change of Control under this Agreement, Refinery Operator shall pay to the Government ten percent (10%) of the Transaction Value, calculated as set forth in clause (B) below.

40

(B)     **Transaction Value.** In the event of a Refinery Change of Control, the *"Transaction Value"* shall mean the greater of (x) the following amounts, and (y) zero (0), in each case expressed in Dollars:

(1)     In the event of a Refinery Change of Control, the Transaction Value shall be calculated as Refinery Operator's Total Realized Refinery Profit upon completion of the Refinery Change of Control transaction For the avoidance of doubt, the Total Realized Refinery Profit from any Refinery Change of Control transaction shall be the same value used to calculate returns on capital to Refinery Operator's Owners.

(2)     In no event shall the Government's share of the Transaction Value be less than twelve million seven hundred fifty thousand Dollars ($12,750,000) so long as Refinery Operator's Total Realized Refinery Profit is greater than zero Dollars ($0).

Section 8.7.    **Fuel Oil Pricing**. If during the Term, the Refinery produces for sale or export fuel oil products then in use for power generation by the Virgin Islands Water and Power Authority or any public power generation entity of the USVI that is a successor thereto ("VIWAPA"), upon the request of VIWAPA the Parties shall enter into good faith negotiations for the sale of such fuel oil products of the same specification to VIWAPA at product prices for spot market cash sales that are (x) equal to or below the lowest prices at which Refinery Operator at the time provides products of the same specification to third-party purchasers on an FOB, spot basis, adjusted to reflect any additional costs (including logistics, storage, blending, processing and other refining costs) incurred by Refinery Operator and Terminal Operator in connection with any such sales or exports and (y) on terms reasonably similar to those of such third-party sales, *provided, however,* that (x) Refinery Operator shall not be required to extend any credit to VIWAPA in connection with any such sales or exports and (y) neither VIWAPA nor any Governmental Authority shall be permitted to resell any such fuel oil products.

## ARTICLE 9
## SECURITY INTEREST

Section 9.1    **Payments Secured By Lien**

Refinery Operator shall secure all of its payment obligations under Article 8 and Article 16 (the *"Payment Obligations"*), by granting to the Government, on the Closing Date, a mortgage lien on the assets transferred to Refinery Operator under the Refinery Transfer Agreement (the *"Refinery Secured Assets"*) pursuant to a Mortgage and Security Agreement to be entered into between the parties consistent with the terms of this Article 9, and the notice of such lien on said personal property shall be reflected in a UCC-1 Financing Statement, fixture filing, or other similar document reasonably necessary to give notice (collectively, the *"Refinery Security Documents"*)   Such security interest is hereinafter referred to as the *"Refinery Subordinate Security Interest"*, provided that the Refinery Subordinate Security Interest shall only be enforceable on the terms and conditions provided herein and in the Refinery Security Documents and only to the extent there are any payment obligations under Article 8 or Article 16 which are due and payable at the time of any such enforcement, and provided that

41

(A)    **Subordination.** (i) The lien of the Refinery Security Documents, and the payment and enforcement thereof, shall be subordinate and junior in all respects to any and all financing (except financing provided by Refinery Operator's Affiliates) incurred in connection with the acquisition, recapitalization (except for recapitalization with funds from Affiliates), development, construction, rehabilitation, expansion, or enhancement or operation of the Refinery (such financings and any obligations relating thereto, including the unpaid principal of and interest on the loans and all other obligations and liabilities owed to the Lenders thereunder, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise being collectively referred to as the "*Senior Obligations*") and any easements between Refinery Operator and Terminal Operator, the burdened land of which is encumbered pursuant to a Refinery Security Document (the "*Easements*"). (ii) The Government expressly undertakes and agrees that, until such time as the Senior Obligations, together with all accrued and unpaid interest thereon and all other sums due and owing in respect thereof, shall have been paid in full in cash and all commitments thereunder shall have been terminated (such date being referred to herein as the "*Discharge Date*"), it shall not bring any legal action to enforce the Refinery Security Documents, including, without limitation, (x) foreclose, execute, levy, or collect on, take possession or control of (other than for purposes of perfection), sell or otherwise realize upon (judicially or non-judicially), or lease, license, or otherwise dispose of (whether publicly or privately), the Refinery Secured Assets or Easements, or otherwise exercise or enforce remedial rights with respect thereto, (y) solicit bids from third Persons, approve bid procedures for any proposed disposition of the Refinery Secured Assets, conduct the liquidation or disposition of Refinery Secured Assets or Easements or engage or retain sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers, or other third Persons for the purposes of valuing, marketing, promoting, and selling the Refinery Secured Assets, or (z) enforce a security interest or exercise another right or remedy, as a secured creditor or otherwise, pertaining to the Refinery Secured Assets at law, in equity, or pursuant to the Refinery Security Documents. (iii) The Government expressly undertakes and agrees that, in addition to the self-operative provisions contained in this Section, it shall enter into a subordination agreement in recordable form with respect to the Easements if requested by Refinery Operator. Any such subordination agreement shall be in form and substance reasonably acceptable to the Government.

(B)    **No Remedy Prior To Discharge.** Prior to the Discharge Date, the Government may not exercise any of its remedies under the Refinery Security Documents

(C)    **Intercreditor Agreements.** In the event that any lender granting any Senior Obligations requires an intercreditor agreement or other customary documentation to confirm the subordination of the Refinery Security Documents and the agreement of the parties that the Government shall not enforce any of the remedies allowed pursuant to the Refinery Security Documents, the Government shall execute and deliver to such lender such intercreditor agreement and other customary documentation

(D)   **Refinancing**.  In the event of the refinancing of any of the Senior Obligations described above, the Refinery Subordinate Security Interest shall be subordinate to such refinancing, and the Government shall enter into such intercreditor agreement and customary documentation to confirm the subordination of the refinancing and the agreement of the parties that the Government shall not enforce any of its remedies allowed pursuant to the Refinery Security Documents prior to the Discharge Date.

