or;

        (1)    By the Government, if Refinery Operator is in Payment Default,

        (2)    By either party, if the other party is in breach of any material obligation hereunder and fails to cure such material breach within ninety (90) days following written notice thereof; and

        (3)    Without further action by either Party, if the Initial Term of the Agreement expires without exercise of an Extension or upon expiration of such Extension.

        (B)    **Site Restoration.**    Upon Termination, and at the option of the Government, Refinery Operator shall, at its own expense, to the extent not already decommissioned pursuant to the terms hereof, remediate and restore the Refinery Site (the *"Refinery Site Restoration"*) by undertaking the following actions:

        (1)    decommissioning the Refinery to the extent required to keep the Refinery inactive and in-place in accordance with Environmental Laws and regulations of the United States Coast Guard, except for (i) any portions of the Refinery reasonably necessary to meet the access needs of St. Croix; and (ii) any other portions of the Refinery the Government may designate, each as identified in writing by the Government on a schedule to be provided by the Government within sixty (60) days of Termination (all decommissioned equipment, the *"Decommissioned Equipment"*), and

        (2)    disconnecting the control and electrical systems and removing hydrocarbons and Contaminants from the Decommissioned Equipment, and otherwise ensuring that the Refinery Site is in a condition that complies in all material respects with applicable Environmental Laws for ongoing heavy industrial uses permitted on the Site.

        (3)    The Refinery Site Restoration shall be undertaken by Refinery Operator. Completion of the Refinery Site Restoration shall be certified by an independent environmental engineer or environmental professional.

        (4)    For the avoidance of doubt, the Refinery Site Restoration shall not require Refinery Operator to remediate any environmental contamination for which it is not otherwise responsible under Applicable Law or this Agreement.

        (5)    Refinery Operator and the Government hereby acknowledge that in the event Refinery Operator fails to perform its obligations under paragraph (B) of this Section 16.3, Terminal Operator shall be required to undertake those obligations, as provided in the Amended Terminal Operating Agreement.

        (C)    **Transfer of Site.**    At the Government's option, either prior to or following the decommissioning activities set forth in Section 16.3(B) following a Termination, Refinery Operator shall transfer the Refinery Site (including, for the avoidance of doubt, such parts of the Refinery that remain on the Terminal Site, subject to Terminal Operator's rights

under the Shared Services Systems Agreement) to the ownership of the Government; provided, that Refinery Operator shall have all required access to the Refinery Site to complete its decommissioning obligations hereunder.

(D)     **Effect on Agreement.** If this Agreement is terminated in accordance with Section 16.3(A), then this Agreement shall be of no further force and effect, except that Articles 1, 9, 16, 17, and 19 shall survive termination of this Agreement indefinitely and the provisions of Article 11 shall continue to apply without exception to all parties covered thereby as set out in Section 11.1 until the date of termination following a Termination Event

Section 16.4. **Rights and Remedies Cumulative.**     Except as expressly provided in this Agreement, all rights and remedies of any Party against any other Party and any permitted assignee of such other Party provided in this Agreement shall be deemed cumulative and not in lieu of, or exclusive of, each other or of any other right or remedy available to any Party at law or in equity, and the exercise of any right or remedy, or the existence herein of other rights or remedies, shall not prevent the exercise of any other right or remedy.

## ARTICLE 17
## CONFIDENTIALITY

Section 17.1. **Confidentiality.**

(A)     Each Party shall, from time to time, require or acquire Confidential Information.

(B)     The Government and Refinery Operator shall disclose the same to each other as required to advance their rights and obligations hereunder.

(C)     The receiving Party shall not, directly or indirectly, in any manner whatsoever, at any time whatsoever, disclose Confidential Information to any other party whatsoever, except that the receiving Party, may disclose Confidential Information to its advisors, as required by lenders, Affiliates, directors, officers, employees, agents, consultants or representatives; provided that the receiving Party, takes all reasonable steps to ensure that each of any such parties are bound by the terms and conditions of this Article 17, including the provision not to disclose any Confidential Information to any party whatsoever.

(D)     The obligations of each Party under Section 17.1(C) do not apply to the following information:

(1)     information provided to the Legislature of the U.S. Virgin Islands in connection with the submission of the Agreement to the Legislature for ratification;

(2)     information required to be disclosed or retained by each other by the laws of any applicable jurisdiction, including any law, order, subpoena or document discovery request or pursuant to a binding requirement of any regulatory or tax authority,

provided that prior written notice is given to the disclosing Party, to the extent permitted under any Applicable Law, as soon as possible in order to afford the disclosing Party, an opportunity to seek a protective order;

(3)    information which enters the public domain other than through any breach of the terms and conditions of this Agreement by the receiving Party;

(4)    information lawfully made available to the receiving Party by another party free to make such disclosure without breach of any legal obligation;

(5)    information already in the possession of the receiving Party at the time of its receipt of the same from the disclosing Party, except to the extent that it has been unlawfully appropriated; and

(6)    information developed by the receiving Party independent of Confidential Information received from the disclosing Party.

