(G)   **Contaminants**. Refinery Operator has not disposed, stored or treated, or arranged for the disposal, storage or treatment, of any Contaminant that has come to be located at or on the Excluded Lands as described in Appendix A prior to the Closing Date.

## ARTICLE 13
## COVENANTS OF REFINERY OPERATOR

Section 13.1.   **Environmental**.

(A)   **Compliance.**   Refinery Operator shall comply, and shall cause the Refinery and the Refinery Site and all operations, activities and conditions at the Refinery Site to comply with all applicable Environmental Laws.   Refinery Operator shall not take, allow, or suffer any action, inaction, or condition at or in connection with the Refinery or the Refinery Site that causes or results in a Release or threatened Release that requires a Response or restoration, assessment, mitigation, or replacement of any natural resource at or in connection with the Refinery or the Refinery Site, or constitutes a violation of any Environmental Laws. In the event of such a Release or threatened Release of a Contaminant at or from the Refinery Site, Refinery Operator at its own cost shall promptly take all appropriate Responses and other actions required by applicable Environmental Laws to investigate, contain, clean up, remove, remediate, and otherwise respond to such Release or threatened Release, assess, restore, replace, or mitigate damaged natural resources, and otherwise protect human health and the environment and consistent with continued industrial use of the affected portions of the Refinery Site. For the avoidance of doubt, the Government's reasonable out-of-pocket costs and expenses it incurs (i) in oversight by DPNR of such actions, or (ii) if Refinery Operator fails promptly to conduct such Responses and the Government elects to conduct such Responses, shall be considered "Losses" for purposes of the indemnification obligation in Section 13.3(C) hereof. Nothing in this Agreement limits or precludes the Government from exercising its authorities under Environmental Laws or other Applicable Law in connection with any such Release or threatened Release.

(B)   **Due Care; Cooperation.**

(1)   Refinery Operator shall exercise due care with respect to all Contaminants at the Refinery and the Refinery Site, including but not limited to Pre-Existing Contamination, and all Contaminants Released or threatened to be Released at or from the Site or otherwise in connection with operations at the Refinery and the Refinery Site, shall take commercially reasonable precautions against foreseeable acts or omissions of any third party and the consequences that could foreseeably result from such acts or omissions, and shall comply with all Environmental Laws applicable thereto.

(2)   Refinery Operator shall cooperate and provide commercially reasonable assistance and access (where Refinery Operator possesses the legal authority to grant such assistance or access) to persons authorized by the Government to conduct Responses and/or natural resource restoration at the Site (including such reasonable

cooperation and access necessary for the installation, integrity, operation, and maintenance of any complete or partial Responses or natural resource restoration at the Site).

(3) Refinery Operator shall (i) comply with land use restrictions established pursuant to Applicable Law in connection with Responses at the Refinery and the Refinery Site; (ii) not unreasonably interfere with or impede the effectiveness or integrity of any institutional or engineering control employed at the Site in connection with a Response; and (iii) comply with all reasonable requests for information or administrative subpoenas issued by the Government pursuant to Environmental Laws.

(4) Refinery Operator shall, consistent with continued industrial use of the Refinery Site, take commercially reasonable measures, including at a minimum all measures required by Applicable Law, to (a) stop Releases at the Refinery or the Refinery Site; (b) prevent threatened or future Releases at the Refinery or the Refinery Site; (c) prevent or limit human, environmental, or natural resource exposure to Pre-Existing Contamination or other contamination at or from the Refinery or the Refinery Site; and (d) fund (through insurance, the Financial Assurance, and all other financial resources available to Refinery Operator) clean-up of all Releases occurring following the Closing Date and restoration of affected third-Person property and the environment.

(5) Refinery Operator, and not the Government, shall have responsibility to comply with Environmental Laws regarding the Refinery and the Refinery Site as now or hereafter used or occupied by Refinery Operator, its Affiliate(s), or its designee(s), and Refinery Submerged Lands.

(6) Refinery Operator shall comply with all Applicable Laws, including but not limited to Environmental Laws, with respect to the Refinery Operations and all other operations and activities conducted at the Refinery and Refinery Site.

(7) To the extent not taken or performed by Terminal Operator, Refinery Operator shall, on behalf of HERT, take all actions and perform all obligations required to comply with the Resource Conservation and Recovery Act ("RCRA") and the Site's RCRA permit(s) and any modifications thereto and extensions thereof, including but not limited to all current and future treatment, storage, disposal, transportation, closure, post-closure, recordkeeping, reporting, financial assurance, corrective action, and remediation requirements thereunder or required by RCRA or any unilateral or consent order or decree relating to the facility or any contamination related thereto to the extent that such performance is funded by HOVENSA or HERT or, to the extent such funds prove inadequate, by amounts made available pursuant to the RCRA financial assurance demonstration for the Site, but only to the extent agreed to in writing by both EPA and DPNR. In no event shall Refinery Operator incur any liability for the environmental contamination that is the subject of the RCRA permit ("*RCRA Corrective Action*"), except to the extent that such liability results from a breach of Refinery Operator's representation in Section 12.2(G). Notwithstanding anything in this Section 13.1(B)(7) or elsewhere in this Agreement, the ongoing RCRA Corrective Action on

52

the Refinery Site shall be operated by HERT and shall not be the responsibility of Refinery Operator.

(C)     **Notification.** In the event that Refinery Operator becomes aware of any action or occurrence which causes or threatens a Release of a Contaminant at or from the Refinery or Refinery Site that constitutes an emergency situation or may present an imminent endangerment to human health or welfare or the environment, Refinery Operator shall immediately take commercially reasonable action (including at a minimum all action required by applicable Environmental Laws) to prevent, abate, or minimize such Release or threat of Release, and shall, in addition to complying with any applicable notification requirements under 42 U.S.C. § 9603 and any other Environmental Laws, promptly notify the Government of such Release or threatened Release.

(D)     **Permits.** Throughout the Term, Refinery Operator shall take all commercially reasonable actions, to the extent required by Applicable Law, promptly to file all applications for and obtaining, maintaining, modifying, and renewing all permits and other Authorizations required for Refinery Operator compliance with this Agreement.

(E)     **Applicable Law.** For the avoidance of doubt, nothing in this Agreement is intended to, or shall, relieve Refinery Operator of its obligation to comply with Environmental Laws.

Section 13.2.     **Consents and Approvals.** Refinery Operator shall take all commercially reasonable actions, to the fullest extent permitted by law, to obtain promptly any Authorizations or other actions on the part of Governmental Authorities or of any officials, departments, agencies, or other instrumentalities thereof that may be necessary or appropriate in connection with rehabilitating and operating the Refinery and the Refinery Site.

Section 13.3.     **Indemnification.** Refinery Operator shall defend, indemnify, and hold harmless and pay on a current basis the Government and its agents, officers, directors and employees and other representatives (each, a "*Government Indemnified Party*") from and against any and all Losses incurred by a Government Indemnified Party arising out of or relating to Refinery Operator's obligations under this Article 13:

(A)     to the extent caused by any negligent act or omission (including strict liability), gross negligence or willful misconduct of Refinery Operator, its subcontractors or any of their respective agents or employees (but only with respect to Losses for injury, illness or death to any individual or damage to any property of any Person); or

(B)     to the extent caused by breach of Applicable Law by Refinery Operator, its contractors, or any of their respective agents or employees; or

(C)     to the extent caused by or arising out of a Release or threatened Release of a Contaminant, a Response, or an obligation under any Environmental Laws at, under, on, or with respect to the Refinery or the Refinery Site;

53

provided, however, that Refinery Operator shall not be required to indemnify any Government Indemnified Party for Losses to the extent that such Losses suffered by the Government Indemnified Party arose out of any grossly negligent act or omission (including strict liability) or willful misconduct of any Government Indemnified Party.

Section 13.4.  **Intercompany Agreements.**

(A)  **Terms.**   Any material intercompany agreements between Refinery Operator and Terminal Operator, other than the Refinery Transfer Agreement, Shared Services Systems Agreement or land and asset transfer, easement, joint use or lease agreements expressly contemplated by this Agreement, including any agreements contemplated by Section 6.4(C) (such agreements being "*Intercompany Agreements*"), shall be negotiated on arm's length, market based terms, except as would not have a material adverse impact on the Government or its rights or interests in this Agreement or the Amended Terminal Operating Agreement.

(B)  **Disclosure.** Refinery Operator shall disclose to the Government upon request all material Intercompany Agreements, including any amendments thereto.   The Government agrees that the terms of Intercompany Agreements shall constitute Confidential Information.