Section 9.2.   **All Necessary Actions**.  Refinery Operator shall take all actions, and execute all documents necessary, to grant, perfect, validate and provide notice of the Refinery Subordinate Security Interest, subject to those matters set forth on a Title Commitment to be obtained and delivered by Refinery Operator at or within a reasonable and customary after Closing.   To the extent permitted by Applicable Law, Refinery Operator authorizes the Government to file financing statements naming the Government as a subordinated secured party, and describing the Refinery, in any appropriate filing office.

Section 9.3.   **No Encumbrances**.  In providing these liens and entering into this Agreement, Refinery Operator hereby represents and warrants that as of the date of delivery of any Title Commitment, such portions of the Refinery as are owned by Refinery Operator are owned free and clear of liens, charges, encumbrances, or defects created by or through Refinery Operator or its Affiliates on the Refinery, including charges, claims, deeds of trust, community property interests, pledges, equitable interests, liens (statutory or other), options, security interests, mortgages, or rights of first refusal, except (i) as otherwise disclosed in the Title Commitment, (ii) permitted liens as set forth in the Refinery Transfer Agreement or any easements, licenses, rights, liens and interests of Terminal Operator pursuant to the Shared Services Systems Agreement and separate easement or license agreements, and (iii) any liens, charges and encumbrances imposed by the Government or pursuant to Environmental Law.

## ARTICLE 10
## INSURANCE

Section 10.1.   **General Insurance**.  Refinery Operator shall maintain or cause to be maintained at its own cost and expense, in full force and effect throughout the Term, with responsible insurance companies authorized to do business in the U.S. Virgin Islands, the types and limits of insurance as set forth in this Article 10.  Such companies shall have an A.M. Best Insurance Reports rating of A- or better or otherwise be reasonably acceptable to the Government. Such insurance required to be maintained by Refinery Operator hereunder shall be primary without, in the case of commercial general liability, the right of contribution of any other insurance carried by or on behalf of the Government and any additional insured.   The Government shall be named as an additional insured on all policies required under this Article 10. Notwithstanding anything to the contrary in this Agreement, Refinery Operator shall be deemed to have satisfied its obligations with respect to insurance policies required from it under this Article 10 if Refinery Operator is included as "additional insured" under the corresponding insurance policies maintained by Terminal Operator pursuant to the Amended Terminal

Operating Agreement and those policies provide coverage appropriate to and commercially adequate for the Refinery and Refinery Operations.

          Section 10.2.  **Insurance Requirements**. In addition to any insurance or demonstration of financial assurance or financial responsibility required under Applicable Law, Refinery Operator shall maintain in effect insurance of the following types and amounts of insurance coverage set forth below, *provided*, that, in each case, as of any date of determination, Refinery Operator shall be required to maintain or cause to be maintained solely such insurance requirements as are necessary to be maintained at such time in light of the then-current stage of development, construction and/or operation of the Refinery:

          (A)  **Property Insurance**. Property Insurance, including physical damage and business interruption on the terms set forth below.  The Property Insurance policy shall contain the following terms: coverage shall be provided in an amount not less than $250,000,000, for physical loss or damage except as hereinafter provided, including coverage for boiler and machinery (electrical and mechanical breakdown), transit, and off- site storage exposure, but excluding coverage for earthquake, flood and named wind for which coverage shall be provided in an amount not less than $75,000,000.  Such policy shall include provisions for first-party and third-party pollution legal liability coverage for the Site in an amount not less than $20,000,000, and first party and third-party cleanup coverage for any Response in an amount not less than $100,000,000, in excess of any financial assurance demonstration pursuant to the federal Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, et seq., and any financial responsibility demonstration pursuant to the federal Oil Pollution Act of 1990, as amended, 33 U.S.C. §§ 2701, et seq.; and the U.S. Virgin Islands Oil Spill Prevention and Pollution Control Act, 12 V.I.C. §§ 701, et seq., in effect or required for the Oil Refinery and Related Facilities or any portion thereof.  Any required payment of the deductible shall be the responsibility of Refinery Operator unless indemnified pursuant to this Agreement.

          (B)  **Workers' Compensation Insurance.**  Workers' compensation insurance, to the extent the exposure exists, to comply with statutory limits of the Workers' Compensation laws of the U.S. Virgin Islands, including coverage under the U.S. Longshore and Harbor Workers Compensation Act, where applicable, and Employer's Liability (including Occupational Disease) coverage with limits of not less than $1,000,000 each accident, $1,000,000 disease limit per employee and $1,000,000 disease policy limit.  Workers' compensation insurance shall cover all of Refinery Operator's employees, contractors and subcontractors providing services to the Refinery.

          (C)  **Commercial General Liability Insurance.**  Commercial General Liability Insurance on an "occurrence" basis with a combined single limit of liability not less than $1,000,000 per occurrence, $2,000,000 general aggregate limit and $2,000,000 products completed operations aggregate limit (which includes pollution liability coverage for products).  Subject to the terms of the policy, coverage shall include premises, operations, blanket contractual liability, independent contractors, products and completed operations and personal

44

injury coverages. The policy shall contain no exclusion for punitive or exemplary damages, unless excluded by law.

        (D)    **Automobile Liability Insurance.** Automobile liability insurance, to the extent the exposure exists, covering any automobiles used in connection with the Refinery in an amount not less than $1,000,000 per accident for combined bodily injury, property damage or death.

        (E)    **Umbrella or Excess Liability Insurance.** Umbrella/Excess Insurance covering claims in excess of the underlying insurance described in this Article 10, with a $20,000,000 minimum per occurrence and $20,000,000 annual aggregate, in excess of liability insurance set forth in this Article 10.

        (F)    **Endorsements.** All policies of liability insurance to be maintained by Refinery Operator shall be written or endorsed to include the following:

        (1)    **Severability.** A severability of interest and cross liability clause, with respect to Commercial General Liability, Automobile Liability and Umbrella or Excess Liability only.