(E)    Any presentations, analyses or data of Refinery Operator created, shared or conveyed in connection with this Agreement shall be deemed to constitute trade secrets of Refinery Operator and shall remain confidential pursuant to Title 3, Chapter 33, Section 881(g)(3) of the U.S. Virgin Islands Code.

## ARTICLE 18
## FORCE MAJEURE

Section 18.1.  **Force Majeure Events**. For the purposes of this Agreement the term "*Force Majeure Event*" shall mean any cause that is reasonably unforeseeable as of the date of this Agreement and that is beyond the reasonable control, directly or indirectly, of the Party affected and with the exercise of due diligence, could not be prevented, avoided or removed by such Party, and does not result from such Party's negligence or fault and that wholly or partly delays or prevents such Party's performance of its obligations under this Agreement, including (to the extent meeting the foregoing requirements): war (whether declared or not) or other armed conflict terrorism; civil insurrection; declaration of martial law; piracy; nuclear accidents; widespread electrical outages; lightning strikes, earthquakes; fires; tornadoes; hurricanes; volcanic activity; accidents; strikes; lockouts or other labor actions (however, specifically excluding the labor force under the control of the Party experiencing such labor actions); actions or omissions of a Governmental Authority (including the actions of the Government in its capacity as a Governmental Authority or in the exercise of its Governmental Functions, or failure to issue an Authorization) that were not voluntarily induced or promoted by the affected Party, or brought about by the breach of its obligations under this Agreement or any Applicable Law. The Parties expressly agree and acknowledge that the list of Force Majeure Events in the foregoing sentence is intended as an inclusive list rather than an exhaustive list Notwithstanding anything to the contrary, the term Force Majeure Event shall not be deemed to include (a) lack of funds or the availability of financing, (b) equipment failure, unless the claiming Party can point to an independent, identifiable Force Majeure Event that caused such

failure; (c) acts or omissions of subcontractors (of any tier) except to the extent such subcontractors if they were a party hereto, would be able to claim a Force Majeure Event for the same or (d) changes in law other than changes in the Applicable Laws of the Government of the U.S. Virgin Islands or changes in Applicable Laws with disproportionate effect on, or targeted at, investors in the U.S. Virgin Islands. Upon the occurrence of a Force Majeure Event the Party claiming or experiencing such event shall promptly notify the other Parties and shall comply with the remaining provisions of this Article 18.

Section 18.2. **Burden of Proof**. In the event that the Parties are unable in good faith to agree that a Force Majeure Event has occurred or whether a Party's performance is excused, such dispute shall be resolved in accordance with the arbitration dispute resolution procedures set forth in Section 19.4 and, in any proceeding to resolve the dispute, the burden of proof as to whether a Force Majeure Event has occurred and whether performance is excused shall be upon the Party claiming a Force Majeure Event.

Section 18.3. **Excused Performance**. If a Party is rendered wholly or partially unable to perform its obligations under this Agreement because of a Force Majeure Event, that Party shall be excused from whatever performance is affected by the Force Majeure Event to the extent so affected, subject to and conditioned upon the following:

(A)    the non-performing Party, by exercise of due foresight could not reasonably have been expected to avoid, or by the exercise of due diligence could not have been able to overcome, such Force Majeure Event;

(B)    the non-performing Party gives the other Party Notice describing the nature, scope and expected duration of the Force Majeure Event, and the steps the affected Party expects to take to both mitigate the Force Majeure Event itself and the effect of such Force Majeure Event on its obligations under this Agreement. Such Notice shall be given promptly after the occurrence of the Force Majeure Event, and in no event more than seven days after the original notification of the Force Majeure Event given pursuant to Section 18.1;

(C)    the suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure Event;

(D)    the non-performing Party shall exercise all reasonable efforts to mitigate or limit damages to itself and to the other Party;

(E)    the non-performing Party shall exercise all reasonable efforts to continue to perform its obligations hereunder and to correct or cure the event or condition excusing performance; and

(F)    when the non-performing Party is able to resume performance of its obligations under this Agreement, that Party shall give the other Party written Notice to that effect and shall promptly resume performance hereunder.