## ARTICLE 14
## GOVERNMENT COVENANTS

Section 14.1.  **Assistance with Permits.**  Throughout the Term, the Government shall take all commercially reasonable actions, to the fullest extent permitted by Applicable Law, to assist Refinery Operator (and, where applicable, its contractors and subcontractors), in Refinery Operator's expeditious filing of all applications for and obtaining, maintaining, and renewing all Authorizations required for Refinery Operator's compliance with this Agreement, including such appropriate Authorization, if any, as are required to maintain the exemption from the Jones Act of the current Oil Refinery and Related Facilities. The Government shall (i) take (and shall cause its relevant agencies, departments, political subdivisions and instrumentalities to take, including DPNR) all applicable actions to qualify the Refinery Site (and limit the liability of Refinery Operator) pursuant to the Virgin Islands Brownfields Revitalization and Environmental Restoration Act (Title 12, Sections 551-557), and regulations promulgated thereunder, and under any other relevant U.S. Virgin Islands law, and (ii) cooperate reasonably with Refinery Operator in qualifying the Refinery Site for similar brownfields treatment under applicable provisions of federal law (including without limitation RCRA). In each case, Refinery Operator will timely file and diligently prosecute any such applications.  The Government shall take all feasible and lawful measures necessary to have all such Authorizations issued as soon as is practicable, and otherwise shall not delay or frustrate the application process. Without prejudice to the generality of the foregoing, the Government (without limiting its permitting or enforcement discretion and in compliance with Applicable Law) shall use reasonable efforts to minimize processing time for reviewing various permits (including any Coastal Zone Management permits) related to (i) the Refinery, (ii) modifications

54

to existing units or installation of new units or tanks at the Refinery Site and (iii) exercising delegated authorities from the U.S. Government in respect of relevant matters. Refinery Operator or Terminal Operator may propose to the Government such Section 325 waivers of the Clean Air Act as either party may believe would benefit Refinery Operations, Terminal Operations or the Government, including, but not limited to, waivers of visibility implementation plan requirements or contemporaneous netting periods. Notwithstanding Applicable Law in the U.S. Virgin Islands, Refinery Operator may elect to be added as a co-permittee, co-holder, or sole holder of any environmental Authorization issued to Terminal Operator by the Department of Planning and Natural Resources by giving Notice to the Government, and Refinery Operator's election shall be effective as of the time Notice is effective under <u>Section 19.1</u> and Refinery Operator shall have as of such effective time the rights and obligations of a permittee or holder of such Authorization, unless such election violates federal Applicable Law; *provided that* any election by Refinery Operator to be added as a sole holder of an environmental Authorization shall be subject to the consent of DPNR, such consent not to be unreasonably withheld.

Section 14.2.  **Consents and Approvals**. The Government undertakes to use its commercially reasonable efforts in good faith to assist Refinery Operator to obtain promptly any consents, approvals, clearances, determinations, or other actions on the part of the U.S. Government or of any officials, departments, agencies, or other instrumentalities thereof that may be necessary or appropriate in connection with operating the Refinery.

Section 14.3.  **Beneficial Use**. Without the prior written consent of Refinery Operator, which consent may not be unreasonably withheld, conditioned or delayed, the Government, except to the extent required by Applicable Law, shall not take, approve, assist or allow any action, or fail to take, approve, assist or allow any action, if such action or failure to act, as the case may be, is reasonably likely to materially adversely affect, diminish or impair the beneficial use, operation, utility or occupancy of the Oil Refinery and Related Facilities in compliance with this Agreement or the ability of Refinery Operator in compliance with this Agreement to beneficially use, occupy, obtain, receive or otherwise enjoy any of: (i) the physical sites, facilities, improvements, programs, financial incentives or other benefits existing as of the Effective Date and/or contemplated by any portion of this Agreement, including without limitation the Shared Services Systems or (ii) the obligations or other commitments of the Government contemplated by, or set forth in, this Agreement; provided, however, that nothing in this <u>Section 14.3</u> shall impair the Government's right to enact laws, regulations, or policies of general application for the preservation of public health and safety. If the Amended Terminal Operating Agreement is suspended for any reason while this Agreement remains in effect, the Government shall allow access to and use by Refinery Operator of the Terminal as reasonably determined by Refinery Operator to be necessary or appropriate for the continued operation, maintenance and use of the Refinery; provided, that Refinery Operator shall notify the Government prior to exercising such access right. If the Amended Terminal Operating Agreement is terminated while this Agreement remains in effect, Refinery Operator shall have the right to, upon notice to the Government, access the Terminal, and assume, exercise and perform all of the rights and obligations of the Terminal Operator under the Amended Terminal Operating Agreement for the remaining term of this Agreement; provided, that Refinery

55

Operator shall deliver a written notice of assumption to the Government agreeing to comply with the terms of the Amended Terminal Operating Agreement (upon which the terms of the Amended Terminal Operating Agreement shall be deemed to be effective with respect of Refinery Operator and the Government for the remaining term of this Agreement). In connection with any such assumption the Government shall provide such documentation as may reasonably be requested by Refinery Operator or its Lenders.

Section 14.4.   **Other Legislation.** The Government agrees to use reasonable efforts to oppose any proposed legislation, initiative, act, event, plan, or proposal which would otherwise have the effect of avoiding or materially reducing any of the obligations or commitments as set forth in this Agreement. To the extent an initiative would negatively impact the full performance after the Effective Date of any or all of the obligations or commitments made by the Government, the Government shall take all legally and commercially appropriate steps to defend the obligations and commitments contained herein. For the avoidance of doubt, any new taxes (but not generally applicable user fees) adopted by the Government shall be treated as exempted payments under Section 11.2.

Section 14.5.   **Change in Law.** The Government acknowledges that Refinery Operator has entered into this Agreement in material reliance on each and all of the obligations and commitments of the Government under this Agreement.   The Government represents, warrants and covenants to Refinery Operator that in the event of a Qualifying Change in Law, the result of which would be to materially (a) diminish, impede, impair, or prevent the full performance after the Closing Date of any or all of the obligations and commitments made by the Government or Refinery Operator under this Agreement, (b) increase the obligations of Refinery Operator to the Government under this Agreement, or (c) reduce the rights of Refinery Operator under this Agreement, the Government, upon prompt written request of Refinery Operator, shall (i) exercise reasonable efforts to provide Refinery Operator with an exemption from the relevant Applicable Law as so changed and (ii) to the extent such an exemption would not remedy the impact of the Qualifying Change in Law, agree to such amendments to this Agreement as may be reasonably necessary. In the event of a Change in Law that is not a Qualifying Change in Law but that has any of the impacts set forth in clauses (a), (b) and (c) above, upon prompt written request of Refinery Operator the Government shall promptly engage in good faith negotiations to seek to agree and implement any reasonable amendments to the Agreement that would be reasonably necessary to remedy the negative impact of such Change in Law. Refinery Operator shall make all commercially reasonable efforts to mitigate the adverse effects of the Qualifying Change in Law or Change in Law.

Section 14.6.   **Other Benefits.** Refinery Operator and its Affiliates shall not be precluded by reason of this Agreement from applying for benefits under legislation hereafter enacted for which it or they would otherwise qualify, but to the extent such benefits are inconsistent with its or their obligations and commitments under this Agreement, the terms of this Agreement shall govern.

Section 14.7. **No Additional Cost to Refinery Operator.** The Government shall fully fund and perform its obligations under this Agreement, and at no time shall Refinery Operator be responsible for or be required to incur or pay any cost, charge or expense under this Agreement relating to those obligations (or any agreement executed pursuant hereto) unless this Agreement (or the agreement executed pursuant hereto) specifically identifies a cost, charge or expense to be borne or paid by Refinery Operator.

Section 14.8. **Zoning; Legal Descriptions.** The Parties acknowledge that the legal description of parcels of land located in the U.S. Virgin Islands must be described on a survey (an official OLG map) filed with and approved by the Office of Public Surveyor, Office of the Lieutenant Governor (Cadastral). To the extent any of the official OLG maps showing all or any portion of the Refinery Site or the Refinery Submerged Lands need to be modified to permit such lands to be properly conveyed to Refinery Operator by Terminal Operator under the Refinery Transfer Agreement or this Agreement or to the Government by Terminal Operator under this Agreement, then the Government agrees to cooperate with Terminal Operator and Refinery Operator to have new or revised surveys of such lands promptly reviewed and approved by the Cadastral department and to have the legal descriptions on the proposed deeds conveying such lands to be promptly reviewed and attested by the Cadastral department. The Government will provide such information and assistance as Refinery Operator may reasonably request in connection with the legal descriptions, leases and permits pertaining to the Refinery Site and the Refinery Submerged Lands. Notwithstanding any provision of chapter 3 of Title 29 of the Virgin Islands Code, the Government agrees (a) that in the event Terminal Operator or Refinery Operator exercises an option to purchase some or all of the Option Parcels, then it shall be a legally permissible use of the "Construction License Area" described in Appendix A to be used as an area for storage of construction materials and access relating to improvements to be made upon all or any of the Option Parcels; (b) that it shall be a legally permissible use of portions of the Site, including, but not limited to, plots 53 and 53-C Estate Castle Coakley to be used for housing for Terminal Operator's and Refinery Operator's employees and contractor employees, provided that such housing would qualify as permitted use under R-4 Zoning; and (c) that the use, for purposes of the Oil Refinery and Related Facilities, of the Site is hereby approved.