        (2)    **Refinery Operator Certificates** Refinery Operator shall furnish to the Government certificates of insurance from each insurance carrier showing that the insurance required from Refinery Operator under this Agreement is in full force and effect. Refinery Operator or its insurer will provide the Government thirty (30) calendar days advance written notice (or 10 calendar days' notice in the case of cancellation due to non-payment of premiums) in the event of any material change to, nonrenewal of or cancellation of the required insurance. Certificates of insurance submitted under this Article 10 shall be in form and content reasonably acceptable to the Government. Certificates of each renewal of the insurance shall also be delivered to the Government promptly after received. Should any of the policies required to be maintained become unavailable or be canceled for any reason during the period of this Agreement, Refinery Operator shall immediately procure replacement coverage. In the event that Refinery Operator shall fail to provide proof of insurance as provided in this Section 10.2(F)(2) within thirty (30) days' receipt of written notice from the Government advising of such failure to provide proof of insurance, Refinery Operator shall promptly provide such proof of insurance to the Government. In the event that Refinery Operator fails to provide such proof of insurance then the Government may elect to file an action in specific performance to compel Refinery Operator to demonstrate proof of insurance, and to recover its reasonable attorneys' fees and costs in connection with such action.

        (3)    **Descriptions Not Limitations.** The coverages referred to above are set forth in full in the respective policy forms, and the foregoing descriptions of such policies are not intended to be complete, nor to alter or amend any provision of the actual policies and in matters, if any, in which the said description may be conflicting with such instruments, the provisions of the policies of the insurance shall govern; provided, however,

that neither the content of any insurance policy or certificate nor approval thereof shall relieve Parties of any of their obligations under this Agreement.

        (4)    **Contractors.**    Refinery Operator shall require all of its contractors and subcontractors (of any tier) to maintain insurance in the form and amount commensurate with the nature of the work or services that such contractor is providing on behalf of Refinery Operator.

        (G)    **Modification of Coverage Limits**. The coverage limits set forth in this Article 10 shall be subject to reasonable revision by mutual agreement of the Parties every five years, if necessary, to reflect inflation and changes in conditions or circumstances.

## ARTICLE 11
## TAX AND FEE EXEMPTIONS

        Section 11.1.  **Scope of Exemption**. Following the Effective Date, Refinery Operator and each of its Affiliates and Equity Holders that are engaged in acquiring, owning (directly or indirectly) or operating, in whole or in material part, the Refinery as set forth in this Agreement, as well as their respective customers, including Refinery processing services customers (the "*Customers*"), counterparties engaged in the supply of feedstock to, and/or offtake of products from the Refinery (the "*Supply and Offtake Counterparties*") with respect to (i) such Customers' and Supply and Offtake Counterparties' activities at the Site and (ii) any transactions with Refinery Operator and its wholly-owned subsidiaries relating to the Refinery or Refinery Operations, shall be exempt from payment of the taxes, fees, and other payments described in Section 11.2. In addition, to the extent any other party owns any portion of the Site or other real property adjacent or in close proximity to the Site and leases said portion to Refinery Operator or its Affiliates for use in operating the Refinery as contemplated in this Agreement (a "*Lessor*"), such Lessor shall be exempt from taxes imposed under Section 11.2(viii).

        Section 11.2.  **Exemptions**. For purposes of this Agreement, "*Exemptions*" shall include all Taxes, fees, excises, customs, duties, rents, royalties, withholdings, lease payments, permit fees, imposts and exactions, whether now existing or enacted hereafter, imposed by, with the consent of, or otherwise payable to, the Government, or any subdivision, agency or instrumentality thereof, on the acquisition, rehabilitation, construction, ownership (whether direct or indirect), operation, maintenance, expansion, transfer, sale of products, or any other activity contemplated by this Agreement, in respect of (i) the Refinery, (ii) the Refinery Site, (iii) the Refinery Submerged Lands (other than rental payments as set forth in this Agreement), (iv) the sale or transfer of any assets or rights or real estate to Affiliates, the Government or its designees, (v) the Shared Services Systems Agreement and the systems, rights and access contemplated thereby and (vi) property and assets acquired by the Refinery Operator as set forth herein, or any portion of such properties and assets, including materials, work in process and products thereof, and including importing, exporting, loading, unloading, discharging, storing, processing, blending, sale or purchase of oil, oil products or by-products including hydrocarbons, petrochemicals, biofuels or any other raw material or products thereof,

or any equipment or machinery imported for lease to or use in Refinery Operations. For the avoidance of doubt, the foregoing exemptions shall include specifically exemption from all:

        (i)      income Taxes (including all Taxes measured by reference to income);

        (ii)     excise Taxes;

        (iii)    customs duties;

        (iv)    fuel Taxes;

        (v)     gross receipts Taxes;

        (vi)    highway users' Taxes;

        (vii)   production Taxes;

        (viii)  property Taxes;

        (ix)    franchise Taxes and annual report fees;

        (x)     license fees;

        (xi)    withholding Taxes (including any backup withholding) on any allocations or distributions to preferred or common Equity Holders of Refinery Operator or any of its Affiliates, profit sharing payments, or on any sale, transfer or other disposition by Refinery Operator or any of its Affiliates or Equity Holders of assets or equity interests relating to the activities referred to in the foregoing provisions of this Section 11.2;

        (xii)   withholding Taxes (including any backup withholding) with respect to the transactions contemplated by the Refinery Transfer Agreement;

        (xiii)  transfer Taxes;

        (xiv)  recording fees; and

        (xv)   hotel room and lodging Taxes with respect to hotel rooms and lodging located on the Site.

For the avoidance of doubt, the Exemptions shall include any taxes, fees, or duties that would otherwise be payable by Customers and Supply and Offtake Counterparties of Refinery Operator for the import, storage, blending, sale within the Refinery or export of petroleum products.