Section 18.4. **Applicability**. For the avoidance of doubt and not as a limitation on the foregoing terms and conditions of this Article 18, (i) during the occurrence of a Force Majeure Event, neither Party shall be excused from any performance or payment obligation hereunder to the extent such obligation is not affected by such occurrence and is otherwise due in accordance with the terms and conditions hereof, and (ii) except as provided in clause (i), the terms and conditions of this Article 18 shall limit or condition all provisions of this Agreement whether or not so expressly stated in this Agreement

## ARTICLE 19
## MISCELLANEOUS

Section 19.1. **Notices, Requests and Communications**. Wherever provision is made for the giving or issuance of any notice, instruction, consent, approval, certificate or determination by any Person (each, a *"Notice"*), unless otherwise specified, such communication shall be in writing and shall not be unreasonably withheld or delayed. All Notices shall be given to a signatory at the physical address or facsimile number specified below or as such signatory hereto shall at any time otherwise specify by like notice to the other signatories hereto. Each such Notice shall be effective (a) if given by facsimile, at the time such appropriate confirmation of receipt is received by the sender (or, if such time is not during regular business hours of a Business Day, at the beginning of the next such Business Day), and (b) if given by mail or courier, upon receipt or refusal of service at the address specified for each signatory below. Notices shall be addressed as follows:

For the Government:

The Government of the U.S. Virgin Islands
Government House
Charlotte Amalie
St. Thomas, U.S. Virgin Islands
Attention: Office of the Governor

With a copy to:

Office of the Attorney General
U.S. Virgin Islands Department of Justice
34-38 Kronprindsens Gade
GERS Building, 2nd Floor
St. Thomas, U.S. Virgin Islands 00802

For Refinery Operator:

Limetree Bay Refining, LLC
1 Estate Hope
Christiansted, St. Croix
U.S. Virgin Islands 00820-5652

Attention:    Robert Haugen
Fax:          (340) 692-3480
Email:        rhaugen@lbterminals.com

With a copy to:

ArcLight Capital Partners, LLC
200 Clarendon St., 55th Floor
Boston, Massachusetts 02117
Attention:    Christine M. Miller
Fax:          (617) 867-4698
Email:        cmiller@arclightcapital.com

Latham & Watkins LLP
885 Third Avenue
New York, New York 20022
Attention:    Christopher G. Cross
              Warren H. Lilien
Fax:          (212) 751-4864
Email:        christopher.cross@lw.com
              Warren.lilien@lw.com


And a copy to:

Nichols, Newman, Logan, Grey & Lockwood, P.C.
1131 King Street, Christiansted, St. Croix
U.S. Virgin Islands 00820-4971
Attention:    G. Hunter Logan, Jr.
              Todd H. Newman
Fax:          (340) 773-3409
Email:        hlogan@nnldlaw.com
              tnewman@nndlaw.com


Section 19.2.  **Assignment**.

(A)    This Agreement shall not be assignable except by Refinery Operator in whole or in part to (1) an Affiliate, or (2) an entity that acquires all or substantially all of Refinery Operator's business or assets, or (3) as provided in Section 19.2(B) below.  In the case of an assignment under subsection (2) of this Section 19.2(A), such assignment shall be subject to the consent of the Government, such consent not to be unreasonably withheld, conditioned, or delayed.

(B)    **Financing Liens**.

65

(1)      Refinery Operator, without approval of the Government, may, by security, charge or otherwise encumber its interest under this Agreement for the purposes of financing the development, construction, rehabilitation, expansion, or enhancement or operation of the Refinery.

(2)      Not less than ten (10) Days prior to making such encumbrance, Refinery Operator shall notify the Government in writing of the name, address, and telephone and facsimile numbers of each Lender(s) to which Refinery Operator's interest under this Agreement has been pledged or assigned. Such notice shall include the names of the account managers or other representatives of the Lender(s) to whom all written and telephonic communications may be addressed.

(3)      After giving the Government such initial notice, Refinery Operator shall promptly give the Government (i) notice of any change in the information provided in the initial notice or any revised notice, and (ii) copies of documents related to such encumbrance (including final, executed copies of documents related thereto).