Section 14.9. **Security.** The Parties acknowledge that the Site is (i) a covered chemical facility for purposes of 6 CFR Part 27, (ii) regulated by 40 CFR Parts 68, 355, 370 and 372 and 33 CFR 105.305, and (iii) required by regulation and International Standards to implement appropriate security measures. The Parties hereby acknowledge and agree that (a) Site security is primarily the responsibility of Refinery Operator, and (b) the Parties shall cooperate with each other and use commercially reasonable efforts to support security measures for the Site required by Applicable Law or International Standards, including, but not limited to, perimeter access, securing Site assets, screening and control of access to the Site and steps needed to deter, detect and delay security breaches. The Government undertakes to use its commercially reasonable efforts in good faith to assist Refinery Operator to obtain promptly any consents, approvals, clearances, determinations, or other actions necessary for Refinery Operator to comply with Applicable Law and International Standards relating to Site security.

57

## ARTICLE 15
## REPORTING, AUDIT AND INSPECTION

Section 15.1. **Reporting.** Refinery Operator shall provide to the Government (i) not later than ninety (90) days following the close of its fiscal year, annual financial statements in accordance with Generally Accepted Accounting Principles, which shall be audited by a certified public accounting firm acceptable to the Government, (ii) not later than forty-five (45) days following the close of each fiscal quarter, unaudited quarterly financial statements, and (iii) on the date of each Quarterly Refinery Payment, the documentation supporting the calculation of such Quarterly Refinery Payment (including the Margin Adjustment) for such fiscal quarter, such deadlines subject in each case to reasonable extensions as may be required to accord with customary practice in the U.S. Virgin Islands. Refinery Operator shall provide quarterly employment information to the U.S. Virgin Islands OMB and the U.S. Virgin Islands Department of Labor for purposes of confirming compliance with Article 7. Refinery Operator shall notify the Government of any material change in the direct ownership of Refinery Operator, including but not limited to any transfer of ownership to an Affiliate, within thirty (30) days of such change.

Section 15.2. **Annual Audit.**

(A)     For the purpose of determining compliance with this Agreement and with Applicable Law, on or about March 31st of each calendar year following the Effective Date, the Government may initiate and conduct an audit of the books, accounts, and records of (a) the Refinery, and (b) Refinery Operator, to the extent such books, accounts, and records relate to the Refinery or its operations (such audit being an "*Annual Audit*").

(B)     Upon completion of any Annual Audit, the Government may prepare a report describing the results of such Annual Audit (an "*Annual Audit Report*") and shall make any such report available to Refinery Operator upon request.

(C)     Following receipt of any Annual Audit Report, Refinery Operator shall have not more than sixty (60) days in which to review such report and identify in writing any material errors or omissions therein. Any alleged material errors or omissions not so identified within the 60-day period are waived, and may not be asserted by Refinery Operator in any subsequent administrative, judicial, or quasi-judicial proceeding.

(D)     Nothing in this Section 15.2 shall constitute a waiver or limitation on the Government's tax assessment, audit, investigation, enforcement, and collection authorities.

Section 15.3. **Inspection.**

(A)     Upon fourteen (14) days' advance written notice to Refinery Operator, the Government may initiate an inspection of the Refinery for the purpose of determining compliance with this Agreement and with Applicable Law.

(B)     Refinery Operator hereby consents to such inspections and agrees to provide reasonable access and assistance to the personnel conducting such inspections.

(C)     To the extent any inspection conducted under this Section 15.3 reveals violations of this Agreement or Applicable Law, the Government hereby agrees to provide notice in writing of such violations within ten (10) days of the Government's determination of such violation.

(D)     Upon receipt of notice of violation, Refinery Operator has thirty (30) days to submit either proof that Refinery Operator has (i) remedied the violation and has restored compliance with this Agreement or Applicable Law or (ii) provided a plan and time reasonably acceptable to the Government to remedy such violations.

(E)     Nothing in this Section 15.3 shall constitute a waiver or limitation on the Government's or other Governmental Authorities', audit, investigation, inspection, enforcement, subpoena, right of entry and access, and collection authorities or the ability to levy fines, penalties or other remedies in connection with violation of Applicable Law, consistent with this Agreement.

## ARTICLE 16
## DEFAULT AND TERMINATION

Section 16.1.   **Payment Default.** In the event that Refinery Operator fails to make any payments due and owing to the Government under this Agreement, then the Government shall have the right to give written notice to Refinery Operator of such failure, and in the event that such payment is not cured within ninety (90) days of such written notice (such failure being a *"Payment Default"*), then:

(A)     the Government shall have the right to recover any outstanding payments from the issuer of the Financial Assurance; and

(B)     to the extent any of Refinery Operator's payment obligations to the Government remain outstanding after the exercise by the Government of its remedies under clause (A) above, the Government shall have the right to exercise its Subordinate Security Interest to the extent permitted by Article 9.

Section 16.2.   **RESERVED.**

Section 16.3.   **Termination.**

(A)     **Termination Events.** Notwithstanding anything herein to the contrary, upon the occurrence of any of the following events (each a *"Termination Event"*), this Agreement may be terminated upon thirty (30) days prior written notice of such termination (a *"Termination"*), as follows:

59

(1)     By the Government, if Refinery Operator is in Payment Default, or;

(2)     By either party, if the other party is in breach of any material obligation hereunder and fails to cure such material breach within ninety (90) days following written notice thereof; and

(3)     Without further action by either Party, if the Initial Term of the Agreement expires without exercise of an Extension or upon expiration of such Extension.

(B)     **Site Restoration.**   Upon Termination, and at the option of the Government, Refinery Operator shall, at its own expense, to the extent not already decommissioned pursuant to the terms hereof, remediate and restore the Refinery Site (the *"Refinery Site Restoration"*) by undertaking the following actions:

(1)     decommissioning the Refinery to the extent required to keep the Refinery inactive and in-place in accordance with Environmental Laws and regulations of the United States Coast Guard, except for (i) any portions of the Refinery reasonably necessary to meet the access needs of St. Croix, and (ii) any other portions of the Refinery the Government may designate, each as identified in writing by the Government on a schedule to be provided by the Government within sixty (60) days of Termination (all decommissioned equipment, the *"Decommissioned Equipment"*); and

(2)     disconnecting the control and electrical systems and removing hydrocarbons and Contaminants from the Decommissioned Equipment, and otherwise ensuring that the Refinery Site is in a condition that complies in all material respects with applicable Environmental Laws for ongoing heavy industrial uses permitted on the Site.

(3)     The Refinery Site Restoration shall be undertaken by Refinery Operator.  Completion of the Refinery Site Restoration shall be certified by an independent environmental engineer or environmental professional.

(4)     For the avoidance of doubt, the Refinery Site Restoration shall not require Refinery Operator to remediate any environmental contamination for which it is not otherwise responsible under Applicable Law or this Agreement.

(5)     Refinery Operator and the Government hereby acknowledge that in the event Refinery Operator fails to perform its obligations under paragraph (B) of this Section 16.3, Terminal Operator shall be required to undertake those obligations, as provided in the Amended Terminal Operating Agreement.

(C)     **Transfer of Site.**   At the Government's option, either prior to or following the decommissioning activities set forth in Section 16.3(B) following a Termination, Refinery Operator shall transfer the Refinery Site (including, for the avoidance of doubt, such parts of the Refinery that remain on the Terminal Site, subject to Terminal Operator's rights

under the Shared Services Systems Agreement) to the ownership of the Government; provided, that Refinery Operator shall have all required access to the Refinery Site to complete its decommissioning obligations hereunder.

(D)     **Effect on Agreement.** If this Agreement is terminated in accordance with Section 16.3(A), then this Agreement shall be of no further force and effect, except that Articles 1, 9, 16, 17, and 19 shall survive termination of this Agreement indefinitely and the provisions of Article 11 shall continue to apply without exception to all parties covered thereby as set out in Section 11.1 until the date of termination following a Termination Event.

Section 16.4.   **Rights and Remedies Cumulative.**   Except as expressly provided in this Agreement, all rights and remedies of any Party against any other Party and any permitted assignee of such other Party provided in this Agreement shall be deemed cumulative and not in lieu of, or exclusive of, each other or of any other right or remedy available to any Party at law or in equity, and the exercise of any right or remedy, or the existence herein of other rights or remedies, shall not prevent the exercise of any other right or remedy.

## ARTICLE 17
## CONFIDENTIALITY

Section 17.1.   **Confidentiality.**

(A)     Each Party shall, from time to time, require or acquire Confidential Information.

(B)     The Government and Refinery Operator shall disclose the same to each other as required to advance their rights and obligations hereunder.

(C)     The receiving Party shall not, directly or indirectly, in any manner whatsoever, at any time whatsoever, disclose Confidential Information to any other party whatsoever, except that the receiving Party, may disclose Confidential Information to its advisors, as required by lenders, Affiliates, directors, officers, employees, agents, consultants or representatives; provided that the receiving Party, takes all reasonable steps to ensure that each of any such parties are bound by the terms and conditions of this Article 17, including the provision not to disclose any Confidential Information to any party whatsoever.