Moreover, all persons importing building or process materials, furnishings, applications, tools, consumables, supplies, feedstock, vehicles (leased or owned), mobile equipment (leased or

owned) or manufactured process equipment and other equipment specifically for use in the construction, operation, maintenance, or expansion of the Oil Refinery and Related Facilities, or importing materials for leasing to, consumption, processing, manufacturing, blending, or storage at the Oil Refinery and Related Facilities, shall be exempt from import duties and excise taxes on those imports upon presentation of a certificate of import duties and excise taxes exemption from an authorized representative of Refinery Operator  Such certificate shall be signed and dated by an authorized representative of Refinery Operator and specifically represent that "the materials, furnishings, applications, tools, consumables, supplies, feedstock, vehicles (leased or owned), mobile equipment (leased or owned) or manufactured process equipment and other equipment as shall be set forth in this invoice is being brought into the U S  Virgin Islands for use in the construction, operation, maintenance, or expansion of the Oil Refinery and Related Facilities or is being leased to, consumed, processed, manufactured, blended, or stored at, the Oil Refinery and Related Facilities and is therefore exempted from the imposition of import duties and excise taxes (and similar taxes) as set forth in Section 11.2 of the Refinery Operating Agreement By and Among the Government of the U S  Virgin Islands and Limetree Bay Refining, LLC dated July 2, 2018."

Section 11.3  **Limitations on Exemption**  For the avoidance of doubt, the foregoing Exemptions shall not be applicable to

(i)     the employer portion of any and all payroll and employment taxes, including wage income withholding taxes, with respect to Refinery Operator's employees;

(ii)    taxes owed under the Federal Insurance Contributions Act;

(iii)   any user fees of general application for use of public facilities;

(iv)    any tax or fee collected by the United States Federal Government that is not payable to the Government or any subdivision, agency or instrumentality thereof;

(v)     withholding taxes of general application imposed directly under Workmen's Compensation, unemployment insurance and other similar employee-benefit legislation with respect to Refinery Operator's employees; and

(vi)    the tire tax imposed by 33 V.I.C. § 80 and the container tax imposed by 33 V.I.C. § 75.

Section 11.4.  **Tax Return Filings**  Refinery Operator shall file any tax returns it is required to file with the Virgin Islands Bureau of Internal Revenue, but except for the limitations on Exemptions set out in Section 11.3 above, shall not have any payment obligations as provided in this Agreement.

Section 11.5.  **No Adverse Actions**  The Government hereby agrees and covenants with Refinery Operator that, except as otherwise provided in this Agreement and to

48

the fullest extent permitted by Applicable Law, the Government shall not take or fail to take any action, nor permit any action within its control to be taken or fail to be taken, which would or could cause Refinery Operator and each of its Affiliates, Equity Holders, Customers and Supply and Offtake Counterparties to lose any applicable tax exemptions granted to such parties pursuant to this Agreement.

## ARTICLE 12
## REPRESENTATIONS AND WARRANTIES

Section 12.1. **Government Representations**. The Government hereby represents and warrants to Refinery Operator as of the Effective Date and as of the Closing Date that:

(A)     The Government is not prohibited from consummating the transactions contemplated in this Agreement by any law, regulation, agreement, instrument, restriction, order, or judgment;

(B)     The Government has, upon ratification and approval of this Agreement by the Legislature: (i) the legal power, due authority and necessary and adequate funding ability to make the representations and perform its obligations set forth in this Agreement, or shall take all legally permitted and feasible actions necessary to obtain such legal power, due authority and necessary funding; and (ii) duly obtained such approvals, Authorizations, or consents in accordance with Applicable Law and procedures to the extent that the approval, Authorization, or consent of the federal or any other territorial or local government or agency or any third Person to make the representations and perform its obligations contained herein as required;

(C)     The Government knows of no impediment which would prevent, impede, diminish or delay its timely performance of its obligations hereunder;

(D)     There are no actions, suits or proceedings pending or, to the best of the Government's knowledge, threatened against or affecting the Government before any court or administrative body or arbitral panel that could reasonably be expected to have a material adverse effect on the ability of the Government to meet and carry out the obligations of this Agreement, other than those identified in Appendix B to this Agreement.

(E)     The Government confirms that the Refinery is zoned Industrial-1 ("I-1") under the U.S. Virgin Islands zoning laws. The improvements constructed on the property and the use of the property as an oil refinery comply with the requirements of I-1 zoning. Any resurvey of the property and the filing of new OLG maps with Cadastral will not affect the property's compliance with the I-1 zoning requirements, will not result in new zoning requirements being imposed upon the Refinery, or result in the existing improvements constructed as part of the Refinery, and the use of the property as an oil refinery, no longer complying with the requirements of I-1.

49

Section 12.2. **Refinery Operator Representations.** Refinery Operator hereby represents and warrants to the Government as of the date hereof and as of the Closing Date that:

(A)     **Organization and Authority.** It has been duly organized and is validly existing and in good standing under the laws of the U.S. Virgin Islands, with all necessary power and authority to enter into, deliver and perform all its obligations under this Agreement (including a valid license to do business in the U.S. Virgin Islands).

(B)     **Due Authorization; Enforceability.** This Agreement has been duly authorized and constitutes the legal, valid and binding obligations of it, and assuming the due authorization, execution and delivery of this Agreement by the Government, is enforceable against it in accordance with its terms. It has the absolute and unrestricted right, power, authority and capacity to execute and deliver this Agreement and to perform its obligations under this Agreement.

(C)     **No Conflict.** Neither the execution and delivery of this Agreement nor the consummation or performance of any of the transactions contemplated by this Agreement will, directly or indirectly (with or without notice or lapse of time) (1) contravene, conflict with or result in a violation of (i) any provision of its organizational documents, (ii) any Contract or other agreement by which it is bound, or (iii) any resolutions adopted by its board of directors, members or its stockholders or (2) contravene, conflict with, or result in a violation of Applicable Law (other than Applicable Law of the U.S. Virgin Islands) to which it or its Affiliates may be subject. There are no actions, suits or Proceedings pending or, to the best of its knowledge, threatened against or affecting it or its Affiliates before any court or administrative body or arbitral panel that could reasonably be expected to have a material adverse effect on its ability to perform its obligations of this Agreement.