(4)      If Refinery Operator encumbers its interest under this Agreement as permitted by this Section 19.2(B), then (i) the Parties, except as provided by the terms of this Agreement, shall not modify or cancel this Agreement without the prior written consent of the Lender(s), (ii) the Lender(s) or their designees shall have the right, but not the obligation, to perform any act required to be performed by Refinery Operator under this Agreement to prevent or cure any Payment Default by Refinery Operator and such act performed by the Lender(s) or their designees shall be as effective to prevent or cure a Payment Default as if done by Refinery Operator: provided that, if any such Lender or its designee elects to perform any act required to be performed by Refinery Operator under this Agreement to prevent or cure a Payment Default by Refinery Operator, the Government will not be deemed to have waived or relinquished its rights and remedies as provided in this Agreement, (iii) the Government shall upon written request by Refinery Operator or Lenders execute statements certifying that this Agreement is unmodified (or, modified and stating the nature of the modification), in full force and effect and the absence or existence (and the nature thereof) of the Payment Default hereunder by Refinery Operator known to the Government and documents of consent to such assignment to the encumbrance and any assignment to such Lender(s), in each case as reasonably requested by Refinery Operator and (iv) the Government shall, upon the receipt of a written request from Refinery Operator or any Lender, execute, or arrange for the delivery of, such certificates, opinions and other documents as may be reasonably necessary in order for Refinery Operator to consummate any financing or refinancing of the Refinery or any part thereof and will enter into reasonable agreements with such Lender (including subordination agreements, intercreditor agreements and any such instruments or documents as may be reasonably necessary to evidence and reaffirm the provisions of Section 9 hereof), which agreements will grant certain rights to the Lender(s) as more fully developed and described in such documents, including, without limitation, that (a) this Agreement shall not be terminated (except for termination pursuant to the terms of this Agreement) without the consent of Lender, which consent is not to be unreasonably withheld or delayed, (b) Lender(s) shall be given

66

notice of any breach or default of this Agreement by Refinery Operator, (c) if a Lender forecloses, takes a deed in lieu of foreclosure or otherwise exercise its remedies pursuant to any security documents, that the Government shall, at such Lender's request, continue to perform all of its obligations hereunder, and Lender or its nominee may perform in the place of Refinery Operator, and may assign this Agreement to another Person in place of Refinery Operator; *provided* that, any party which succeeds Refinery Operator shall agree to perform Refinery Operator's obligations hereunder, including making payments to the Government consistent with those provided for hereunder, (d) in the event this Agreement is rejected or otherwise terminated as a result of any bankruptcy, insolvency, reorganization or similar proceeding affecting Refinery Operator, the Government will enter into a new agreement with the Lender or Lender's designee for the remainder of the term with substantially the same covenants, terms, provisions and limitations as are contained in this Agreement, (e) the Government shall accept performance in accordance with this Agreement by Lender or its designee, and (f) the Government shall make representations and warranties to Lender as Lender may reasonably request, but solely with regard to (1) the Government's existence, (2) the Government's authority to execute, deliver and perform this Agreement, (3) the binding nature of the document evidencing the Government's consent to assignment to Lender and this Agreement on the Government, (4) receipt of regulatory approvals by the Government with respect to its execution and performance under this Agreement and (5) such other representations and warranties as are customary in the context of a financing of projects similar to the development, construction, rehabilitation, expansion, or enhancement or operation of the Refinery.

        Section 19.3.  **Governing Law**.  This Agreement and the rights and duties of the Parties arising out of this Agreement shall be governed by, and construed in accordance with, the applicable laws of the U.S. Virgin Islands without reference to the conflict of laws rules thereof that would direct the application of the laws of another jurisdiction.

        Section 19.4.  **Dispute Resolution**.  Any dispute between the Parties as to the interpretation or effect of this Agreement (which shall include for the purposes of this Agreement any subsequent modification thereof unless otherwise expressly provided by such modification) and any controversy between them or claim by either of them, whether sounding in tort or contract, arising out of or relating to this Agreement or the conduct of the Parties, their agents and/or representatives, (collectively, a "*Dispute*") shall during the Term and within one year thereafter, notwithstanding the Government's status as such and in the same manner as similar actions, suits or proceedings to which the Government is not a Party, be the subject of the following dispute resolution procedures:

        (A)  Following written notice by one Party to another of a Dispute, the Parties shall attempt to settle such Dispute in the first instance by mutual discussions between their respective designated representatives. Failing such resolution, the senior representative of the Government and the chief executive officer (or a Person holding a similar position) of Refinery Operator (or their duly appointed representatives) shall meet to resolve such Dispute. The joint decision of such individuals shall be binding upon the Parties hereto.  If a settlement

of any such Dispute or difference is not reached pursuant to this Section 19.4(A) within sixty (60) days after such notice of Dispute is delivered, then the provisions of Sections 19.4(B) and 19.4(C) below shall apply.

(B) If the settlement of any Dispute is not reached pursuant to Section 19.4(A), then an action, suit or proceeding may be brought by a Party in the United States District Court of the Virgin Islands. Each of the Parties hereby irrevocably waives and shall cause its Affiliates to waive all right to a trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or the transactions contemplated hereby.