(D)     The obligations of each Party under Section 17.1(C) do not apply to the following information:

(1)     information provided to the Legislature of the U.S. Virgin Islands in connection with the submission of the Agreement to the Legislature for ratification;

(2)     information required to be disclosed or retained by each other by the laws of any applicable jurisdiction, including any law, order, subpoena or document discovery request or pursuant to a binding requirement of any regulatory or tax authority;

provided that prior written notice is given to the disclosing Party, to the extent permitted under any Applicable Law, as soon as possible in order to afford the disclosing Party, an opportunity to seek a protective order;

(3)    information which enters the public domain other than through any breach of the terms and conditions of this Agreement by the receiving Party;

(4)    information lawfully made available to the receiving Party by another party free to make such disclosure without breach of any legal obligation;

(5)    information already in the possession of the receiving Party at the time of its receipt of the same from the disclosing Party, except to the extent that it has been unlawfully appropriated; and

(6)    information developed by the receiving Party independent of Confidential Information received from the disclosing Party.

(E)    Any presentations, analyses or data of Refinery Operator created, shared or conveyed in connection with this Agreement shall be deemed to constitute trade secrets of Refinery Operator and shall remain confidential pursuant to Title 3, Chapter 33, Section 881(g)(3) of the U.S. Virgin Islands Code.

## ARTICLE 18
## FORCE MAJEURE

Section 18.1.    **Force Majeure Events**. For the purposes of this Agreement the term "*Force Majeure Event*" shall mean any cause that is reasonably unforeseeable as of the date of this Agreement and that is beyond the reasonable control, directly or indirectly, of the Party affected and with the exercise of due diligence, could not be prevented, avoided or removed by such Party, and does not result from such Party's negligence or fault and that wholly or partly delays or prevents such Party's performance of its obligations under this Agreement, including (to the extent meeting the foregoing requirements): war (whether declared or not) or other armed conflict terrorism; civil insurrection; declaration of martial law; piracy; nuclear accidents; widespread electrical outages; lightning strikes; earthquakes; fires; tornadoes; hurricanes; volcanic activity; accidents; strikes; lockouts or other labor actions (however, specifically excluding the labor force under the control of the Party experiencing such labor actions); actions or omissions of a Governmental Authority (including the actions of the Government in its capacity as a Governmental Authority or in the exercise of its Governmental Functions, or failure to issue an Authorization) that were not voluntarily induced or promoted by the affected Party, or brought about by the breach of its obligations under this Agreement or any Applicable Law. The Parties expressly agree and acknowledge that the list of Force Majeure Events in the foregoing sentence is intended as an inclusive list rather than an exhaustive list. Notwithstanding anything to the contrary, the term Force Majeure Event shall not be deemed to include (a) lack of funds or the availability of financing; (b) equipment failure, unless the claiming Party can point to an independent, identifiable Force Majeure Event that caused such

failure; (c) acts or omissions of subcontractors (of any tier) except to the extent such subcontractors if they were a party hereto, would be able to claim a Force Majeure Event for the same or (d) changes in law other than changes in the Applicable Laws of the Government of the U.S. Virgin Islands or changes in Applicable Laws with disproportionate effect on, or targeted at, investors in the U.S. Virgin Islands. Upon the occurrence of a Force Majeure Event the Party claiming or experiencing such event shall promptly notify the other Parties and shall comply with the remaining provisions of this Article 18.

Section 18.2. **Burden of Proof**. In the event that the Parties are unable in good faith to agree that a Force Majeure Event has occurred or whether a Party's performance is excused, such dispute shall be resolved in accordance with the arbitration dispute resolution procedures set forth in Section 19.4 and, in any proceeding to resolve the dispute, the burden of proof as to whether a Force Majeure Event has occurred and whether performance is excused shall be upon the Party claiming a Force Majeure Event.

Section 18.3. **Excused Performance**. If a Party is rendered wholly or partially unable to perform its obligations under this Agreement because of a Force Majeure Event, that Party shall be excused from whatever performance is affected by the Force Majeure Event to the extent so affected, subject to and conditioned upon the following:

(A)     the non-performing Party, by exercise of due foresight could not reasonably have been expected to avoid, or by the exercise of due diligence could not have been able to overcome, such Force Majeure Event;

(B)     the non-performing Party gives the other Party Notice describing the nature, scope and expected duration of the Force Majeure Event, and the steps the affected Party expects to take to both mitigate the Force Majeure Event itself and the effect of such Force Majeure Event on its obligations under this Agreement.   Such Notice shall be given promptly after the occurrence of the Force Majeure Event, and in no event more than seven days after the original notification of the Force Majeure Event given pursuant to Section 18.1;

(C)     the suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure Event;

(D)     the non-performing Party shall exercise all reasonable efforts to mitigate or limit damages to itself and to the other Party;

(E)     the non-performing Party shall exercise all reasonable efforts to continue to perform its obligations hereunder and to correct or cure the event or condition excusing performance; and

(F)     when the non-performing Party is able to resume performance of its obligations under this Agreement, that Party shall give the other Party written Notice to that effect and shall promptly resume performance hereunder.

Section 18.4.    **Applicability**. For the avoidance of doubt and not as a limitation on the foregoing terms and conditions of this Article 18, (i) during the occurrence of a Force Majeure Event, neither Party shall be excused from any performance or payment obligation hereunder to the extent such obligation is not affected by such occurrence and is otherwise due in accordance with the terms and conditions hereof, and (ii) except as provided in clause (i), the terms and conditions of this Article 18 shall limit or condition all provisions of this Agreement whether or not so expressly stated in this Agreement.

## ARTICLE 19
## MISCELLANEOUS

Section 19.1.   **Notices, Requests and Communications**. Wherever provision is made for the giving or issuance of any notice, instruction, consent, approval, certificate or determination by any Person (each, a *"Notice"*), unless otherwise specified, such communication shall be in writing and shall not be unreasonably withheld or delayed. All Notices shall be given to a signatory at the physical address or facsimile number specified below or as such signatory hereto shall at any time otherwise specify by like notice to the other signatories hereto. Each such Notice shall be effective (a) if given by facsimile, at the time such appropriate confirmation of receipt is received by the sender (or, if such time is not during regular business hours of a Business Day, at the beginning of the next such Business Day), and (b) if given by mail or courier, upon receipt or refusal of service at the address specified for each signatory below. Notices shall be addressed as follows:

For the Government:

The Government of the U.S. Virgin Islands
Government House
Charlotte Amalie
St. Thomas, U.S. Virgin Islands
Attention: Office of the Governor

With a copy to:

Office of the Attorney General
U.S. Virgin Islands Department of Justice
34-38 Kronprindsens Gade
GERS Building, 2nd Floor
St. Thomas, U.S. Virgin Islands 00802

For Refinery Operator:

Limetree Bay Refining, LLC
1 Estate Hope
Christiansted, St. Croix
U.S. Virgin Islands 00820-5652

64

Attention:
Fax:
Email:

With a copy to:

ArcLight Capital Partners, LLC
200 Clarendon St., 55th Floor
Boston, Massachusetts 02117
Attention:
Fax:
Email:

Latham & Watkins LLP
885 Third Avenue
New York, New York 20022
Attention:

Fax:
Email:

And a copy to:

Nichols, Newman, Logan, Grey & Lockwood, P.C.
1131 King Street, Christiansted, St. Croix
U.S. Virgin Islands 00820-4971
Attention:

Fax:
Email:

Section 19.2.   **Assignment.**

(A)   This Agreement shall not be assignable except by Refinery Operator in whole or in part to (1) an Affiliate, or (2) an entity that acquires all or substantially all of Refinery Operator's business or assets, or (3) as provided in Section 19.2(B) below.  In the case of an assignment under subsection (2) of this Section 19.2(A), such assignment shall be subject to the consent of the Government, such consent not to be unreasonably withheld, conditioned, or delayed.

(B)   **Financing Liens.**

65

(1)     Refinery Operator, without approval of the Government, may, by security, charge or otherwise encumber its interest under this Agreement for the purposes of financing the development, construction, rehabilitation, expansion, or enhancement or operation of the Refinery.

(2)     Not less than ten (10) Days prior to making such encumbrance, Refinery Operator shall notify the Government in writing of the name, address, and telephone and facsimile numbers of each Lender(s) to which Refinery Operator's interest under this Agreement has been pledged or assigned. Such notice shall include the names of the account managers or other representatives of the Lender(s) to whom all written and telephonic communications may be addressed.

(3)     After giving the Government such initial notice, Refinery Operator shall promptly give the Government (i) notice of any change in the information provided in the initial notice or any revised notice, and (ii) copies of documents related to such encumbrance (including final, executed copies of documents related thereto).