(D)     **Consents and Notices.** It is not required to give any notice to or obtain any approval, consent, ratification, waiver or other authorization of any person (including any Authorization of any Governmental Authority other than the Government) in connection with the execution and delivery of this Agreement or the consummation or performance of any of the transactions contemplated by this Agreement.

(E)     **No Litigation.** Neither Refinery Operator nor any of its Affiliates is involved in any litigation, arbitration, or claim against the Government, except for claims arising in the ordinary course of Refinery Operator's business

(F)     **Solvency.** There are no bankruptcy, reorganization or receivership proceedings pending against, being contemplated by, or, to its actual knowledge, threatened against Refinery Operator or any of the shareholders of Refinery Operator. Refinery Operator is solvent.

50

(G)    **Contaminants.** Refinery Operator has not disposed, stored or treated, or arranged for the disposal, storage or treatment, of any Contaminant that has come to be located at or on the Excluded Lands as described in Appendix A prior to the Closing Date.

## ARTICLE 13
## COVENANTS OF REFINERY OPERATOR

### Section 13.1.  **Environmental**.

(A)    **Compliance.**  Refinery Operator shall comply, and shall cause the Refinery and the Refinery Site and all operations, activities and conditions at the Refinery Site to comply with all applicable Environmental Laws. Refinery Operator shall not take, allow, or suffer any action, inaction, or condition at or in connection with the Refinery or the Refinery Site that causes or results in a Release or threatened Release that requires a Response or restoration, assessment, mitigation, or replacement of any natural resource at or in connection with the Refinery or the Refinery Site, or constitutes a violation of any Environmental Laws. In the event of such a Release or threatened Release of a Contaminant at or from the Refinery Site, Refinery Operator at its own cost shall promptly take all appropriate Responses and other actions required by applicable Environmental Laws to investigate, contain, clean up, remove, remediate, and otherwise respond to such Release or threatened Release, assess, restore, replace, or mitigate damaged natural resources, and otherwise protect human health and the environment and consistent with continued industrial use of the affected portions of the Refinery Site. For the avoidance of doubt, the Government's reasonable out-of-pocket costs and expenses it incurs (i) in oversight by DPNR of such actions, or (ii) if Refinery Operator fails promptly to conduct such Responses and the Government elects to conduct such Responses, shall be considered "Losses" for purposes of the indemnification obligation in Section 13.3(C) hereof. Nothing in this Agreement limits or precludes the Government from exercising its authorities under Environmental Laws or other Applicable Law in connection with any such Release or threatened Release.

(B)    **Due Care; Cooperation.**

(1)    Refinery Operator shall exercise due care with respect to all Contaminants at the Refinery and the Refinery Site, including but not limited to Pre-Existing Contamination, and all Contaminants Released or threatened to be Released at or from the Site or otherwise in connection with operations at the Refinery and the Refinery Site, shall take commercially reasonable precautions against foreseeable acts or omissions of any third party and the consequences that could foreseeably result from such acts or omissions, and shall comply with all Environmental Laws applicable thereto.

(2)    Refinery Operator shall cooperate and provide commercially reasonable assistance and access (where Refinery Operator possesses the legal authority to grant such assistance or access) to persons authorized by the Government to conduct Responses and/or natural resource restoration at the Site (including such reasonable

51

cooperation and access necessary for the installation, integrity, operation, and maintenance of any complete or partial Responses or natural resource restoration at the Site).

(3)     Refinery Operator shall (i) comply with land use restrictions established pursuant to Applicable Law in connection with Responses at the Refinery and the Refinery Site; (ii) not unreasonably interfere with or impede the effectiveness or integrity of any institutional or engineering control employed at the Site in connection with a Response; and (iii) comply with all reasonable requests for information or administrative subpoenas issued by the Government pursuant to Environmental Laws.

(4)     Refinery Operator shall, consistent with continued industrial use of the Refinery Site, take commercially reasonable measures, including at a minimum all measures required by Applicable Law, to (a) stop Releases at the Refinery or the Refinery Site, (b) prevent threatened or future Releases at the Refinery or the Refinery Site; (c) prevent or limit human, environmental, or natural resource exposure to Pre-Existing Contamination or other contamination at or from the Refinery or the Refinery Site; and (d) fund (through insurance, the Financial Assurance, and all other financial resources available to Refinery Operator) clean-up of all Releases occurring following the Closing Date and restoration of affected third-Person property and the environment.

(5)     Refinery Operator, and not the Government, shall have responsibility to comply with Environmental Laws regarding the Refinery and the Refinery Site as now or hereafter used or occupied by Refinery Operator, its Affiliate(s), or its designee(s), and Refinery Submerged Lands.

(6)     Refinery Operator shall comply with all Applicable Laws, including but not limited to Environmental Laws, with respect to the Refinery Operations and all other operations and activities conducted at the Refinery and Refinery Site.

(7)     To the extent not taken or performed by Terminal Operator, Refinery Operator shall, on behalf of HERT, take all actions and perform all obligations required to comply with the Resource Conservation and Recovery Act ("*RCRA*") and the Site's RCRA permit(s) and any modifications thereto and extensions thereof, including but not limited to all current and future treatment, storage, disposal, transportation, closure, post-closure, recordkeeping, reporting, financial assurance, corrective action, and remediation requirements thereunder or required by RCRA or any unilateral or consent order or decree relating to the facility or any contamination related thereto to the extent that such performance is funded by HOVENSA or HERT or, to the extent such funds prove inadequate, by amounts made available pursuant to the RCRA financial assurance demonstration for the Site, but only to the extent agreed to in writing by both EPA and DPNR. In no event shall Refinery Operator incur any liability for the environmental contamination that is the subject of the RCRA permit ("*RCRA Corrective Action*"), except to the extent that such liability results from a breach of Refinery Operator's representation in Section 12.2(G). Notwithstanding anything in this Section 13.1(B)(7) or elsewhere in this Agreement, the ongoing RCRA Corrective Action on

the Refinery Site shall be operated by HERT and shall not be the responsibility of Refinery Operator.