(C) If the United States District Court of the Virgin Islands or the Third Circuit Court of the United States refuses for any reason to adjudicate such Dispute, the Parties agree that the matter shall be referred to an arbitration proceeding brought by a Party either in accord with the Rules of the American Arbitration Association or as otherwise agreed by the Parties. The arbitration will be conducted before three (3) arbitrators: one selected by the Government, another by Refinery Operator, and the third by the two selected arbitrators. The arbitrators shall determine the venue for the arbitration. Judgment upon any award rendered by the arbitrator(s) in any such proceeding may be entered in any court having jurisdiction.

Section 19.5. **Commercial Act**. Each Party unconditionally and irrevocably

(A) agrees that the execution, delivery and performance by it of this Agreement and all other agreements, contracts, documents and writings relating hereto constitute private and commercial acts and not public or governmental acts;

(B) agrees that should any proceedings be brought against it or its assets, other than the assets protected by the diplomatic and consular privileges under any law ("*Exempted Assets*") in any jurisdiction, in relation to this Agreement or any transaction contemplated hereby, no immunity, sovereign or otherwise, from such proceedings, execution, attachment or other legal process shall be claimed by or on behalf of itself or with respect to any of its assets (other than the Exempted Assets); and

(C) subject to the Parties following the dispute resolution procedures set forth in Section 19.4, consents generally in respect of the enforcement of any judgment against it in any proceedings in any jurisdiction to the giving of any relief or the issue of any process in connection with such proceedings including the making, enforcement or execution against or in respect of any property irrespective of its use subject to Section 19.5(B).

Section 19.6. **Limitation on Liability**. No claim may be made by one Party against the other Party for any special, indirect, consequential, incidental or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or relating to this Agreement or the development, construction, rehabilitation, expansion, or enhancement or operation of the Refinery or any act, omission or event occurring in connection therewith and the Parties hereby waive, release and agree not to sue upon any claim for such damages.

68

Section 19.7. **Entire Agreement; Subsequent Amendments**. This Agreement constitutes the entire agreement of the Parties and the provisions herein shall supersede any and all prior agreements or understandings relating to the same subject matter. It is intended that no Party shall have or be deemed to have any obligation under this Agreement except as the same shall be explicitly stated herein. This Agreement may not be amended, modified, or altered except by an instrument in writing signed on behalf of each Party.

Section 19.8. **Severability of Provisions**. If any clause, sentence, section, or part of this Agreement or the application thereof to anyone in any circumstances, is declared invalid, the application thereof to others, or in other circumstances, and the remainder of this Agreement, shall not be affected thereby. In the event of any such holding and to the extent of any such invalidity, the Government undertakes, insofar as it may lawfully do so, to take such alternative steps (including the consent to or enactment of legislation and the consent to or promulgation of rules and regulations) as may reasonably and in good faith be required to confer upon the Parties benefits comparable in character and substantially equivalent in amount to those intended to be conferred by this Agreement, on terms and conditions not materially more burdensome to either party than those herein provided and without prejudice to any other remedies that may be available to either of them.

Section 19.9. **Payment Terms and Interest Calculation** Except as otherwise expressly provided in this Agreement, payment terms and interest calculations shall be as follows:

(A)     All payments will be made in US$ by wire transfer of immediately available funds to an account or accounts designated in writing by the Party entitled to receive payment.

(B)     Late payments shall bear interest at the U.S. Prime Rate, compounded quarterly until paid in full.

(C)     A wire transfer or delivery of a check shall not operate to discharge any payment under this Agreement and shall be accepted subject to collection.

Section 19.10. **Public Announcements**. No Party shall, except as required by Applicable Law or the rules of any recognized national stock exchange, cause any public announcement to be made regarding this Agreement. In the event that a Party shall be required to cause such a public announcement to be made pursuant to any Applicable Law or the rules of any recognized national stock exchange, it shall use commercially reasonable efforts to provide the other Party at least two Business Days prior written notice of such announcement.

Section 19.11. **Parties in Interest**. Unless specified in this Agreement, the terms and provisions of this Agreement shall be binding upon and inure to the benefit of each Party and its respective legal representatives, successors and assigns. No other Person shall have any right, benefit, priority or interest hereunder or as a result hereof or have standing to require satisfaction of the provisions hereof in accordance with its terms.