(4)     If Refinery Operator encumbers its interest under this Agreement as permitted by this Section 19.2(B), then (i) the Parties, except as provided by the terms of this Agreement, shall not modify or cancel this Agreement without the prior written consent of the Lender(s), (ii) the Lender(s) or their designees shall have the right, but not the obligation, to perform any act required to be performed by Refinery Operator under this Agreement to prevent or cure any Payment Default by Refinery Operator and such act performed by the Lender(s) or their designees shall be as effective to prevent or cure a Payment Default as if done by Refinery Operator: provided that, if any such Lender or its designee elects to perform any act required to be performed by Refinery Operator under this Agreement to prevent or cure a Payment Default by Refinery Operator, the Government will not be deemed to have waived or relinquished its rights and remedies as provided in this Agreement, (iii) the Government shall upon written request by Refinery Operator or Lenders execute statements certifying that this Agreement is unmodified (or, modified and stating the nature of the modification), in full force and effect and the absence or existence (and the nature thereof) of the Payment Default hereunder by Refinery Operator known to the Government and documents of consent to such assignment to the encumbrance and any assignment to such Lender(s), in each case as reasonably requested by Refinery Operator and (iv) the Government shall, upon the receipt of a written request from Refinery Operator or any Lender, execute, or arrange for the delivery of, such certificates, opinions and other documents as may be reasonably necessary in order for Refinery Operator to consummate any financing or refinancing of the Refinery or any part thereof and will enter into reasonable agreements with such Lender (including subordination agreements, intercreditor agreements and any such instruments or documents as may be reasonably necessary to evidence and reaffirm the provisions of Section 9 hereof), which agreements will grant certain rights to the Lender(s) as more fully developed and described in such documents, including, without limitation, that (a) this Agreement shall not be terminated (except for termination pursuant to the terms of this Agreement) without the consent of Lender, which consent is not to be unreasonably withheld or delayed, (b) Lender(s) shall be given

66

notice of any breach or default of this Agreement by Refinery Operator, (c) if a Lender forecloses, takes a deed in lieu of foreclosure or otherwise exercise its remedies pursuant to any security documents, that the Government shall, at such Lender's request, continue to perform all of its obligations hereunder, and Lender or its nominee may perform in the place of Refinery Operator, and may assign this Agreement to another Person in place of Refinery Operator; *provided* that, any party which succeeds Refinery Operator shall agree to perform Refinery Operator's obligations hereunder, including making payments to the Government consistent with those provided for hereunder, (d) in the event this Agreement is rejected or otherwise terminated as a result of any bankruptcy, insolvency, reorganization or similar proceeding affecting Refinery Operator, the Government will enter into a new agreement with the Lender or Lender's designee for the remainder of the term with substantially the same covenants, terms, provisions and limitations as are contained in this Agreement, (e) the Government shall accept performance in accordance with this Agreement by Lender or its designee, and (f) the Government shall make representations and warranties to Lender as Lender may reasonably request, but solely with regard to (1) the Government's existence, (2) the Government's authority to execute, deliver and perform this Agreement, (3) the binding nature of the document evidencing the Government's consent to assignment to Lender and this Agreement on the Government, (4) receipt of regulatory approvals by the Government with respect to its execution and performance under this Agreement and (5) such other representations and warranties as are customary in the context of a financing of projects similar to the development, construction, rehabilitation, expansion, or enhancement or operation of the Refinery.

Section 19.3. **Governing Law.** This Agreement and the rights and duties of the Parties arising out of this Agreement shall be governed by, and construed in accordance with, the applicable laws of the U.S. Virgin Islands without reference to the conflict of laws rules thereof that would direct the application of the laws of another jurisdiction.

Section 19.4. **Dispute Resolution.** Any dispute between the Parties as to the interpretation or effect of this Agreement (which shall include for the purposes of this Agreement any subsequent modification thereof unless otherwise expressly provided by such modification) and any controversy between them or claim by either of them, whether sounding in tort or contract, arising out of or relating to this Agreement or the conduct of the Parties, their agents and/or representatives, (collectively, a "*Dispute*") shall during the Term and within one year thereafter, notwithstanding the Government's status as such and in the same manner as similar actions, suits or proceedings to which the Government is not a Party, be the subject of the following dispute resolution procedures:

(A)    Following written notice by one Party to another of a Dispute, the Parties shall attempt to settle such Dispute in the first instance by mutual discussions between their respective designated representatives. Failing such resolution, the senior representative of the Government and the chief executive officer (or a Person holding a similar position) of Refinery Operator (or their duly appointed representatives) shall meet to resolve such Dispute. The joint decision of such individuals shall be binding upon the Parties hereto. If a settlement

of any such Dispute or difference is not reached pursuant to this <u>Section 19.4(A)</u> within sixty (60) days after such notice of Dispute is delivered, then the provisions of <u>Sections 19.4(B)</u> and <u>19.4(C)</u> below shall apply.

(B)    If the settlement of any Dispute is not reached pursuant to <u>Section 19.4(A)</u>, then an action, suit or proceeding may be brought by a Party in the United States District Court of the Virgin Islands. Each of the Parties hereby irrevocably waives and shall cause its Affiliates to waive all right to a trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or the transactions contemplated hereby.

(C)    If the United States District Court of the Virgin Islands or the Third Circuit Court of the United States refuses for any reason to adjudicate such Dispute, the Parties agree that the matter shall be referred to an arbitration proceeding brought by a Party either in accord with the Rules of the American Arbitration Association or as otherwise agreed by the Parties. The arbitration will be conducted before three (3) arbitrators: one selected by the Government, another by Refinery Operator, and the third by the two selected arbitrators. The arbitrators shall determine the venue for the arbitration. Judgment upon any award rendered by the arbitrator(s) in any such proceeding may be entered in any court having jurisdiction.

Section 19.5.   <u>**Commercial Act**</u>. Each Party unconditionally and irrevocably:

(A)    agrees that the execution, delivery and performance by it of this Agreement and all other agreements, contracts, documents and writings relating hereto constitute private and commercial acts and not public or governmental acts;

(B)    agrees that should any proceedings be brought against it or its assets, other than the assets protected by the diplomatic and consular privileges under any law ("*Exempted Assets*") in any jurisdiction, in relation to this Agreement or any transaction contemplated hereby, no immunity, sovereign or otherwise, from such proceedings, execution, attachment or other legal process shall be claimed by or on behalf of itself or with respect to any of its assets (other than the Exempted Assets); and

(C)    subject to the Parties following the dispute resolution procedures set forth in <u>Section 19.4</u>, consents generally in respect of the enforcement of any judgment against it in any proceedings in any jurisdiction to the giving of any relief or the issue of any process in connection with such proceedings including the making, enforcement or execution against or in respect of any property irrespective of its use subject to <u>Section 19.5(B)</u>.

Section 19.6.   <u>**Limitation on Liability**</u>. No claim may be made by one Party against the other Party for any special, indirect, consequential, incidental or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or relating to this Agreement or the development, construction, rehabilitation, expansion, or enhancement or operation of the Refinery or any act, omission or event occurring in connection therewith and the Parties hereby waive, release and agree not to sue upon any claim for such damages.

Section 19.7. **Entire Agreement; Subsequent Amendments**. This Agreement constitutes the entire agreement of the Parties and the provisions herein shall supersede any and all prior agreements or understandings relating to the same subject matter. It is intended that no Party shall have or be deemed to have any obligation under this Agreement except as the same shall be explicitly stated herein. This Agreement may not be amended, modified, or altered except by an instrument in writing signed on behalf of each Party.

Section 19.8. **Severability of Provisions**. If any clause, sentence, section, or part of this Agreement or the application thereof to anyone in any circumstances, is declared invalid, the application thereof to others, or in other circumstances, and the remainder of this Agreement, shall not be affected thereby. In the event of any such holding and to the extent of any such invalidity, the Government undertakes, insofar as it may lawfully do so, to take such alternative steps (including the consent to or enactment of legislation and the consent to or promulgation of rules and regulations) as may reasonably and in good faith be required to confer upon the Parties benefits comparable in character and substantially equivalent in amount to those intended to be conferred by this Agreement, on terms and conditions not materially more burdensome to either party than those herein provided and without prejudice to any other remedies that may be available to either of them.

Section 19.9. **Payment Terms and Interest Calculation**. Except as otherwise expressly provided in this Agreement, payment terms and interest calculations shall be as follows:

(A)     All payments will be made in US$ by wire transfer of immediately available funds to an account or accounts designated in writing by the Party entitled to receive payment.

(B)     Late payments shall bear interest at the U.S. Prime Rate, compounded quarterly until paid in full.

(C)     A wire transfer or delivery of a check shall not operate to discharge any payment under this Agreement and shall be accepted subject to collection.

Section 19.10. **Public Announcements**. No Party shall, except as required by Applicable Law or the rules of any recognized national stock exchange, cause any public announcement to be made regarding this Agreement. In the event that a Party shall be required to cause such a public announcement to be made pursuant to any Applicable Law or the rules of any recognized national stock exchange, it shall use commercially reasonable efforts to provide the other Party at least two Business Days prior written notice of such announcement.

Section 19.11. **Parties in Interest**. Unless specified in this Agreement, the terms and provisions of this Agreement shall be binding upon and inure to the benefit of each Party and its respective legal representatives, successors and assigns. No other Person shall have any right, benefit, priority or interest hereunder or as a result hereof or have standing to require satisfaction of the provisions hereof in accordance with its terms.

69

Section 19.12. **Waiver.** By an instrument in writing, any Party may waive compliance by any other Party with respect to any term or provision of this Agreement that such other Party was or is obligated to comply with or perform or any breach hereof. The failure of a Party at any time to strictly enforce any provision of this Agreement shall in no way affect its right thereafter to require performance thereof, nor shall the waiver of any breach of any provision of this Agreement be taken or held to be a waiver of any succeeding breach of any such provision or as a waiver of the provision itself. Unless otherwise specified herein, the rights and remedies provided in this Agreement are cumulative and the exercise of any one right or remedy by any Party shall not preclude or waive its right to exercise any or all other rights or remedies.