   (C) **Notification.** In the event that Refinery Operator becomes aware of any action or occurrence which causes or threatens a Release of a Contaminant at or from the Refinery or Refinery Site that constitutes an emergency situation or may present an imminent endangerment to human health or welfare or the environment, Refinery Operator shall immediately take commercially reasonable action (including at a minimum all action required by applicable Environmental Laws) to prevent, abate, or minimize such Release or threat of Release, and shall, in addition to complying with any applicable notification requirements under 42 U.S.C. § 9603 and any other Environmental Laws, promptly notify the Government of such Release or threatened Release.

   (D) **Permits.** Throughout the Term, Refinery Operator shall take all commercially reasonable actions, to the extent required by Applicable Law, promptly to file all applications for and obtaining, maintaining, modifying, and renewing all permits and other Authorizations required for Refinery Operator compliance with this Agreement.

   (E) **Applicable Law.** For the avoidance of doubt, nothing in this Agreement is intended to, or shall, relieve Refinery Operator of its obligation to comply with Environmental Laws.

   Section 13.2. **Consents and Approvals.** Refinery Operator shall take all commercially reasonable actions, to the fullest extent permitted by law, to obtain promptly any Authorizations or other actions on the part of Governmental Authorities or of any officials, departments, agencies, or other instrumentalities thereof that may be necessary or appropriate in connection with rehabilitating and operating the Refinery and the Refinery Site.

   Section 13.3. **Indemnification.** Refinery Operator shall defend, indemnify, and hold harmless and pay on a current basis the Government and its agents, officers, directors and employees and other representatives (each, a "*Government Indemnified Party*") from and against any and all Losses incurred by a Government Indemnified Party arising out of or relating to Refinery Operator's obligations under this Article 13:

   (A) to the extent caused by any negligent act or omission (including strict liability), gross negligence or willful misconduct of Refinery Operator, its subcontractors or any of their respective agents or employees (but only with respect to Losses for injury, illness or death to any individual or damage to any property of any Person); or

   (B) to the extent caused by breach of Applicable Law by Refinery Operator, its contractors, or any of their respective agents or employees; or

   (C) to the extent caused by or arising out of a Release or threatened Release of a Contaminant, a Response, or an obligation under any Environmental Laws at, under, on, or with respect to the Refinery or the Refinery Site;

provided, however, that Refinery Operator shall not be required to indemnify any Government Indemnified Party for Losses to the extent that such Losses suffered by the Government Indemnified Party arose out of any grossly negligent act or omission (including strict liability) or willful misconduct of any Government Indemnified Party.

Section 13.4. **Intercompany Agreements.**

(A)    **Terms.**    Any material intercompany agreements between Refinery Operator and Terminal Operator, other than the Refinery Transfer Agreement, Shared Services Systems Agreement or land and asset transfer, easement, joint use or lease agreements expressly contemplated by this Agreement, including any agreements contemplated by Section 6.4(C) (such agreements being "*Intercompany Agreements*"), shall be negotiated on arm's length, market based terms, except as would not have a material adverse impact on the Government or its rights or interests in this Agreement or the Amended Terminal Operating Agreement.

(B)    **Disclosure.** Refinery Operator shall disclose to the Government upon request all material Intercompany Agreements, including any amendments thereto    The Government agrees that the terms of Intercompany Agreements shall constitute Confidential Information.

## ARTICLE 14
## GOVERNMENT COVENANTS

Section 14.1. **Assistance with Permits**. Throughout the Term, the Government shall take all commercially reasonable actions, to the fullest extent permitted by Applicable Law, to assist Refinery Operator (and, where applicable, its contractors and subcontractors), in Refinery Operator's expeditious filing of all applications for and obtaining, maintaining, and renewing all Authorizations required for Refinery Operator's compliance with this Agreement, including such appropriate Authorization, if any, as are required to maintain the exemption from the Jones Act of the current Oil Refinery and Related Facilities. The Government shall (i) take (and shall cause its relevant agencies, departments, political subdivisions and instrumentalities to take, including DPNR) all applicable actions to qualify the Refinery Site (and limit the liability of Refinery Operator) pursuant to the Virgin Islands Brownfields Revitalization and Environmental Restoration Act (Title 12, Sections 551-557), and regulations promulgated thereunder, and under any other relevant U.S. Virgin Islands law, and (ii) cooperate reasonably with Refinery Operator in qualifying the Refinery Site for similar brownfields treatment under applicable provisions of federal law (including without limitation RCRA). In each case, Refinery Operator will timely file and diligently prosecute any such applications. The Government shall take all feasible and lawful measures necessary to have all such Authorizations issued as soon as is practicable, and otherwise shall not delay or frustrate the application process. Without prejudice to the generality of the foregoing, the Government (without limiting its permitting or enforcement discretion and in compliance with Applicable Law) shall use reasonable efforts to minimize processing time for reviewing various permits (including any Coastal Zone Management permits) related to (i) the Refinery, (ii) modifications

to existing units or installation of new units or tanks at the Refinery Site and (iii) exercising delegated authorities from the U.S. Government in respect of relevant matters. Refinery Operator or Terminal Operator may propose to the Government such Section 325 waivers of the Clean Air Act as either party may believe would benefit Refinery Operations, Terminal Operations or the Government, including, but not limited to, waivers of visibility implementation plan requirements or contemporaneous netting periods. Notwithstanding Applicable Law in the U.S Virgin Islands, Refinery Operator may elect to be added as a co-permittee, co-holder, or sole holder of any environmental Authorization issued to Terminal Operator by the Department of Planning and Natural Resources by giving Notice to the Government, and Refinery Operator's election shall be effective as of the time Notice is effective under Section 19.1 and Refinery Operator shall have as of such effective time the rights and obligations of a permittee or holder of such Authorization, unless such election violates federal Applicable Law; *provided that* any election by Refinery Operator to be added as a sole holder of an environmental Authorization shall be subject to the consent of DPNR, such consent not to be unreasonably withheld.