Section 19.12. **Waiver**. By an instrument in writing, any Party may waive compliance by any other Party with respect to any term or provision of this Agreement that such other Party was or is obligated to comply with or perform or any breach hereof. The failure of a Party at any time to strictly enforce any provision of this Agreement shall in no way affect its right thereafter to require performance thereof, nor shall the waiver of any breach of any provision of this Agreement be taken or held to be a waiver of any succeeding breach of any such provision or as a waiver of the provision itself. Unless otherwise specified herein, the rights and remedies provided in this Agreement are cumulative and the exercise of any one right or remedy by any Party shall not preclude or waive its right to exercise any or all other rights or remedies.

Section 19.13. **Performance Extended to Next Business Day**. Notwithstanding any deadline for payment, performance, notice, or election under this Agreement, if such deadline falls on a date that is not a Business Day, then the deadline for such payment, performance, notice, or election will be extended to the next succeeding Business Day.

Section 19.14. **Negotiation and Preparation Costs**. Except as provided in Article 3, each Party shall bear the costs and expenses incurred by it in connection with the negotiation, preparation, and execution of this Agreement and other documents referred to herein.

Section 19.15. **Further Assurances**. From time to time, each Party agrees to promptly execute and deliver such additional documents, and will provide such additional information and assistance, as any Party may reasonably require to effect the terms of this Agreement.

Section 19.16. **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute a single agreement to which no signatory hereto shall be bound until all signatories hereto have executed a counterpart. Signatures transmitted by facsimile or as emailed PDF copies shall be binding as originals so long as the Agreement is transmitted in its entirety, and each signatory hereto hereby waives any defenses to the enforcement of the terms of this Agreement sent by facsimile or emailed PDF based upon the manner of transmission or form of signature (electronic, facsimile or "ink original").

*Execution Copy*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

GOVERNMENT OF THE U.S. VIRGIN ISLANDS

By _____

Name: Kenneth E. Mapp

Title: Governor of the U.S. Virgin Islands


ATTESTED:

By _____

Name  Osbert E. Potter

Title  Lieutenant Governor of the U.S. Virgin Islands


Approved for Legal Sufficiency:

By _____

Name  Claude Walker

Title  Attorney General of the U.S. Virgin Islands

LIMETREE BAY REFINING, LLC

Witnesses:

By

Name   John F. Erhard

Title   manager

2

*Execution Version*

## Appendix A

### Terminal Site and Refinery Site

#### Terminal / Terminal Site

**Terminal Plot No. 4** Over Portions of Estate Blessing, Estate Hope, Estate Jerusalem and Estate Figtree Hill, King and Queen Quarters, St. Croix, U.S. Virgin Islands, consisting of 386.444 U.S. acres, more or less, as more fully shown on OLG Drawing No. A9-116-C016 dated June 24, 2016.

**Terminal Plot No. 5** Portions of Estate Figtree Hill and Estate Castle Coakley Land, King and Queen Quarters, St. Croix, U.S. Virgin Islands, consisting of 33.773 U.S. acres, more or less, as more fully shown on OLG Drawing No. A9-116-C016 dated June 24, 2016.

**Road Plot 4-1** (out of Plot 4) Estate Jerusalem and Estate Figtree Hill, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 0.2255 U.S. acres, more or less, as more fully shown on OLG Drawing No. 5315-A, dated February 20, 2002.

**Plot No. 8, Estate Limetree Bay, Reclaimed Land** consisting of 0.030 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as OLG Drawing No. A9-116-C016, dated June 24, 2016. (LPG Flare)

**Terminal Plot No. 9, Estate Limetree Bay, Reclaimed Land**, consisting of 197.4471 U.S acres, more or less, King and Queen Quarters, St. Croix, U.S Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

**Plot No. 13-A, Estate Limetree Bay, Reclaimed Land**, consisting of 2.617 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. D9-6551-C017, dated April 26, 2017.

**Refinery / Refinery Site**

**Refinery Plot No. 1** over portions of **Estates Blessing and Hope**, consisting of 175.1634 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

**Refinery Plot No. 2** over portions of **Estates Blessing, Hope, and Jerusalem**, consisting of 36.686 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016.

**Refinery Plot No. 3** over portions of **Estates Jerusalem, Figtree Hill, and Castle Coakley Land**, consisting of 187.8263 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016

**Plot No. 25, Estate Clifton Hill**, King Quarter, St. Croix, U.S. Virgin Islands, consisting of 0.5108 U.S. acre, more or less, as more fully shown on OLG Drawing No. 1564 dated May 05, 1964.