Section 19.13. **Performance Extended to Next Business Day.** Notwithstanding any deadline for payment, performance, notice, or election under this Agreement, if such deadline falls on a date that is not a Business Day, then the deadline for such payment, performance, notice, or election will be extended to the next succeeding Business Day.

Section 19.14. **Negotiation and Preparation Costs.** Except as provided in Article 3, each Party shall bear the costs and expenses incurred by it in connection with the negotiation, preparation, and execution of this Agreement and other documents referred to herein.

Section 19.15. **Further Assurances.** From time to time, each Party agrees to promptly execute and deliver such additional documents, and will provide such additional information and assistance, as any Party may reasonably require to effect the terms of this Agreement.

Section 19.16. **Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute a single agreement to which no signatory hereto shall be bound until all signatories hereto have executed a counterpart. Signatures transmitted by facsimile or as emailed PDF copies shall be binding as originals so long as the Agreement is transmitted in its entirety, and each signatory hereto hereby waives any defenses to the enforcement of the terms of this Agreement sent by facsimile or emailed PDF based upon the manner of transmission or form of signature (electronic, facsimile or "ink original").

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**GOVERNMENT OF THE U.S. VIRGIN ISLANDS**

By: _____

Name: Kenneth E. Mapp

Title:     Governor of the U.S. Virgin Islands

ATTESTED:

By: _____

Name: Osbert E. Potter

Title:     Lieutenant Governor of the U.S. Virgin Islands

Approved for Legal Sufficiency

By: _____

Name: Claude Walker

Title:     Attorney General of the U.S. Virgin Islands

LIMETREE BAY REFINING, LLC

Witnesses:

By:
Name: John F. Erhard
Title: manager

2

## EXHIBIT C

**Letter of Credit**

# Citibank, N.A.

DATE : JAN. 11, 2016

IRREVOCABLE STANDBY LETTER OF CREDIT NO ▆▆6183

ISSUING BANK:
CITIBANK, N.A.
C/O ITS SERVICER CITICORP NORTH AMERICA, INC.
3800 CITIBANK CENTER, BUILDING B, 3RD FLOOR
TAMPA, FL 33610
PHONE: 1-866-945-6284
ATTN: U.S. STANDBY DEPT.

BENEFICIARY:
VIRGIN ISLANDS PUBLIC FINANCE AUTHORITY,
ON BEHALF OF THE GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS
5033 KONGENS GADE, GOVERNMENT HILL
ST. THOMAS, U.S. VIRGIN ISLANDS 00802
ATTENTION: ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

APPLICANT:
ARCLIGHT ENERGY PARTNERS FUND VI, L.P ON BEHALF OF
LIMETREE BAY TERMINALS, LLC
(AN AFFILIATE OF ARCLIGHT ENERGY PARTNERS FUND VI, L.P)
200 CLARENDON STREET, 55TH FLOOR,
BOSTON, MA 02117

AMOUNT: USD 50,000,000.00 ( FIFTY MILLION AND 00/100 U.S. DOLLARS)

EXPIRY DATE: JANUARY 11, 2017

LADIES AND GENTLEMEN:

AT THE REQUEST OF ARCLIGHT ENERGY PARTNERS FUND VI, L.P., ON BEHALF OF
LIMETREE BAY TERMINALS, LLC, AN AFFILIATE OF ARCLIGHT ENERGY PARTNERS FUND
VI, L.P., WE, CITIBANK, N.A., C/O CITICORP NORTH AMERICA, INC., 3800
CITIBANK CENTER, BUILDING B, 3RD FLOOR, TAMPA, FLORIDA 33610, ATTN: US
STANDBY UNIT, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (THE "BANK"), HEREBY
ESTABLISH THIS IRREVOCABLE STANDBY LETTER OF CREDIT NO. ▆▆6183 (THIS
"LETTER OF CREDIT") IN YOUR FAVOR, ON BEHALF OF THE GOVERNMENT OF THE
UNITED STATES VIRGIN ISLANDS, FOR THE ACCOUNT OF LIMETREE BAY TERMINALS,
LLC, C/O NICHOLS, NEWMAN, LOGAN, GREY & LOCKWOOD, P.C., 1131 KING STREET,
CHRISTIANSTED, ST. CROIX, U.S. VIRGIN ISLANDS, 00820-4971, IN THE INITIAL
STATED AMOUNT OF FIFTY MILLION DOLLARS ($50,000,000.00) (THE "STATED
AMOUNT").

AS USED IN THIS LETTER OF CREDIT, "DOLLARS" AND "$" MEAN THE LAWFUL
CURRENCY OF THE UNITED STATES OF AMERICA.

THIS LETTER OF CREDIT IS VALID AND EFFECTIVE IMMEDIATELY AND, ON AND AFTER
THE DATE HEREOF, DRAWINGS MAY BE MADE BY YOU FROM TIME TO TIME BY
PRESENTATION OF YOUR SIGNED CERTIFICATE IN THE FORM OF EXHIBIT A ATTACHED
HERETO (THE "DRAFT CERTIFICATE").

## Citibank,N.A.

IN ADDITION, PRESENTATION OF SUCH DRAFT CERTIFICATE MAY ALSO BE MADE BY FAX TRANSMISSION TO ████████), OR SUCH OTHER FAX NUMBER IDENTIFIED BY CITIBANK, N.A. IN A WRITTEN NOTICE TO YOU. TO THE EXTENT A PRESENTATION IS MADE BY FAX TRANSMISSION, YOU MUST (I) PROVIDE TELEPHONE NOTIFICATION THEREOF TO CITIBANK, N.A. ████████ PRIOR TO OR SIMULTANEOUSLY WITH THE SENDING OF SUCH FAX TRANSMISSION AND (II) SEND THE ORIGINAL OF SUCH DRAFT CERTIFICATE BY OVERNIGHT COURIER TO OUR SERVICER, CITICORP NORTH AMERICA, INC., 3800 CITIBANK CENTER, BUILDING B 3RD FLOOR, TAMPA, FL 33610; PROVIDED, HOWEVER, THAT CITIBANK, N.A.'S RECEIPT OF SUCH TELEPHONE NOTICE OR ORIGINAL DOCUMENTS SHALL NOT BE A CONDITION TO PAYMENT OF THE STATED AMOUNT.

ITEMS DELIVERED BY FACSIMILE TRANSMISSION SHALL BE DEEMED TO BE THE EQUIVALENT OF ORIGINALS OF SUCH ITEMS FOR ALL PURPOSES OF THIS LETTER OF CREDIT. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, A FACSIMILE OF THIS LETTER OF CREDIT SHALL SERVE AS THE OPERATIVE INSTRUMENT UNTIL RECEIPT BY THE BENEFICIARY OF THE ORIGINAL DOCUMENT.

WE HEREBY AGREE TO HONOR EACH DRAWING HEREUNDER MADE IN COMPLIANCE WITH THIS LETTER OF CREDIT. IN THE CASE OF A DRAW MEETING THE REQUIREMENTS OF THE PRECEDING SENTENCE, SUCH DRAW SHALL BE HONORED BY WIRE TRANSFER IN IMMEDIATELY AVAILABLE FUNDS IN THE AMOUNT SPECIFIED IN THE DRAFT CERTIFICATE DELIVERED TO THE BANK IN CONNECTION WITH SUCH DRAWING TO YOUR ACCOUNT NUMBER AS SPECIFIED IN THE SIGNED DRAFT CERTIFICATE. IF SUCH DRAWINGS ARE PRESENTED BY YOU ON A BUSINESS DAY AT OR BEFORE 10:00 AM (OUR LOCAL TIME IN TAMPA, FLORIDA), SUCH PAYMENT WILL BE MADE NOT LATER THAN THE CLOSE OF BUSINESS ON SUCH DATE. DRAWINGS PRESENTED AFTER 10:00 AM WILL BE PAID ON THE NEXT BUSINESS DAY.

THIS LETTER OF CREDIT IS EFFECTIVE IMMEDIATELY AND WILL EXPIRE ON JANUARY 11, 2017 (THE "LOC
EXPIRATION DATE").

THE LOC EXPIRATION DATE WILL BE AUTOMATICALLY EXTENDED WITHOUT AMENDMENT FOR A PERIOD OF ONE (1) YEAR FROM THE INITIAL LOC EXPIRATION DATE, OR ANY FUTURE LOC EXPIRATION DATE, FOR UP TO AN AGGREGATE MAXIMUM OF SEVEN (7) CONSECUTIVE YEARS FROM THE INITIAL ISSUANCE OF THIS LETTER OF CREDIT BUT NOT BEYOND JANUARY 11, 2023, UNLESS NO LATER THAN FORTY-FIVE (45) DAYS PRIOR TO THE THEN-CURRENT LOC EXPIRATION DATE, WE SEND NOTICE TO YOU BY OVERNIGHT COURIER AT YOUR ADDRESS SHOWN ABOVE, THAT WE ELECT NOT TO EXTEND THE LOC EXPIRATION DATE FOR ANY SUCH ADDITIONAL PERIOD.