Section 14.2. **Consents and Approvals** The Government undertakes to use its commercially reasonable efforts in good faith to assist Refinery Operator to obtain promptly any consents, approvals, clearances, determinations, or other actions on the part of the U.S Government or of any officials, departments, agencies, or other instrumentalities thereof that may be necessary or appropriate in connection with operating the Refinery.

Section 14.3. **Beneficial Use**. Without the prior written consent of Refinery Operator, which consent may not be unreasonably withheld, conditioned or delayed, the Government, except to the extent required by Applicable Law, shall not take, approve, assist or allow any action, or fail to take, approve, assist or allow any action, if such action or failure to act, as the case may be, is reasonably likely to materially adversely affect, diminish or impair the beneficial use, operation, utility or occupancy of the Oil Refinery and Related Facilities in compliance with this Agreement or the ability of Refinery Operator in compliance with this Agreement to beneficially use, occupy, obtain, receive or otherwise enjoy any of: (i) the physical sites, facilities, improvements, programs, financial incentives or other benefits existing as of the Effective Date and/or contemplated by any portion of this Agreement, including without limitation the Shared Services Systems or (ii) the obligations or other commitments of the Government contemplated by, or set forth in, this Agreement, provided, however, that nothing in this Section 14.3 shall impair the Government's right to enact laws, regulations, or policies of general application for the preservation of public health and safety. If the Amended Terminal Operating Agreement is suspended for any reason while this Agreement remains in effect, the Government shall allow access to and use by Refinery Operator of the Terminal as reasonably determined by Refinery Operator to be necessary or appropriate for the continued operation, maintenance and use of the Refinery; provided, that Refinery Operator shall notify the Government prior to exercising such access right. If the Amended Terminal Operating Agreement is terminated while this Agreement remains in effect, Refinery Operator shall have the right to, upon notice to the Government, access the Terminal, and assume, exercise and perform all of the rights and obligations of the Terminal Operator under the Amended Terminal Operating Agreement for the remaining term of this Agreement; provided, that Refinery

Operator shall deliver a written notice of assumption to the Government agreeing to comply with the terms of the Amended Terminal Operating Agreement (upon which the terms of the Amended Terminal Operating Agreement shall be deemed to be effective with respect of Refinery Operator and the Government for the remaining term of this Agreement). In connection with any such assumption the Government shall provide such documentation as may reasonably be requested by Refinery Operator or its Lenders.

Section 14.4. **Other Legislation**. The Government agrees to use reasonable efforts to oppose any proposed legislation, initiative, act, event, plan, or proposal which would otherwise have the effect of avoiding or materially reducing any of the obligations or commitments as set forth in this Agreement. To the extent an initiative would negatively impact the full performance after the Effective Date of any or all of the obligations or commitments made by the Government, the Government shall take all legally and commercially appropriate steps to defend the obligations and commitments contained herein. For the avoidance of doubt, any new taxes (but not generally applicable user fees) adopted by the Government shall be treated as exempted payments under Section 11.2.

Section 14.5. **Change in Law**. The Government acknowledges that Refinery Operator has entered into this Agreement in material reliance on each and all of the obligations and commitments of the Government under this Agreement.   The Government represents, warrants and covenants to Refinery Operator that in the event of a Qualifying Change in Law, the result of which would be to materially (a) diminish, impede, impair, or prevent the full performance after the Closing Date of any or all of the obligations and commitments made by the Government or Refinery Operator under this Agreement, (b) increase the obligations of Refinery Operator to the Government under this Agreement, or (c) reduce the rights of Refinery Operator under this Agreement, the Government, upon prompt written request of Refinery Operator, shall (i) exercise reasonable efforts to provide Refinery Operator with an exemption from the relevant Applicable Law as so changed and (ii) to the extent such an exemption would not remedy the impact of the Qualifying Change in Law, agree to such amendments to this Agreement as may be reasonably necessary. In the event of a Change in Law that is not a Qualifying Change in Law but that has any of the impacts set forth in clauses (a), (b) and (c) above, upon prompt written request of Refinery Operator the Government shall promptly engage in good faith negotiations to seek to agree and implement any reasonable amendments to the Agreement that would be reasonably necessary to remedy the negative impact of such Change in Law. Refinery Operator shall make all commercially reasonable efforts to mitigate the adverse effects of the Qualifying Change in Law or Change in Law.

Section 14.6. **Other Benefits**. Refinery Operator and its Affiliates shall not be precluded by reason of this Agreement from applying for benefits under legislation hereafter enacted for which it or they would otherwise qualify, but to the extent such benefits are inconsistent with its or their obligations and commitments under this Agreement, the terms of this Agreement shall govern.

Section 14.7. **No Additional Cost to Refinery Operator**. The Government shall fully fund and perform its obligations under this Agreement, and at no time shall Refinery Operator be responsible for or be required to incur or pay any cost, charge or expense under this Agreement relating to those obligations (or any agreement executed pursuant hereto) unless this Agreement (or the agreement executed pursuant hereto) specifically identifies a cost, charge or expense to be borne or paid by Refinery Operator.

Section 14.8. **Zoning; Legal Descriptions** The Parties acknowledge that the legal description of parcels of land located in the U.S Virgin Islands must be described on a survey (an official OLG map) filed with and approved by the Office of Public Surveyor, Office of the Lieutenant Governor (Cadastral). To the extent any of the official OLG maps showing all or any portion of the Refinery Site or the Refinery Submerged Lands need to be modified to permit such lands to be properly conveyed to Refinery Operator by Terminal Operator under the Refinery Transfer Agreement or this Agreement or to the Government by Terminal Operator under this Agreement, then the Government agrees to cooperate with Terminal Operator and Refinery Operator to have new or revised surveys of such lands promptly reviewed and approved by the Cadastral department and to have the legal descriptions on the proposed deeds conveying such lands to be promptly reviewed and attested by the Cadastral department. The Government will provide such information and assistance as Refinery Operator may reasonably request in connection with the legal descriptions, leases and permits pertaining to the Refinery Site and the Refinery Submerged Lands. Notwithstanding any provision of chapter 3 of Title 29 of the Virgin Islands Code, the Government agrees (a) that in the event Terminal Operator or Refinery Operator exercises an option to purchase some or all of the Option Parcels, then it shall be a legally permissible use of the "Construction License Area" described in Appendix A to be used as an area for storage of construction materials and access relating to improvements to be made upon all or any of the Option Parcels; (b) that it shall be a legally permissible use of portions of the Site, including, but not limited to, plots 53 and 53-C Estate Castle Coakley to be used for housing for Terminal Operator's and Refinery Operator's employees and contractor employees, provided that such housing would qualify as permitted use under R-4 Zoning; and (c) that the use, for purposes of the Oil Refinery and Related Facilities, of the Site is hereby approved.