**Plot No. 214, Estate Ruby**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 0.1914 U.S. acre, more or less, as more fully shown on OLG Drawing No. 4413 dated June 5, 1987

**Plot No. 487-A, Estate Strawberry Hill**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 0.23 U.S. acre, more or less, as more fully shown on OLG Drawing No. 2733-J dated June 7, 1973, revised September 18, 1997

**Refinery Plot No. 6, Estate Limetree Bay, Reclaimed Land**, consisting of 26.7027 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016

**Refinery Plot No. 7, Estate Limetree Bay, Reclaimed Land**, consisting of 19.857 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. A9-116-C016, dated June 24, 2016

**Plot No. 12, Estate Limetree Bay, Reclaimed Land** consisting of 5.8240 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as OLG Drawing No. A9-116-C016, dated June 24, 2016 (Flare)

Excluded Land:

**Plot No. 10, Estate Limetree Bay, Reclaimed Land**, consisting of 18.881 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No A9-116-C016, dated June 24, 2016.

**Plot No. 11, Estate Limetree Bay, Reclaimed Land**, consisting of 19.8975 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No A9-116-C016, dated June 24, 2016.

**Remainder of Plot No. 13, Estate Limetree Bay, Reclaimed Land**, consisting of 37.956 U.S. acres, more or less, King and Queen Quarters, St. Croix, U.S. Virgin Islands as shown on OLG Drawing No. D9-6551-C017, dated April 26, 2017.

**Property Acquired for Closing Payment:**

**Estate Castle Coakley, including all improvements thereupon**

1.      **Plot No. 29, Estate Castle Coakley**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 1.840 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

2.      **Plot No. 45, Estate Castle Coakley**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 1.790 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

3.      **Plot No. 52, Estate Castle Coakley**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 4.070 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

4.      **Plot No. 53, Estate Castle Coakley**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 22.137 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

5.      **Plot No. 53-C, Estate Castle Coakley**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 0.734 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

**Estate Caldwell, including all improvements thereupon**

6.      **Plot No. 5, Estate Caldwall**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 46.111 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 07, 1991

**Estate Cottage, including all improvements thereupon**

7.      **Plot No. 3-A, Estate Cottage**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 12.837 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 7, 1991

8.      **Plot No. 4 Estate Cottage**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 70.000 U.S. acres, more or less, as more fully shown on OLG Drawing No. 4028-A dated June 7, 1991

**Estate Blessing, including all improvements thereupon**

9.      **Remainder Plot No. 4-B, Estate Blessing,** King Quarter, St Croix, U S Virgin Islands, consisting of 35.82 U.S. acres, more or less, as more fully shown on OLG Drawing No A9-131-C018, dated June 26, 2018.

**Estate Hope, including all improvements thereupon**

10.     **Plot No. 2-A, Estate Hope,** Queen Quarter, St. Croix, U.S Virgin Islands, consisting of 4.475 U.S. acres, more or less, as more fully shown on OLG Drawing No. A9-113-C016, dated May 12, 2016

11.     **Plot No. 6-D Estate Hope,** Queen Quarter, St. Croix, U.S Virgin Islands, consisting of 26.332 U.S. acres, more or less, as more fully shown on OLG Drawing No A9-113-C016, dated May 12, 2016

## Option Parcels

**Estate Pearl, including all improvements thereupon**
1.      **Remainder Matr. 38, Estate Pearl**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 112.297 U.S. acres, more or less, as more fully shown on OLG Drawing No. 3136, dated August 9, 1973, revised August 23, 1991.
2.      **Remainder Matr. 51 & Matr. 43, Estate Pearl**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 60.597 U.S. acres, more or less, as more fully shown on OLG Drawing No. 3136, dated August 9, 1973, revised August 23, 1991.
3.      **Parcel No. 11, Estate Pearl**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 29.132 U.S. acres, more or less, as more fully shown on OLG Drawing No. 3136, dated August 9, 1973, revised August 23, 1991.

**Estate Cassava Garden, including all improvements thereupon**
4.      **Parcel No. 1, Estate Cassava Gardens**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 1.377 U.S. acres, more or less, as more fully shown on OLG Drawing No. 3136, dated August 09, 1973, revised August 23, 1991.
5.      **Remainder Matr. No. 39-A and 49, Estate Cassava Gardens**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 62.791 U.S. acres, more or less, as more fully shown on OLG Drawing No. 3136, dated August 09, 1973, revised August 23, 1991.

**Estate Barren Spot, including all improvements thereupon**
6       **Remainder Parcel No. 1, Estate Barren Spot**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 30.712 U.S. acres, more or less, as more fully shown on OLG Drawing No 3136, dated August 09, 1973, revised August 23, 1991.