SUBJECT TO THE PROVISIONS HEREIN, WE HEREBY AUTHORIZE YOU TO MAKE DRAWINGS HEREUNDER IN AN AGGREGATE AMOUNT NOT IN EXCESS OF THE STATED AMOUNT FROM THE DATE HEREOF THROUGH OUR CLOSE OF BUSINESS ON THE LOC EXPIRATION DATE. UPON PAYMENT OF DRAWINGS ON THE STATED AMOUNT IN AN AGGREGATE AMOUNT EQUAL TO THE STATED AMOUNT OF THIS LETTER OF CREDIT, WE SHALL BE FULLY DISCHARGED OF OUR OBLIGATION UNDER THIS LETTER OF CREDIT AND WE SHALL NOT THEREAFTER BE OBLIGATED TO MAKE ANY FURTHER PAYMENTS UNDER THIS LETTER OF CREDIT

COMMUNICATIONS WITH RESPECT TO THIS LETTER OF CREDIT, INCLUDING, WITHOUT LIMITATION, THE DELIVERY OF THE DRAFT CERTIFICATE, SHALL BE IN WRITING AND SHALL BE ADDRESSED TO YOU AT THE ADDRESS SET FORTH ABOVE AND TO US AT

## Citibank, N.A.

CITIBANK, N.A., C/O CITICORP NORTH AMERICA, INC., AT THE ADDRESS SET FORTH
ABOVE, AND PRESENTED TO US BY DELIVERY IN PERSON OR FACSIMILE TRANSMISSION
AT SUCH ADDRESS, PROVIDED IN THIS LETTER OF CREDIT.

AS USED HEREIN A "BUSINESS DAY" SHALL MEAN ANY DAY OTHER THAN A SATURDAY,
SUNDAY OR A DAY ON WHICH BANKS ARE REQUIRED OR AUTHORIZED TO CLOSE IN THE
STATE OF NEW YORK.

THIS LETTER OF CREDIT IS NOT TRANSFERABLE.

PARTIAL DRAWINGS ARE PERMITTED.

THIS LETTER OF CREDIT, EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, IS
SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES, INTERNATIONAL CHAMBER OF
COMMERCE PUBLICATION NO. 590 ("ISP98") AND AS TO MATTERS NOT ADDRESSED BY
ISP98, THE LAWS OF THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION,
THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN THE STATE OF NEW YORK, WILL
CONTROL.

THIS LETTER OF CREDIT SETS FORTH IN FULL OUR UNDERTAKING, AND SUCH
UNDERTAKING SHALL NOT IN ANY WAY BE MODIFIED, AMENDED, AMPLIFIED OR
LIMITED BY REFERENCE TO ANY DOCUMENT, INSTRUMENT OR AGREEMENT REFERRED
HEREIN, EXCEPT FOR EXHIBIT A HERETO AND ANY SUCH REFERENCE SHALL NOT BE
DEEMED TO INCORPORATE HEREIN BY REFERENCE ANY DOCUMENT, INSTRUMENT OR
AGREEMENT EXCEPT AS SET FORTH ABOVE.

ALL PARTIES TO THIS LETTER OF CREDIT ARE ADVISED THAT THE U.S. GOVERNMENT
HAS IN PLACE CERTAIN SANCTIONS AGAINST CERTAIN COUNTRIES, INDIVIDUALS,
ENTITIES, AND VESSELS. CITIGROUP ENTITIES, INCLUDING BRANCHES AND, IN
CERTAIN CIRCUMSTANCES, SUBSIDIARIES, ARE/WILL BE PROHIBITED FROM ENGAGING
IN TRANSACTIONS OR OTHER ACTIVITIES WITHIN THE SCOPE OF APPLICABLE
SANCTIONS.

AUTHORIZED SIGNATURE(S).
CITIBANK, N.A.

## **EXHIBIT D**

**Certificate**

# Citibank,N.A.

DATE : JAN. 11, 2016

OUR REF. NO. ▮▮6183

EXHIBIT A

[BENEFICIARY LETTERHEAD]

DRAWN UNDER CITIBANK, N.A.
LETTER OF CREDIT NO ▮▮6183

DATE:. . . . . . . . . . . . ., 20. .

CITIBANK, N.A.
C/O CITICORP NORTH AMERICA, INC.
3800 CITIBANK CENTER
BUILDING B, 3RD FLOOR
TAMPA, FLORIDA 33610
ATTN: US STANDBY UNIT

THE UNDERSIGNED, DULY AUTHORIZED REPRESENTATIVE OF THE VIRGIN ISLANDS
PUBLIC FINANCE AUTHORITY, ON BEHALF OF THE GOVERNMENT OF THE UNITED STATES
VIRGIN ISLANDS (THE "BENEFICIARY") HEREBY CERTIFIES TO CITIBANK, N.A. (THE
"ISSUING BANK"), WITH REFERENCE TO THE IRREVOCABLE LETTER OF CREDIT NO.
▮▮6183 (THE "LETTER OF CREDIT") ISSUED BY THE ISSUING BANK IN FAVOR OF
THE BENEFICIARY (ANY CAPITALIZED TERM USED HEREIN AND NOT DEFINED SHALL
HAVE ITS RESPECTIVE MEANING AS SET FORTH IN THE LETTER OF CREDIT) THAT:

USE THE FOLLOWING FOR DRAWINGS:

1. THE BENEFICIARY IS MAKING A DRAWING UNDER THE LETTER OF CREDIT IN THE
AMOUNT OF [. . . . . . . . . . .] DOLLARS (US$ . . . . . . . . . . .
. . .) (THE "DRAWING AMOUNT")

2. THE DRAWING AMOUNT HEREUNDER DOES NOT EXCEED THE STATED AMOUNT, REDUCED
BY ALL PAYMENTS OF ANY PREVIOUS DRAWINGS OR REDUCTIONS TO THE STATED
AMOUNT UNDER THE LETTER OF CREDIT.

3. LIMETREE BAY TERMINALS, LLC IS IN DEFAULT, UNDER THAT CERTAIN OPERATING
AGREEMENT, DATED AS OF DECEMBER 1, 2015 (THE "AGREEMENT"), BETWEEN
APPLICANT AND BENEFICIARY BECAUSE OF [SELECT APPROPRIATE OPTION]: [A
PAYMENT DEFAULT (AS DEFINED IN THE AGREEMENT)] /OR/ [FAILURE TO PERFORM
THE SITE RESTORATION (AS DEFINED IN THE AGREEMENT)] /OR/ [FAILURE TO
PROVIDE FINANCIAL ASSURANCE (AS DEFINED IN THE AGREEMENT), PRIOR TO THE
LOC EXPIRATION DATE].

4. BENEFICIARY IS ENTITLED IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF
THE AGREEMENT TO DRAW THE AMOUNT REQUESTED HEREUNDER; THE AMOUNT OF THIS
DRAWING REMAINS DUE AND OWING UNDER SUCH AGREEMENT, AND ANY APPLICABLE
NOTICE PERIODS AND GRACE PERIODS PERTAINING TO SUCH PAYMENT UNDER THE
AGREEMENT HAVE EXPIRED.

5. IF THE DRAWING IS BECAUSE OF FAILURE TO PROVIDE FINANCIAL ASSURANCE,

PAGE 1 OF 2

## Citibank,N.A.

THIS DRAWING IS FOR THE FULL STATED AMOUNT (REDUCED BY ALL PAYMENTS OF ANY PREVIOUS DRAWINGS OR REDUCTIONS TO THE STATED AMOUNT UNDER THE LETTER OF CREDIT) AND IS MADE NOT MORE THAN FIFTEEN (15) DAYS PRIOR TO THE LOC EXPIRATION DATE.

6.YOU ARE HEREBY DIRECTED TO MAKE PAYMENT OF THE REQUESTED DRAWING AMOUNT TO [NAME OF BANK]. AT [. . . . . . . . . . . .,] ABA NO. [. . . . . . . . . . . ..] FOR FURTHER CREDIT TO ACCOUNT NO. [. . . . . . . . . . . .,] RE: [. . . . . . . . . . . .,] ATTENTION: [. . . . . . . . . . . .,].]

IN WITNESS WHEREOF, THE BENEFICIARY HAS EXECUTED AND DELIVERED THIS CERTIFICATE AS OF THE . . . DAY OF . . . . . . . . . . . ., 20. . .

VIRGIN ISLANDS PUBLIC FINANCE AUTHORITY, ON BEHALF OF THE GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS

BY: . . . . . . . . . . . . .,
NAME: . . . . . . . . . . . . .,
TITLE: . . . . . . . . . . . . ..

AUTHORIZED SIGNATURE(S).
CITIBANK,N.A.

PAGE 2 OF 2

**EXHIBIT E-1**

**June Certificate**

[USVI Letterhead]

Drawn Under Citibank, N.A.
Letter of Credit No. 69606183

Date: _____, 2022

Citibank N.A.
c/o Citicorp North America, Inc.
3800 Citibank Center
Building B, 3rd Floor
Tampa, Florida 33610
Attn: US Standby Unit

The undersigned, a duly authorized representative of the Virgin Islands Public Finance Authority, on behalf of the Government of the United States Virgin Islands (the "Beneficiary") hereby certifies to Citibank N.A. (the "Issuing Bank"), with respect to the irrevocable letter of credit No. 69606183 (the "Letter of Credit") issued by the Issuing Bank in favor of the Beneficiary that:

     1.     The Beneficiary is making a drawing under the Letter of Credit in the amount of TWO MILLION FOUR HUNDRED NINETY-THREE THOUSAND ONE HUNDRED FIFTY-ONE DOLLARS (US$2,493,151) (the "Drawing Amount").