Section 14.9. **Security**. The Parties acknowledge that the Site is (i) a covered chemical facility for purposes of 6 CFR Part 27, (ii) regulated by 40 CFR Parts 68, 355, 370 and 372 and 33 CFR 105.305, and (iii) required by regulation and International Standards to implement appropriate security measures. The Parties hereby acknowledge and agree that (a) Site security is primarily the responsibility of Refinery Operator, and (b) the Parties shall cooperate with each other and use commercially reasonable efforts to support security measures for the Site required by Applicable Law or International Standards, including, but not limited to, perimeter access, securing Site assets, screening and control of access to the Site and steps needed to deter, detect and delay security breaches. The Government undertakes to use its commercially reasonable efforts in good faith to assist Refinery Operator to obtain promptly any consents, approvals, clearances, determinations, or other actions necessary for Refinery Operator to comply with Applicable Law and International Standards relating to Site security.

## ARTICLE 15
## REPORTING, AUDIT AND INSPECTION

Section 15.1. **Reporting**. Refinery Operator shall provide to the Government (i) not later than ninety (90) days following the close of its fiscal year, annual financial statements in accordance with Generally Accepted Accounting Principles, which shall be audited by a certified public accounting firm acceptable to the Government, (ii) not later than forty-five (45) days following the close of each fiscal quarter, unaudited quarterly financial statements, and (iii) on the date of each Quarterly Refinery Payment, the documentation supporting the calculation of such Quarterly Refinery Payment (including the Margin Adjustment) for such fiscal quarter, such deadlines subject in each case to reasonable extensions as may be required to accord with customary practice in the U.S. Virgin Islands. Refinery Operator shall provide quarterly employment information to the U.S. Virgin Islands OMB and the U.S. Virgin Islands Department of Labor for purposes of confirming compliance with Article 7. Refinery Operator shall notify the Government of any material change in the direct ownership of Refinery Operator, including but not limited to any transfer of ownership to an Affiliate, within thirty (30) days of such change.

Section 15.2. **Annual Audit**.

(A)   For the purpose of determining compliance with this Agreement and with Applicable Law, on or about March 31st of each calendar year following the Effective Date, the Government may initiate and conduct an audit of the books, accounts, and records of (a) the Refinery, and (b) Refinery Operator, to the extent such books, accounts, and records relate to the Refinery or its operations (such audit being an "*Annual Audit*").

(B)   Upon completion of any Annual Audit, the Government may prepare a report describing the results of such Annual Audit (an "*Annual Audit Report*") and shall make any such report available to Refinery Operator upon request.

(C)   Following receipt of any Annual Audit Report, Refinery Operator shall have not more than sixty (60) days in which to review such report and identify in writing any material errors or omissions therein. Any alleged material errors or omissions not so identified within the 60-day period are waived, and may not be asserted by Refinery Operator in any subsequent administrative, judicial, or quasi-judicial proceeding.

(D)   Nothing in this Section 15.2 shall constitute a waiver or limitation on the Government's tax assessment, audit, investigation, enforcement, and collection authorities.

Section 15.3. **Inspection**.

(A)   Upon fourteen (14) days' advance written notice to Refinery Operator, the Government may initiate an inspection of the Refinery for the purpose of determining compliance with this Agreement and with Applicable Law.

58

(B)     Refinery Operator hereby consents to such inspections and agrees to provide reasonable access and assistance to the personnel conducting such inspections

(C)     To the extent any inspection conducted under this Section 15.3 reveals violations of this Agreement or Applicable Law, the Government hereby agrees to provide notice in writing of such violations within ten (10) days of the Government's determination of such violation.

(D)     Upon receipt of notice of violation, Refinery Operator has thirty (30) days to submit either proof that Refinery Operator has (i) remedied the violation and has restored compliance with this Agreement or Applicable Law or (ii) provided a plan and time reasonably acceptable to the Government to remedy such violations.

(E)     Nothing in this Section 15.3 shall constitute a waiver or limitation on the Government's or other Governmental Authorities', audit, investigation, inspection, enforcement, subpoena, right of entry and access, and collection authorities or the ability to levy fines, penalties or other remedies in connection with violation of Applicable Law, consistent with this Agreement.

## ARTICLE 16
## DEFAULT AND TERMINATION

Section 16.1.  **Payment Default**. In the event that Refinery Operator fails to make any payments due and owing to the Government under this Agreement, then the Government shall have the right to give written notice to Refinery Operator of such failure, and in the event that such payment is not cured within ninety (90) days of such written notice (such failure being a "*Payment Default*"), then:

(A)     the Government shall have the right to recover any outstanding payments from the issuer of the Financial Assurance; and

(B)     to the extent any of Refinery Operator's payment obligations to the Government remain outstanding after the exercise by the Government of its remedies under clause (A) above, the Government shall have the right to exercise its Subordinate Security Interest to the extent permitted by Article 9.

Section 16.2.  **RESERVED**.

Section 16.3.  **Termination**.

(A)     **Termination Events.** Notwithstanding anything herein to the contrary, upon the occurrence of any of the following events (each a "*Termination Event*"), this Agreement may be terminated upon thirty (30) days prior written notice of such termination (a "*Termination*"), as follows:

59