## Construction License Area

**Plot No. 2, Estate Humbug**, Queen Quarter, St. Croix, U.S Virgin Islands, consisting of 25.3493 U.S. acres, more or less, as shown on OLG Drawing No. 3040 dated May 15, 1972.
**Rem Plot No. 3, Estate Humbug**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 23.6678 U.S. acres, more or less, as shown on OLG Drawing No. 5732 dated April 19, 2006.
**Plot No. 3-A, Estate Humbug**, Queen Quarter, St. Croix, U.S. Virgin Islands, consisting of 1.00 U.S. acres, more or less, as shown on OLG Drawing No. 5732 dated April 19, 2006.



| Legend | | |
| --- | --- | --- |
| | Refinery - Main Land | |
| | Refinery – Reclaimed Land | |
| | Terminal – Main Land | |
| | Terminal – Reclaimed Land | |
| | Excluded Land | |
| | Landfarm No. 1 (ERT) | |
| | Property Acquired for Closing Payment | |
| | Option Parcels | |

Note: The plot boundaries on the map above are approximate



| Legend | |
| --- | --- |
| | Refinery – Main Land |
| | Refinery – Reclaimed Land |
| | Terminal – Main Land |
| | Terminal – Reclaimed Land |
| | Excluded Land |
| | Landfarm No. 1 (ERT) |
| | Property Acquired for Closing Payment |
| | Option Parcels |
| | Construction Easement Area |
| | New Option Parcel – Parcel No. 11 |

Note: The plot boundaries in the map above are approximate.



## Appendix B

### List of Claims and Litigations

- *In re HOVENSA LLC*, No  15-10003 (Bankr V I 2015)

Appendix C

NRD Settlement and Release Agreement

[See attached ]

EXECUTION COPY                          Appendix C

## SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement ("Agreement" or "Settlement Agreement") is by and among Alicia V. Barnes, Commissioner of the Virgin Islands Department of Planning and Natural Resources, in her capacity as Trustee for Natural Resources of the Territory of the United States Virgin Islands ("Trustee"), and the Government of the Virgin Islands, in its *parens patriae* and public trustee capacities, on behalf of the public and its quasi-sovereign interests ("Government" or "Government of the Virgin Islands"), collectively referred to as the "Plaintiffs," and Hess Oil Virgin Islands Corp., a corporation organized and existing under the laws of the United States Virgin Islands ("HOVIC") and HOVENSA, L.L.C., a limited liability company organized and existing under the laws of the United States Virgin Islands ("HOVENSA"), collectively referred to as "Settling Defendants," all collectively referred to as "Settling Parties" and individually referred to as a "Settling Party."

WHEREAS, on May 5, 2005, the Trustee filed a complaint captioned *Commissioner of the Dep't of Planning and Natural Resources v. Century Alumina Co., et al.*, Civ. No. 2005-0062, against Settling Defendants and St. Croix Renaissance Group, L.L.L.P., Alcoa World Alumina Company, L.L.C., Lockheed Martin Corporation, St. Croix Alumina, L.L.C., Century Alumina Company, and Virgin Islands Alumina Company, (collectively, the "Alumina Parties") pursuant to the Virgin Islands Water Pollution Control Act, V.I. Code Ann. Tit. 12 § 181 *et seq* ("VIWPCA"), the Virgin Islands Oil Spill Prevention and Pollution Control Act, V.I. Code Ann. Tit. 12 § 701 *et seq.* ("VIOSPPCA"), common law, and Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*, as amended ("CERCLA");

WHEREAS, on July 30, 2009, the Trustee and the Government filed an amended complaint against the same parties;

WHEREAS, through the complaint the Trustee and the Government sought injunctive relief, damages, attorneys' fees and costs, and other amounts as may be just and proper relating to pollution or contamination of waters of the Virgin Islands alleged to have resulted from the presence of petroleum, chloride, nutrients, micronutrients, hazardous wastes, solid wastes, and other pollutants generated by or associated with the Refinery Property, as defined below;

WHEREAS, in response to the complaint, HOVIC and HOVENSA brought counterclaims against the Government of the Virgin Islands and a third-party complaint against Virgin Islands Waste Management Authority ("VIWMA");

WHEREAS, all claims pursuant to CERCLA between the Trustee and HOVIC and HOVENSA concerning groundwater damages have been dismissed by rulings of the United States District Court for the Virgin Islands and all claims pursuant to CERCLA concerning marine natural resources have been withdrawn by the Trustee, leaving no CERCLA claims currently pending;

WHEREAS, the Trustee is included in this Settlement Agreement solely to effectuate formal resolution of this litigation and to make clear that there will be no appeals from prior dismissal or voluntary withdrawal of the Trustee's claims; and

1