     2.     The Drawing Amount hereunder does not exceed the stated amount, reduced by all payments of any previous drawings or reductions to the stated amount under the Letter of Credit.

     3.     The United States Bankruptcy Court for the Southern District of Texas has granted relief from the automatic stay to permit Beneficiary to submit this request to draw on the Letter of Credit pursuant to the *Order (I) Granting Relief from the Automatic Stay and (II) Approving the Agreed Motion for Order Approving Assumption and Assignment of Certain Executory Contract* (the "Order") executed in the bankruptcy case of *In re Limetree Bay Services, LLC* (Case No. 21-32351). A copy of the order is attached hereto as **Exhibit A**.

     4.     Limetree Bay Refinery, LLC (the "Applicant") is in default under that certain operating agreement dated July 2, 2018 (the "Agreement"), between the Applicant and the Beneficiary because of a Payment Default (as defined in the Agreement).

     5.     Beneficiary is entitled in accordance with the terms and conditions of the Order and the Agreement to draw the amount requested hereunder; the amount of this drawing remains due and owing under such Agreement, and any applicable notice periods and grace periods pertaining to such payment under the Agreement have expired.

     6.     You are hereby directed to make payment of the requested Drawing Amount to US Virgin Islands Department of Finance…

IN WITNESS WHEREOF, the Beneficiary has executed and delivered this certificate as of the ___ day of _____, 2022.

VIRGIN ISLANDS PUBLIC FINANCE AUTHORITY,
ON BEHALF OF THE GOVERNMENT OF THE
UNITED STATES VIRGIN ISLANDS

By:      _____
Name:   _____
Title:    _____

## **EXHIBIT E-2**

### **September and December Certificate**

[USVI Letterhead]

Drawn Under Citibank, N.A.
Letter of Credit No. 69606183

Date: _____, 2022

Citibank N.A.
c/o Citicorp North America, Inc.
3800 Citibank Center
Building B, 3rd Floor
Tampa, Florida 33610
Attn: US Standby Unit

The undersigned, a duly authorized representative of the Virgin Islands Public Finance Authority, on behalf of the Government of the United States Virgin Islands (the "Beneficiary") hereby certifies to Citibank N.A. (the "Issuing Bank"), with respect to the irrevocable letter of credit No. 69606183 (the "Letter of Credit") issued by the Issuing Bank in favor of the Beneficiary that:

     1.     The Beneficiary is making a drawing under the Letter of Credit in the amount of FIVE MILLION FORTY-ONE THOUSAND NINETY-SIX DOLLARS (US$5,041,096) (the "Drawing Amount").

     2.     The Drawing Amount hereunder does not exceed the stated amount, reduced by all payments of any previous drawings or reductions to the stated amount under the Letter of Credit.

     3.     The United States Bankruptcy Court for the Southern District of Texas has granted relief from the automatic stay to permit Beneficiary to submit this request to draw on the Letter of Credit pursuant to the *Order (I) Granting Relief from the Automatic Stay and (II) Approving the Agreed Motion for Order Approving Assumption and Assignment of Certain Executory Contract* (the "Order") executed in the bankruptcy case of *In re Limetree Bay Services, LLC* (Case No. 21-32351). A copy of the order is attached hereto as **Exhibit A**.

     4.     Limetree Bay Refinery, LLC (the "Applicant") is in default under that certain operating agreement dated July 2, 2018 (the "Agreement"), between the Applicant and the Beneficiary because of a Payment Default (as defined in the Agreement).

     5.     Beneficiary is entitled in accordance with the terms and conditions of the Order and the Agreement to draw the amount requested hereunder; the amount of this drawing remains due and owing under such Agreement, and any applicable notice periods and grace periods pertaining to such payment under the Agreement have expired.

     6.     You are hereby directed to make payment of the requested Drawing Amount to US Virgin Islands Department of Finance…

IN WITNESS WHEREOF, the Beneficiary has executed and delivered this certificate as of the ___
day of _____, 2022.
VIRGIN ISLANDS PUBLIC FINANCE AUTHORITY,
ON BEHALF OF THE GOVERNMENT OF THE
UNITED STATES VIRGIN ISLANDS


By:      _____
Name:  _____
Title:    _____

**<u>EXHIBIT F</u>**

**Assignment and Assumption Agreement**

# ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Agreement"), effective as of the Effective Date (as defined below), is entered into by and among Limetree Bay Refining, LLC, a United States Virgin Islands limited liability company ("LBR" and the "Seller"), on the one hand, and Port Hamilton Refining and Transportation, LLLP ("PHRT"), a Virgin Islands limited liability limited partnership ("Purchaser" and together with Sellers, each a "Party" and collectively, the "Parties"), on the other hand.

**WHEREAS**, Seller and Purchaser have entered into that certain Asset Purchase Agreement, dated as of December 2021 (the "Purchase Agreement"), pursuant to which, among other things, the Seller has agreed to assign all of its right, title and interest in, and Purchaser has agreed to assume the Seller's duties and obligations under that certain Refinery Operating Agreement entered into as of July 2, 2018 (the "USVI Operating Agreement") between LBR and the Government of the U.S. Virgin Islands (the "USVI").

**WHEREAS**, on December 21, 2021, the Bankruptcy Court (as defined in the Purchase Agreement) entered an order approving the Purchase Agreement and the transaction(s) envisioned therein, including, without limitation, the assignment and assumption of Seller's rights, titles and interests as provided herein.

**WHEREAS**, on May [__], 2022, the Sellers filed their *Motion for Agreed order (I) Granting Relief from the Automatic Stay and (II) Approving Assumption and Assignment of Certain Executory Contract* [Docket No. __] (the "Assumption and Assignment Motion") and the Bankruptcy Court entered its *Order (I) Granting Relief from the Automatic Stay and (II) Approving Assumption and Assignment of Certain Executory Contract* on [__], 2022 [Docket No. __] (the "Assumption and Assignment Order").

**NOW, THEREFORE**, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Definitions.  All capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the Purchase Agreement or, if not defined therein, the Assumption and Assignment Order.

2.      Assignment and Assumption.  Subject to the terms, conditions and limitations of the Purchase Agreement, the Assumption and Assignment Order, and applicable law, each Seller hereby sells, conveys, assigns, transfers, and delivers to Purchasers all of such Seller's right, title and interest in and to the USVI Operating Agreement, and Purchaser hereby accepts such assignment and assumes all of the Seller's duties and obligations under the USVI Operating Agreement, and agrees to pay, perform and discharge, as and when due, all of the obligations of Sellers under the USVI Operating Agreement accruing on and after the upon which the Debtors effectively assume the USVI Operating Agreement under the Assumption and Assignment Order (such date, the "Effective Date").

3.      Cure Process.[3]  The Cure Amount will be paid from draws on the Letter of Credit, pursuant to the Assumption and Assignment Order. The assignment contemplated under this Agreement is subject to the satisfaction of the Cure Amount, per the Assumption and Assignment Order.  In no event shall the Debtors, their bankruptcy estates, or any liquidating trust established by the Debtors (the "**Liquidating Trust**") be obligated to pay any "cure" payments associated with the assumption or assignment of the USVI Operating Agreement.

4.      Terms of the Purchase Agreement.  The provisions of this Agreement are subject, in all respects, to the terms, conditions and limitations of applicable law, the Purchase Agreement, including, without limitation, all of the covenants, representations and warranties contained therein, all of which shall survive the execution and delivery of this Agreement to the extent indicated in the Purchase Agreement, Bankruptcy Court approval of the Purchase Agreement and transaction(s) envisioned therein and hereunder, the Assumption and Assignment Order, and, to the extent applicable, Section 365 of the Bankruptcy Code. Nothing contained in this Agreement shall be deemed to modify, amend or supersede any of the terms or conditions of the Purchase Agreement or the Assumption and Assignment Order. In the event of any conflict or inconsistency between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement, Assumption and Assignment Order, or Sale Order (as defined in the Purchase Agreement), as applicable, shall prevail. This Agreement shall be binding upon the Parties and their respective successors and assigns and shall inure to the benefit of the Parties and their respective successors and assigns, to the extent provided in the Purchase Agreement, the Assumption and Assignment Order or Sale Order.

5.      Governing Law.  This Agreement shall be governed by, and constructed in accordance with, the law of Texas applicable to contract executed in and to be performed in that State.

6.      Counterparts.  This Agreement may be executed and delivered (including by facsimile or other electronic transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

---

[3] Capitalized terms used in this section but not otherwise defined shall be given the meaning ascribed to them in the Assumption and Assignment Motion.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the first date written above.

**SELLER:**

**Limetree Bay Refining, LLC**

By: _____

Name: _____

Title: _____

**PURCHASER:**

**Port Hamilton Refining and Transportation, LLLP, a Virgin Islands limited liability limited partnership**

By: _____

Name: _____

Title: _____

00714501.DOCX 7

36